IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| MOHAMMED ISSE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06CV01422 (CKK) |
| | ) | |
| AMERICAN UNIVERSITY, <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
|  | ) | |

---

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c), defendants American University and Kevin Wyatt hereby respectfully move the Court to grant summary judgment on plaintiff's claims of religious discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended.  The grounds for the motion are set forth in the accompanying memorandum, which is incorporated herein by reference.

Respectfully submitted,


  /s/ Hisham Khalid_____
Hisham R.O. Khalid, Esq. (D.C. Bar # 445494)
Associate General Counsel
American University
4400 Massachusetts Avenue, N.W.
Washington, D.C. 20016-2724
Tel. (202) 885-3285
Fax (202) 885-3273

Attorney for Defendants
American University and Kevin Wyatt


Dated:  May 31, 2007

# TABLE OF AUTHORITIES

**Page**

**CASES:**

Ahmad v. Nassau Health Care Corp., 274 F. Supp. 2d 185 (E.D.N.Y. 2002), aff'd,
 71 Fed. Appx. 98 (2d Cir. 2003) ...........................................................................23

Akonji v. Unity Healthcare, Inc., 2007 WL 1207194 (D.D.C. April 24, 2007) ...........................13

Amos v. Tysons Foods, Inc., 153 Fed. Appx. 637 (11th Cir. 2005) .......................................19, 20

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ................................................................12

Brown v. Brody, 199 F.3d 446 (D.C. Cir. 1999) ..........................................................................12

Burke v. Gutierrez, 2006 WL 89936 (S.D.N.Y. Jan. 12, 2006) ...................................................28

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .............................................................................2

Cheek v. Western & Southern Life Ins. Co., 31 F.3d 497 (7th Cir. 1994) ...................................26

Chisholm v. United States Postal Serv., 665 F.2d 482 (4th Cir. 1981) .......................................29

Clark County Sch. Dist. v. Breeden, 532 U.S. 268 (2001) ...........................................................30

Doke v. PPG Indus., 118 Fed. Appx. 366 (10th Cir. 2004) .........................................................20

* Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130 (2d Cir. 2003) .............................................24

* Elmenayer v. ABF Freight Systems, 2001 WL 1152815 (E.D.N.Y. Sept. 20,
 2001), aff'd, 318 F.3d 130 (2d Cir. 2003) .....................................................................23, 25

* Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180 (D.C. Cir.
 1996) ...............................................................................................................................14, 31

* Freedman v. MCI Telecommunications Corporation, 255 F.3d 840 (D.C. Cir.
 2001) ....................................................................................................................... passim

* Galdamez v. Xerox Corp., 2005 WL 486161 (D.D.C. Feb. 28, 2005) ...................................20, 27

Gary v. Long, 59 F.3d 1391 (D.C. Cir. 1995) ................................................................................1

Henry v. Guest Servs., Inc., 902 F. Supp. 245 (D.D.C. 1995), aff'd, 98 F.3d 646
 (D.C. Cir. 1996) ...................................................................................................................12

Holbrook v. Reno, 196 F.3d 255 (D.C. Cir. 1999) .......................................................................19

Hussain v. Principi, 344 F. Supp. 2d 86 (D.D.C. 2004) ................................................24

\*    Johnson v. Dong Moon Joo, 2006 WL 627154 (D.D.C. Mar 12, 2006) .............................. passim

Khan v. Federal Reserve Bank of New York, 2005 WL 273027 (S.D.N.Y. Feb. 2, 2005).....................................................................................................................25

Kolupa v. Roselle Park District, 438 F.3d 713 (7th Cir. 2006) ....................................28

Laffey v. Northwest Airlines, Inc., 567 F.2d 429 (D.C. Cir. 1976)................................29

Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76 (2006), reconsideration denied, 241 F.R.D. 15 (D.D.C. Mar. 1, 2007) ............................20

Loe v. Heckler, 768 F.2d 409 (D.C. Cir. 1985) ............................................................29

Marshall v. James, 276 F. Supp. 2d 41 (D.D.C. 2003).............................................2, 27

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)....................12

\*    Mayers v. Laborers' Health & Safety Fund of North America, 478 F.3d 364 (D.C. Cir. 2007).....................................................................................................30, 31

McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368 (7th Cir. 1992) ............14

McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973) .................................12

Miles v. Dell, 429 F.3d 480 (4th Cir. 2005) ...........................................................28, 29

Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985)...............................................30

Morgan v. Federal Home Loan Mortgage Corp., 328 F.3d 647 (D.C. Cir. 2003)..................26, 30

Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507 (D.C. Cir. 1995) .....................19, 21

Nuriddin v. Goldin, 382 F. Supp. 2d 79 (D.D.C. 2005), aff'd, 2007 WL 1126199 (D.C. Cir. April 16, 2007)...................................................................................24

\*    Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995)............................26, 28, 30

Pyne v. District of Columbia, 298 F. Supp. 2d 7 (D.D.C. 2002)...................................27

Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133 (2000)................................13

Rush v. McDonald's Corp., 966 F.2d 1104 (7th Cir. 1992) ..........................................29

Simms v. U.S. Gov't Printing Office, 87 F. Supp. 2d 7 (D.D.C. 2000), aff'd, 435 F.3d 359 (D.C. Cir.), cert. denied, 127 S. Ct. 494 (2006) ......................................24

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993) ...................................................13

Stringer v. Stan Koch & Sons Trucking, 2006 WL 212190 (D. Minn. Jan. 27, 2006) ...................................................................................................................28

Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S.248 (1981) ...................................13

Udoh v. Trade Center Mgt. Assocs., ___ F. Supp. 2d __, 2007 WL 901982 (D.D.C. Mar. 27, 2007)...........................................................................................19

* Valles-Hall v. Center for Nonprofit Advancement, __ F. Supp. 2d __, 2007 WL 779385 (D.D.C. Mar. 12, 2007)............................................................... passim

Waterhouse v. District of Columbia, 124 F. Supp. 2d 1 (D.D.C. 2000), aff'd, 298 F.3d 989 (D.C. Cir. 2002)..................................................................................15, 24

Waterhouse v. District of Columbia, 298 F.3d 989 (D.C. Cir. 2002)...........................17

Woodruff v. Peters, 482 F.3d 521 (D.C. Cir. 2007) ...............................................30, 31

Zenaty-Paulson v. McLane/Sunwest, Inc., 11 AD Cases 893, 2000 WL 33300666 (D. Ariz. Mar. 18, 2000)........................................................................................28

**RULES:**

Fed. R. Civ. P. 56(c) ....................................................................................................12

Fed. R. Civ. P. 56(e) ....................................................................................................12

**STATUTES:**

42 U.S.C. § 2000e, et seq. ............................................................................................1

42 U.S.C. § 2000e-5(f)(1) ...........................................................................................26

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————
                                        )
MOHAMMED ISSE,                          )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )        Civil Action No. 1:06CV01422 (CKK)
                                        )
AMERICAN UNIVERSITY, <u>et al.</u>,    )
                                        )
        Defendants.                     )
———————————————————)

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This employment discrimination case is ideally suited for summary disposition.

Plaintiff Mohammed Isse <u>1</u>/ contends that defendant American University ("the University")

terminated his employment as a shuttle bus driver because of his Muslim religion in violation of

Title VII, 42 U.S.C. § 2000e, <u>et seq</u>. <u>2</u>/   The relevant documentary evidence and his own sworn

deposition testimony demonstrate, however, that Mr. Isse was in fact discharged because of

repeated complaints that he drove unsafely and in violation of University rules.  This conclusion

is supported not only by eyewitness reports from University personnel and shuttle passengers of

Mr. Isse's reckless driving, but also by several other completely neutral decisionmakers --

including the University's Staff Personnel Review Board, which rejected Mr. Isse's appeal of his

---

<u>1</u>/      Mr. Isse's first name is sometimes spelled "Mohamed" in his pleadings and in the
materials cited herein.  For consistency, this memorandum adopts the spelling used in the
Complaint in this case.

<u>2</u>/      The Complaint also names Mr. Isse's supervisor, Kevin Wyatt, as a party defendant.
Complaint ¶ 6.  Because there is no individual liability under Title VII, the claims against Mr.
Wyatt should be dismissed.  <u>Gary v. Long</u>, 59 F.3d 1391, 1399 (D.C. Cir. 1995).

termination after a full evidentiary hearing, and the United States Equal Employment

Opportunity Commission ("EEOC"), which investigated but did not find Mr. Isse's discharge to

be discriminatorily motivated.

Mr. Isse's claim that he was terminated in retaliation for requesting a religious

accommodation likewise fails as a matter of law, both because he did not exhaust this claim

before the EEOC and because there is no causal connection between his accommodation request

-- which by his own account was initiated several years before the infractions that resulted in his

termination -- and the discharge decision.  Mr. Isse simply has adduced no evidence from which

a reasonable factfinder could infer retaliatory intent.

"'Summary judgment is not a "disfavored procedural shortcut," but is an integral

procedural tool'" for efficiently isolating and disposing of factually and legally meritless claims.

Johnson v. Dong Moon Joo, 2006 WL 627154, at *18 (D.D.C. Mar 12, 2006) (Kollar-Kotelly, J.)

(quoting Marshall v. James, 276 F. Supp. 2d 41, 47 (D.D.C. 2003)) (quoting Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986)).  Given the absence of any probative evidence that might

support Mr. Isse's claims under the governing law, the University respectfully requests that the

Court grant summary judgment on Mr. Isse's discriminatory discharge and retaliation claims and

dismiss this case in its entirety.

## **FACTUAL BACKGROUND**

**A.**       **Mr. Isse's Employment in the University's Transportation Services Department**

American University is a private higher education institution located in the

District of Columbia.  From 1990 until his termination in September 2005, Mr. Isse worked as a

full-time shuttle bus driver in the University's Transportation Services Department

("Transportation Services"), a department within the University's Risk Management and Safety

Services Office ("Risk Management").   Declaration of Tony Newman ("Newman Decl.") at ¶ 1 (attached as Exhibit 1 hereto); Exhibit 2; Complaint ¶¶ 8, 13.  The shuttle staff, which consists of approximately 23 full- and part-time drivers, is supervised by Kevin Wyatt, who has been Shuttle Supervisor since January 1999.  Declaration of Kevin Wyatt ("Wyatt Decl.") at ¶ 2 (attached as Exhibit 3 hereto).  Since August 2004, Mr. Wyatt has reported to Tony Newman, Director of Risk Management and Transportation Services, who is responsible for overseeing Transportation Services and approving all disciplinary actions related to bus drivers.  Newman Decl. at ¶¶ 1, 15.

University shuttle drivers operate 30-foot or larger commercial transit buses and other University-owned and leased vehicles.  They transport passengers -- including students, faculty, and staff -- between the University's main campus and other local campuses and the Tenleytown Metro Station.  Drivers are expected to operate the buses safely and in accordance with all federal and local laws and University policies.  Newman Decl. at ¶ 2.

At the time of Mr. Isse's discharge, the University ran nine shuttle buses on three established routes.  The three roundtrip routes were: 1) Main Campus to Tenley Campus and Tenleytown Metro (referred to within Transportation Services as "Metro 1," "Metro 2," and "Metro 3"); 2) Washington College of Law to Tenleytown Metro (referred to as "WCL Direct 1" and "WCL Direct 2"); and 3) Main Campus to Washington College of Law. 3/  Newman Decl. at ¶ 3.  Drivers received route assignments on a weekly basis, and routes were rotated daily.  Day-shift drivers such as Mr. Isse received a one-hour lunch break during which a scheduled "relief driver" -- another member of the shuttle staff -- operated the regular driver's bus.  Newman Decl. at ¶ 3; Wyatt Dec. at  ¶ 3.

---

3/      The University's Main Campus is located at 4400 Massachusetts Avenue; the Tenley Campus, on Nebraska Avenue at Tenley Circle; the Washington College of Law, at 4801 Massachusetts Avenue; and the Tenleytown Metro Station at the intersection of 40th Street and Albemarle Street.  Newman Decl. at ¶ 2.

**B.**          **The Disciplinary Actions that Led to Mr. Isse's Termination**

In 2005 Mr. Isse committed a series of safety infractions and violations of

University policy that resulted in his discharge.  In each instance passengers and University

administrators outside of Transportation Services reported Mr. Isse's unsafe driving practices to

Mr. Newman.

**1.          The April 8, 2005 Warning for Making Unauthorized Stops**

On April 4, 2005, Mr. Newman received a complaint from Tanisha Jagoe, the

University's Director of Business Compliance, about Mr. Isse's operation of a shuttle bus she

rode that day.  Newman Decl. at ¶ 7.  Ms. Jagoe was a frequent shuttle rider who recognized Mr.

Isse.  She reported that, shortly after 11:00 a.m., Mr. Isse twice allowed passengers to get off of

his bus while it was stopped at traffic lights where there were no designated shuttle stops.

Declaration of Tanisha Jagoe ("Jagoe Decl.") at ¶¶ 2-5 (attached as Exhibit 4 hereto); Newman

Decl. at ¶ 7; Exhibit 5.  Mr. Wyatt confirmed that Mr. Isse was the "relief driver" driving the

shuttle on the Metro 1 route about which Ms. Jagoe complained.  Newman Decl. at ¶ 7; Wyatt

Decl. at ¶ 12.

Mr. Newman and Mr. Wyatt frequently admonished shuttle operators against

making unauthorized stops at monthly meetings, including a meeting on March 1, 2005 that Mr.

Isse attended.  Newman Decl. at ¶ 4; Wyatt Decl. at ¶ 8; Declaration of Norman Porter ("Porter

Decl.") at  ¶¶ 2-3 (attached as Exhibit 6 hereto); Declaration of Edwin Weddle ("Weddle Decl.")

at ¶¶ 2-3 (attached as Exhibit 7 hereto).  Unauthorized stops constitute a safety hazard because

they encourage students and other riders to approach buses in traffic, where they cannot always

be seen by the shuttle bus drivers or by other vehicles.  They also pose a safety hazard to the

disembarking passengers themselves.  Newman Decl. at ¶ 4.  For these reasons, after consulting

with the University's Human Resources Department, Mr. Newman instructed Mr. Wyatt to issue

Mr. Isse a "Level II Documented Oral Warning" for "willful violation of safety rules." 4/

Newman Decl. at ¶ 8; Wyatt Decl. at ¶ 13; Exhibit 8.  The warning states that "[a]ny further

violations will result in further disciplinary actions including termination."  Exhibit 8.

### 2.    The July 26, 2005 Warning for Failing to Use a Turn Signal and Running a Stop Sign

Just before 7:00 am on July 11, 2005, William Suter, the University's Director of

Physical Plant Operations, observed shuttle bus #160 turn into the main campus without using a

turn signal and then run a stop sign.  Mr. Suter immediately reported the incident to Mr. Newman

and subsequently documented it in an email.  Newman Decl. at ¶ 9; Exhibit 10.  Mr. Wyatt

confirmed that Mr. Isse was assigned to bus #160 and showed Mr. Newman a signed receipt

demonstrating that Mr. Isse had purchased gas for the bus that morning.  Newman Decl. at ¶ 9;

Wyatt Decl. at ¶ 14; Exhibit 11.

Based on this evidence, Mr. Newman concluded that Mr. Isse had committed the

safety violations observed by Mr. Suter.  Newman Decl. at ¶ 9.  Accordingly, on July 26, 2005,

after consulting with the Human Resources Department, Mr. Newman instructed Mr. Wyatt to

issue Mr. Isse a "Level II Written Warning" for engaging in "careless, reckless, or slipshod

work."  Newman Decl. at ¶ 9; Exhibit 12.  The warning states that "[a]ny repetition of this

---

4/      The University's progressive disciplinary policy, which provides "guidelines" for
supervisors to follow in cases of employee misconduct, categorizes offenses as Level I, Level II,
or Level III, with Level III infractions being the most serious and warranting immediate
dismissal. Exhibit 9.  Three Level II offenses generally warrant dismissal. Id.  Since becoming
Director of Transportation Services, Mr. Newman has generally treated shuttle drivers' safety
violations as Level II violations.  See Newman Decl. at ¶ 8.

behavior or other violations of university policy will result in additional disciplinary action up to and including termination of employment." Id.

### 3.    Denial of Mr. Isse's Grievance Concerning the Two Warnings

On August 4, 2005, Mr. Isse met with Mr. Newman to contest his prior disciplinary notices.  At this meeting, he also described numerous purported improprieties in Transportation Services, but he did not allege discrimination.  Newman Decl. at ¶ 11; Exhibit 13. Mr. Isse alleged, for example, that a part-time driver skipped a run and left her bus unattended to go to Starbucks; that employees -- including himself -- were paid for hours they did not work; that two drivers engaged in a fist fight and another threatened to punch him; and that free parking permits had been distributed.  Exhibit 13.

Mr. Isse put his complaint about the April 8 and July 26 disciplinary actions in writing on August 9, 2005, in a memorandum addressed to Mr. Newman and copied to Pat Kelshian, Executive Director of Risk Management, and Beth Muha, Executive Director of Human Resources.  Exhibit 14.  In this memo, he denied that he was driving the bus that made unauthorized stops on April 4.  He admitted that he drove bus #160 on July 11 but claimed that he left it unattended on campus shortly before 7:00 a.m. and that "someone else may have been driving" when the bus was observed entering campus without a turn signal and running a stop sign.  Id.

Mr. Newman investigated Mr. Isse's complaint and, after reviewing the allegations with Ms. Kelshian and Ms. Muha, concluded that both warnings were justified based on the eyewitness reports by two "individuals outside the Transportation Services unit," including Ms. Jagoe's positive identification of Mr. Isse as the driver in the first incident. Newman Decl. at ¶ 12; Exhibit 15.  Mr. Newman also rejected the conclusory claims in Mr.

Isse's grievance that Mr. Wyatt "targeted [him] because of racial, religious, and ethnic

discrimination" and "in retaliation for" his prior complaints "about corrupt practices at the work

place."   Exhibits 14, 15.

> ### 4.  Mr. Isse's September 16, 2005 Termination for Continued Safety Violations and Insubordination

On September 15, 2005, when Mr. Isse was the assigned driver for the Metro 2

route (Main Campus to Tenley Campus and Tenleytown Metro), Mr. Newman received another

complaint from Ms. Jagoe about his driving.  Newman Decl. at ¶ 13.  She reported that during

the past two morning rush hours, Mr. Isse had returned from the Tenleytown Metro stop by

making a left turn onto Wisconsin Avenue not from Albemarle Street, where there is a traffic

light, but from Grant Road, where there is no traffic light.  In making the left turn from Grant

Road, Mr. Isse blocked five lanes of traffic while honking his horn at least eight times at the cars

in front of him.  Newman Decl. at ¶ 13; Jagoe Decl. at ¶¶ 6-7; Exhibit 16.  Ms. Jagoe's report

was corroborated by another passenger on the same bus, Brenda Harner, a Human Resources

Policy Analyst.  Newman Decl. at ¶ 15.  Mr. Newman determined that Mr. Isse's actions "in this

busy intersection . . . were unsafe and jeopardized the safety of passengers" and others near the

bus.  Exhibit 17.

Mr. Newman also concluded that by turning left onto Wisconsin Avenue from

Grant Road, Mr. Isse violated express University policy.  Due to heavy construction in the area,

all shuttle drivers, including Mr. Isse, had been specifically instructed to make the left turn onto

Wisconsin Avenue from Albemarle Street, not Grant Road.  Newman Decl. at ¶ 5; Wyatt Decl. at

¶ 10; Porter Decl. at ¶ 4; Weddle Decl. at ¶ 4.  In April 2005, Mr. Newman and Mr. Wyatt

distributed to "All Shuttle Personnel," including Mr. Isse, a detailed "Route Summary" that set

forth the "proper routes for all AU shuttles."  Newman Decl. at ¶ 5; Wyatt Decl. at ¶ 9; Porter

Decl. at ¶ 4; Weddle Decl. at ¶ 4; Exhibit 18. The Route Summary clearly directed drivers of the Main Campus to Tenleytown Metro route to turn left onto Wisconsin Avenue from Albemarle Street when returning to the main campus.  Exhibit 18, at 2.  Other shuttle drivers remember seeing the Route Summary and discussing it at a meeting in April.  Porter Decl. at ¶ 4; Weddle Decl. at ¶ 4.  Drivers were again instructed to use Albemarle Street when returning to the main campus at a meeting on July 28, 2005.  Newman Decl. at ¶ 10.

> The Route Summary also stated:

> > NO Shuttle operator can change or deviate from the normal/regular shuttle routes without prior approval from Kevin and/or Tony Newman <u>FIRST</u>.

> > **Failure to follow this guideline will result in disciplinary action.**

 Exhibit 18, at 3 (emphases and underscoring in original).  Likewise, on April 11, 2005 Mr. Wyatt attached to the driver briefing clipboard (the Transportation Services bulletin board) a one-page notice instructing the shuttle drivers in large, boldface type: "**<u>DO NOT deviate</u> off of the normal routes for any reasons**" except with "**prior approval from Wyatt or Newman first**."  Newman Decl. at ¶ 6; Wyatt Decl. at ¶ 11; Exhibit 19.  Because Mr. Isse "blatantly violated this direct order," Mr. Newman concluded that he was guilty of "insubordination" in violation of University policy.  Exhibit 17 at 1, 2.

Mr. Wyatt reported to Mr. Newman that when he asked Mr. Isse about the route he drove from the Tenleytown Metro back to the main campus, Mr. Isse stated that he always took Albemarle Street.  Newman Decl. at ¶ 14; Wyatt Decl. at ¶ 16; Exhibit 20.  Because of the contrary observations by Ms. Jagoe and Ms. Harner, as well as reports from other drivers who stated that Mr. Isse did not follow the approved route, Mr. Newman concluded that Mr. Isse was lying.  Exhibit 17, at 1.  Based on Mr. Isse's repeated safety infractions and violations of

University policy dating from April 2005 and his insubordination in deviating from an approved

route, Mr. Newman determined that Mr. Isse's employment should be terminated.  After

consulting with Human Resources Specialist Grace Karmiol, who prepared a draft termination

memorandum, and his supervisor Ms. Kelshian, Mr. Newman instructed Mr. Wyatt to issue Isse

a memorandum terminating his employment on September 16, 2005.    Newman Decl. at ¶ 15;

Wyatt Decl. at ¶ 16; Exhibit 17.

**C.**          **Mr. Isse's Internal Appeal of his Termination**

On September 26, 2005, Mr. Isse filed a written appeal of his termination with the

University's Staff Personnel Review Board ("Review Board").  Exhibit 21.  He again denied that

he was the driver responsible for the safety infractions described in the April 8 and July 26

warnings.  Id. at 2.  Contrary to his earlier statement to Mr. Wyatt, however, he did <u>not</u> deny that

he took the Grant Road turn on September 15.  Instead, Mr. Isse denied that he was told to use

Albemarle Street when returning from the Tenleytown Metro to the Main Campus,  and he

denied ever receiving the April 11 notice prohibiting drivers from deviating from the normal

routes without prior approval.  Id. at 1.  He claimed that the only route he was instructed not to

deviate from was the Washington College of Law to Tenleytown Metro route.  Id. at 2.

Before the Review Board, Mr. Isse also claimed that Mr. Wyatt retaliated against

him for alleged prior discrimination complaints that he now <u>admits</u> he did not make.  Id. at 3.

Specifically, Mr. Isse represented to the Review Board that he complained in 2002 and 2003

letters to Human Resources personnel that he "had a hard time getting permission to use my one-

hour lunch break to attend Friday prayers" and that Mr. Wyatt and Thomas Leathers (Mr.

Newman's predecessor as Transportation Services Manager) told him "to change my name

9

because it was too Muslim." Id. The 2002 and 2003 letters contain no such complaints. 5/ See Exhibits 22, 23. Mr. Isse now concedes, as he must, that his statement to the Review Board was false. See Deposition of Mohammed A. Isse ("Isse Dep.") at 218-219 (attached as Exhibit 26 hereto). Indeed, although Mr. Isse filed frequent written complaints about numerous aspects of his employment during his fifteen years as a University shuttle operator, 6/ it is undisputed that none of these complaints ever mentioned derogatory comments or his alleged difficulty attending Friday prayers. At his deposition, Mr. Isse admitted that he never put these complaints in writing until after his discharge. See Isse Dep. at 71-72, 76-78, 111-112, 197-198.

Consistent with University policy, the Review Board appointed a Hearing Panel comprised of three University employees from other departments. Exhibit 31. 7/ Following a full evidentiary hearing, the Review Board concluded that Mr. Isse (1) drove the bus that made unauthorized stops on April 4; (2) drove the bus that turned onto campus without signaling and ran a stop sign on July 11; and (3) deviated from the approved route from the Tenleytown Metro

_____

5/       Instead, the 2002 and 2003 letters recite several other alleged actions by Mr. Wyatt and Mr. Leathers -- including improperly recording Mr. Isse's hours, giving him inadequate pay raises, and refusing to help him clean his bus -- that he claimed were discriminatory. Exhibits 22, 23. The Human Resources Department informed Mr. Isse that it had "thoroughly investigated" these allegations and "found no evidence of discrimination." Exhibit 24. See also Exhibit 25 ("Through our review, we have found no evidence of discrimination against you by your supervisors").

6/       In addition to the written complaints referred to in the text, Mr. Isse filed written complaints about a verbal altercation he had with a Public Safety supervisor in 1998 about leaving his food in the microwave and leaving work early, see Exhibit 27; and about two Level I warnings that he received in January 2005 for not reporting to work and for stopping a route without permission, see Exhibit 28. Mr. Isse's attorney also sent two letters to Mr. Wyatt complaining about the Level I warnings. See Exhibits 29, 30.

7 /       The Hearing Panel members included Michele Mikkelsen, Team Leader, Personnel & Fiscal Affairs, University Library; Terry Fernandez, Director, Customer Services & Supplies, Information Technology; and Charles Pardue, Assistant University Registrar, Office of the Registrar. See Exh. 31.

to the main campus on September 15.  Exhibit 32.  The Review Board also concluded that Mr.

Isse's "termination was unrelated to his complaints of racial and religious discrimination."  Id. at

2.  Acting Provost Ivy Broder reviewed these findings and affirmed the Review Board's

recommendation that Mr. Isse's termination be upheld.  See Exhibits 33, 34.

**D.        Mr. Isse's EEOC Charge and Lawsuit**

Mr. Isse filed a charge of discrimination with the EEOC on January 4, 2006.

Exhibit 35.  He identified the "cause of discrimination" by checking the boxes marked

"religion," "age," and "national origin."  Id.  The narrative portion of the charge alleged that Mr.

Isse was (1) "denied a reasonable accommodation (i.e., the opportunity to use my lunch break for

my 'Friday Muslim Prayer' session"); (2) "subjected to religious-based, disparaging remarks";

and (3) discharged for infractions that other employees also committed but were not discharged.

Id.  The EEOC investigated these allegations, was unable to conclude that they established any

legal violation, and dismissed the charge and issued Mr. Isse a notice of his right to sue.  Exhibits

36-38.

Apparently determined to try his luck in additional forums, Mr. Isse filed this pro

se action and an identical action in the Superior Court for the District of Columbia on August 10,

2006. 8/

**ARGUMENT**

Summary judgment is warranted when the evidence, viewed in the light most

favorable to the nonmoving party, shows that "there is no genuine issue as to any material fact

and . . . the moving party is entitled to a judgment as a matter of law."  Valles-Hall v. Center for

---

8/      The Superior Court action has been stayed.  See Isse v. American University, Civil
Action No. 006135-06 (order dated April 12, 2006).

Nonprofit Advancement, ___ F. Supp. 2d ___, 2007 WL 779385, at *16 (D.D.C. Mar. 12, 2007) (Kollar-Kotelly, J.) (quoting Fed. R. Civ. P. 56(c)).  The nonmovant bears the ultimate burden to "'come forward with "specific facts" showing that there is a genuine issue for trial.'"  Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)) (quoting Fed. R. Civ. P. 56(e)).  "[T]he mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment."  Id.  Speculative allegations will not suffice, and evidence that is "merely colorable" or "not significantly probative" will not prevent summary judgment.  Id.  See also Brown v. Brody, 199 F.3d 446, 458 (D.C. Cir. 1999).  Similarly, only "reasonable inferences" -- those with a reasonable probability of being correct -- may be drawn in the nonmovant's favor. See Henry v. Guest Servs., Inc., 902 F. Supp. 245, 250 (D.D.C. 1995) (emphasis added) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)), aff'd, 98 F.3d 646 (D.C. Cir. 1996)).

As discussed below, Mr. Isse's termination and retaliation claims cannot survive summary judgment under these settled standards.

## I.    NO REASONABLE JUROR COULD CONCLUDE THAT THE UNIVERSITY DISCHARGED MR. ISSE BECAUSE OF HIS RELIGION

Because Mr. Isse has offered no direct evidence that his termination was based on his religion, see Valles-Hall, ___ F. Supp. 2d at ___, 2007 WL 779385, at *19, he must produce probative evidence sufficient to create a triable issue under the familiar framework of McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). 9/  Even assuming that Mr.

---

9/    Under McDonnell Douglas, if the plaintiff can establish a prima facie case of discrimination, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the challenged employment decision.  Once it does so, the presumption of discrimination created by the prima facie showing "drops from the case," and the plaintiff bears the ultimate burden of proving not only that the employer's asserted justification is not credible, but also that the real reason for the challenged decision was unlawful

Isse can meet his "'not onerous'" initial burden under <u>McDonnell Douglas</u> of establishing a

prima facie case, <u>Valles-Hall</u>, ___ F. Supp. 2d at ___, 2007 WL 779385, at *23 (quoting <u>Texas</u>

<u>Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S.248, 253 (1981)), there can be no dispute that the

University has asserted substantial reasons for his discharge: his multiple safety infractions,

violations of University policy, and insubordination.  <u>See</u> <u>Akonji v. Unity Healthcare, Inc.</u>, 2007

WL 1207194, at *9 (D.D.C. April 24, 2007) ("Insubordination and violation of company rules

are widely accepted non-discriminatory reasons for termination.").  Mr. Isse thus can survive

summary judgment only by adducing concrete evidence that, if believed, would permit a

reasonable factfinder to conclude that the University's proffered reasons are actually pretexts for

religious discrimination.   <u>St. Mary's Honor Center</u>, 509 U.S. at 515.  Given his deposition

testimony and the other record evidence in this case, Mr. Isse clearly cannot satisfy this burden.

> **A.     THERE IS NO GENUINE DISPUTE AS TO THE CREDIBILITY OF THE UNIVERSITY'S PROFFERED REASONS FOR MR. ISSE'S DISCHARGE**

Mr. Isse is unable to cast any meaningful doubt on the credibility of the

University's stated reasons for terminating his employment.  Although he challenges virtually

every factual aspect of the disciplinary actions that led to his discharge, his denials and

conjectures create no genuine issues for trial, for two reasons.  First, no reasonable juror could

conclude that Mr. Isse did not commit the infractions for which he was disciplined.  Second, and

more important, the evidence shows that Mr. Isse's supervisors reasonably and in good faith

<u>believed</u> that discipline was warranted.  The law is clear that "[o]nce the employer has articulated

---

discrimination.  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 512 (1993).  Although "intermediate evidentiary burdens shift back and forth in this framework, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 530 U.S.133, 143 (2000) (internal quotation marks omitted).

a nondiscriminatory explanation for its action . . . the issue is not 'the <u>correctness</u> . . . of [the]

reasons offered . . . but whether the employer <u>honestly believes</u> in the reasons it offers.'"

<u>Fischbach v. District of Columbia Dep't of Corrections</u>, 86 F.3d 1180, 1186 (D.C. Cir. 1996)

(emphases added) (quoting <u>McCoy v. WGN Continental Broadcasting Co.</u>, 957 F.2d 368, 373

(7th Cir. 1992)).  As this Court recently explained in another case in which a plaintiff attempted

to prove that she was not guilty of the offenses that prompted her termination:

> The relevant question at this stage is not whether Plaintiff
> actually committed the actual offenses . . . ; rather, the
> pertinent inquiry becomes whether [the Plaintiff's
> supervisor] believed -- in good faith -- that Plaintiff
> violated [the employer's] policy on numerous occasions,
> had been uncooperative and insubordinate, and could no
> longer be trusted, or whether discrimination based on
> Plaintiff's . . . religious affiliation was the actual motivation
> for his decision.

<u>Johnson</u>, 2006 WL 627154 at *34, 36.

The evidence in this case demonstrates that, like the supervisor in <u>Johnson</u>, Mr.

Newman and Mr. Wyatt reasonably and in good faith believed that Mr. Isse repeatedly violated

safety rules and University policy, was insubordinate, and was dishonest when confronted with

his last infraction -- and he was disciplined and ultimately discharged for those reasons.

      **1.**    <u>**The April and July Incidents.**</u> -- Mr. Isse simply denies that he was

driving the bus that made unauthorized stops on April 4, Complaint ¶ 11, Isse Dep. at 108-109,

119-121, and he claims -- without a shred of supporting evidence -- that Ms. Jagoe's

identification of him is "[p]retext because . . . I'm a Muslim."  <u>Id</u>. at 123.  In fact, Ms. Jagoe did

not even know Mr. Isse's religion at the time she reported his unsafe driving.  Jagoe Decl. at ¶ 8.

His claim that a mechanic "maybe" took his bus for a drive without telling him on July 11, at the

precise time that Mr. Suter observed the bus entering the campus without signaling and running a

stop sign, is equally speculative.  Complaint ¶ 12; Isse Dep. at 126-128.  No rational factfinder could conclude from these unsupported allegations that Mr. Isse was not the driver of the buses in question.

Mr. Isse's mistaken identity argument, moreover, misses the mark, because his supervisors clearly had reason to believe (and did in fact believe) that he was the driver on both occasions.  Both disciplinary actions began with complaints that Mr. Newman received from University administrators <u>outside</u> of Transportation Services, including a regular shuttle passenger who was able positively to identify Mr. Isse.  Ms. Jagoe positively identified Mr. Isse as the driver in the April 4 incident, and a signed gas receipt demonstrated that Mr. Isse was driving the bus that Mr. Suter observed on July 11.  Newman Decl. at ¶¶ 7, 9; Wyatt Decl. at ¶ 14; Exhibit 11.  Given this evidence, there can be no doubt that Mr. Newman and Mr. Wyatt reasonably believed that Mr. Isse committed the safety infractions for which he was disciplined in April and July.  <u>See</u> <u>Valles-Hall</u>, ___ F. Supp. 2d at ___, 2007 WL 779385, at *25 (where challenged employment decisions are based on coworker complaints, the relevant issue is not whether the "complaints were justified," but "whether [the plaintiff's supervisor] received the complaints and believed that plaintiff's performance was deficient") (quoting <u>Waterhouse v. District of Columbia</u>, 124 F. Supp. 2d 1, 10 (D.D.C. 2000), <u>aff'd</u>, 298 F.3d 989 (D.C. Cir. 2002)).

        **2.**      **<u>The September Incident</u>. --** The same reasoning applies to the September 15 Grant Road incident, as to which Mr. Isse's story continues to evolve.  He initially denied to Mr. Wyatt that he had ever used Grant Road.  Newman Decl. at ¶ 14; Wyatt Decl. at ¶ 16; Exhibit 20.  Now, by contrast, he not only admits that he used Grant Road, Isse Dep. at 131, 134, but he even claims -- with no supporting evidence -- that Grant Road was part of a written,

normal route, id. at 179-180, that Mr. Wyatt expressly told him to take, id. at 150-152. He baldly asserts that the two witnesses who reported his unsafe driving on Grant Road, Ms. Jagoe and Ms. Harner, did so because of "[t]he fact that I'm a Muslim." Isse Dep. at 167.

　　　　　Mr. Isse also now admits, contrary to his position before the Review Board, Exhibit 21, at 1, that he saw the April 11 clipboard notice instructing drivers not to deviate from normal routes in April 2005. Isse Dep. at 176-178; Exhibit 19. But he denies that anyone ever told him that Albemarle Street was part of the normal Main Campus to Tenleytown Metro route. Complaint ¶ 13; Isse Dep. at 132-133, 142-146, 150, 184-185. The proper route is specified, however, in the April 11 Route Summary, which other drivers recall seeing and discussing with Isse. Porter Decl. at ¶ 4; Weddle Decl. at ¶ 4; Exhibit 18. Mr. Isse does not "remember" whether he was present during such discussions. Isse Dep. at 144 ("Maybe I wasn't there."). He nonetheless insists that he is "[one] hundred percent sure" that the University concocted the Route Summary "after the fact" as a post hoc justification for his discharge. Id. at 141, 180, 184-187, 192-193.

　　　　　No reasonable juror could conclude from these unsupported and sometimes contradictory allegations that Mr. Isse was wrongly accused of deviating from an established route. Nor can there be any genuine dispute that Mr. Newman and Mr. Wyatt reasonably believed he had committed this offense. Given the reports of Ms. Jagoe and Ms. Harner, Mr. Isse's supervisors reasonably believed that he had driven on Grant Road and then lied about it to Mr. Wyatt. Drivers had been informed of the importance of using the Albemarle Street intersection, where there is a traffic light, rather than Grant Road, where there is no traffic light. Because the proper route was clearly stated in the Route Summary, Mr. Newman and Mr. Wyatt reasonably believed that Mr. Isse's deviation was willful and constituted insubordination.

Confronted with these infractions and Mr. Isse's two prior offenses, Mr. Newman properly consulted with his own supervisor and the University's Human Resources Department in order to ensure that the disciplinary actions and termination decision were appropriate under the University's policies.  Newman Decl. at ¶ 15; Wyatt Decl. at ¶ 16.  No rational factfinder could conclude from these undisputed facts that the disciplinary actions were merely pretexts for a discriminatory discharge.

"[C]ourts are without authority to second-guess an employer's personnel decision absent <u>demonstrably</u> discriminatory motive."  <u>Waterhouse v.  District of Columbia</u>, 298 F.3d 989, 995 (D.C. Cir. 2002) (emphasis added).  This principle applies with particular force here, because the decision to terminate Mr. Isse's employment was not made exclusively by Transportation Services, but rather was also approved by the Human Resources Department and then affirmed, after a full hearing, by the Review Board and the Acting Provost.  Exhibits 32-34. Mr. Isse does not, and cannot, allege that all of these independent decisionmakers acted from religious animus. The fact that the University's Human Resources Department, the Review Board, the Acting Provost, and later the EEOC all confirmed the propriety of the termination decision demonstrates decisively the absence of any discriminatory motive on the University's part.

### B.    MR. ISSE'S REMAINING ALLEGATIONS ARE LEGALLY INSUFFICIENT TO WARRANT TRIAL

Mr. Isse's remaining efforts to establish pretext are equally unavailing.  He has not identified, and cannot identify, a single non-Muslim shuttle driver who was known by the University to have committed the same infractions as he and yet was not discharged.  Indeed, undisputed evidence shows that other drivers outside the protected class have also been

disciplined and terminated for safety violations. 10/   Mr. Isse's only allegations of religious animus -- his purported difficulty attending Friday prayers and a few stray remarks -- even if true (and they are not), have no connection to the termination decision and therefore provide no support for his discriminatory discharge claim.

1.     **MR. ISSE HAS FAILED TO OFFER COMPETENT EVIDENCE THAT SIMILARLY SITUATED NON-MUSLIM EMPLOYEES WERE TREATED MORE FAVORABLY THAN HE**

Mr. Isse alleges that other non-Muslim drivers have committed safety violations similar to his without being disciplined.  Complaint ¶¶ 12-13.   His disparate discipline claim fails at the threshold, because uncontroverted evidence shows that other non-Muslim University shuttle drivers have in fact received discipline, up to and including termination, for safety violations similar to Mr. Isse's.  Drivers have been terminated, for example, after failing to secure a bus that rolled and crashed into a parked car; driving recklessly, including under suspicion of driving under the influence; and leaving a running bus unattended.  Newman Decl. at ¶ 16; Exhibit 39.  In addition, other drivers have received Level II warnings, short of the three generally required for dismissal, for safety infractions including driving an overcrowded bus and failing to give the right of way to another vehicle. Newman Decl. at ¶ 16.

The District of Columbia Circuit has held that such evidence precludes a disparate treatment claim as a matter of law.  In Freedman v. MCI Telecommunications Corporation, 255 F.3d 840 (D.C. Cir. 2001), the plaintiff, an Orthodox Jew, claimed that he was treated less favorably than other employees because of his religion.  Affirming summary judgment for the employer, the Court rejected the plaintiff's disparate treatment claim, even though the evidence

---

10 /     The University does not ask employees about their religious affiliations but has no reason to believe that any other shuttle operators employed during Mr. Isse's tenure were Muslim. Newman Decl. at ¶ 17.

showed that some employees <u>were</u> treated more favorably than the plaintiff, because <u>other</u> employees outside the protected class were treated similarly to him. <u>Id.</u> at 845-847. <u>See</u> <u>also</u> <u>Udoh v. Trade Center Mgt. Assocs.</u>, ___ F. Supp. 2d___, ___, 2007 WL 901982, at *4 (D.D.C. Mar. 27, 2007) (plaintiff failed to establish prima facie case of discrimination where employer offered uncontroverted evidence that other employees outside of the protected class were terminated for violating the same policy as the plaintiff).

Indeed, Mr. Isse's disparate treatment claim is far weaker than the claim at issue in <u>Freedman</u>, because Mr. Isse has not identified any non-Muslim employee who received less discipline in circumstances similar to his. To prevail on a disparate treatment claim, a plaintiff must show that he and the employees to whom he compares himself are "similarly situated" -- which means that "<u>all</u> of the relevant aspects of [their] employment situation[s]" must be "'<u>nearly identical</u>.'" <u>Neuren v. Adduci, Mastriani, Meeks & Schill</u>, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (emphases added) (citation omitted). <u>Accord</u> <u>Johnson</u>, 2006 WL 627154 at *23. In a case of alleged disparate discipline, the plaintiff must demonstrate that the comparator employees were "charged with offenses of the same magnitude." <u>Holbrook v. Reno</u>, 196 F.3d 255, 261 (D.C. Cir. 1999). The other employees' misconduct also must be <u>known</u> to the employer; otherwise, the employer's failure to impose discipline creates no inference of discriminatory intent. <u>Amos v. Tysons Foods, Inc.</u>, 153 Fed. Appx. 637, 647 (11th Cir. 2005) ("Employees are not 'similarly situated' if management is aware of one's improper conduct, but not aware of the other's conduct."). Mr. Isse cannot identify anyone who is similarly situated to him under these settled standards.

Mr. Isse principally alleges that other employees told him they had taken a left turn from Grant Road but were not disciplined. Isse Dep. at 247-248, 255. This evidence

constitutes inadmissible hearsay, and as such the Court cannot consider it in resolving the

University's summary judgment motion.  See Galdamez v. Xerox Corp., 2005 WL 486161, at

*12 (D.D.C. Feb. 28, 2005) (Kollar-Kotelly, J.) (on summary judgment, plaintiff must show

disparate treatment "through the use of admissible evidence, rather than via hearsay").  Accord

Lemmons v.  Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 90 (2006), reconsideration denied,

241 F.R.D. 15 (D.D.C. Mar. 1, 2007).

      In any event, Mr. Isse's alleged comparators are not similarly situated to him

because, as he admits, he has no evidence that Mr. Wyatt or Mr. Newman  knew of their

purported misconduct.  Isse Dep. at 257-258.  See Amos, 153 Fed. Appx. at 647.  Indeed, at his

deposition Mr. Isse expressed reluctance to identify his comparators by name for fear that, if the

University did know that they had used Grant Road, they would promptly be fired.  Isse Dep. at

154-155 ("I talked to them, but I don't want to mention their names . . . .  If I tell you, tomorrow

they're going to fire them.").  This admission, of course, is fatal to Mr. Isse's claim that he has

been singled out because of his religion, as well as to his claim that Grant Road was a proper

route.

      Mr. Isse also alleges that Mr. Wyatt knew that two employees, Edwin Weddle and

Monissa Segar, used Grant Road, and that Mr. Weddle ran a stop sign, because Mr. Isse himself

reported these infractions. 11/  Isse Dep. at 244-246, 249-253.  It is not clear when Mr. Isse

claims to have made these reports, but he admits that at least one did not occur until the time of

his termination.  Id. at 246-247.  See Doke v. PPG Indus., 118 Fed. Appx. 366, 369 (10th Cir.

2004) (where "the only evidence management had of [another employee's] violations consisted

---

11 /     Mr. Isse also claims that Norman Porter ran stop signs "all the time, and a lot of people
complained," but he does not allege that anyone ever complained to Mr. Wyatt or Mr. Newman
about these alleged acts.  Isse Dep. at 243-244.

of post-termination allegations by a disgruntled" employee, "[d]ifferential treatment . . . is not evidence of pretext").  Mr. Isse also admits that he does not know whether either employee was ever disciplined.  Id. at 247, 249-250, 253-254.  And he offers no evidence that either had a record of prior infractions, including dishonesty, similar to his own.  Id. at 247. 12/

Mr. Isse's evidence thus falls far short of establishing that any other shuttle driver's employment situation was "nearly identical" to his own.  Neuren, 43 F.3d at 1514.  For this reason, and because undisputed evidence shows that many other drivers have received discipline similar to Mr. Isse's, his disparate treatment claim fails as a matter of  law.  See Freedman, 255 F.3d at 845-847.

## 2.    MR. ISSE HAS PRODUCED NO EVIDENCE THAT HIS DISCHARGE WAS MOTIVATED BY RELIGIOUS ANIMUS

Significantly, Mr. Isse offers no evidence that Mr. Newman, who made the final decision to terminate his employment, harbored any religious animus toward him.  Newman Decl. at ¶ 15.  Nor is there any evidence, other than Mr. Isse's speculation, of religious animus on the part of the individuals who complained about his driving, the Human Resources personnel who approved his termination, or the Review Board members and Acting Provost who denied his internal appeal.  Mr. Isse's sole allegations of religious animus are directed toward his immediate supervisor, Mr. Wyatt, and Mr. Leathers -- who left Transportation Services in July 2004 and had no involvement in his termination.  Wyatt Decl. at  ¶ 2.  None of these allegations, taken singly or together, suffices to enable a reasonable factfinder to conclude that Mr. Isse's termination was religiously motivated.

---

12/     Mr. Wyatt interviewed several shuttle operators, including Mr. Weddle and Ms. Segar, to determine whether other drivers were using Grant Road.  Mr. Weddle stated that he had stopped using Grant Road after being directed not to do so in April 2005.  Everyone else reported using Albemarle Street.  Wyatt Decl. at ¶ 16.

Mr. Isse claims that Mr. Wyatt and Mr. Leathers refused to allow him to attend Friday prayers on "numerous occasions" from approximately 2000 to 2005.  Complaint ¶¶ 10, 19-20, Exhibit 35.  He also alleges that Mr. Wyatt and Mr. Leathers made comments derogatory to Muslims.  Complaint ¶ 9.  Specifically, Mr. Isse claims that Mr. Wyatt and Mr. Leathers told him in 2003 that his native country, Somalia, was on a terrorist watch list, Isse Dep. at 82-83; asked him "What's wrong with you people?" after incidents of international terrorism, id. at 79, 83-84; and jokingly suggested that Mr. Isse should change his Muslim-sounding name after September 11 so that he would not be deported.  Id. at 79-81.

Mr. Wyatt denies that these alleged events occurred, Wyatt Decl. at ¶¶ 5-7, 17, and no reasonable factfinder could conclude otherwise.  Given Mr. Isse's propensity to file complaints about every other aspect of his employment -- from disciplinary warnings and pay increases to parking permits and disputes about microwave use, see supra at 10 & n.6 -- it strains credulity to suggest that he was repeatedly denied an opportunity to attend Friday prayers and felt that workplace comments were hostile to his religion but never once put those complaints in writing.

Furthermore, Mr. Isse admits that over the years he often did attend Friday prayers, Isse Dep. at 27-28, which were held on the University's main campus from 1:10 to 2:10 p.m..  Id. at 42.  Because the shuttle drivers' regularly scheduled one-hour lunch breaks ended at 12:50 p.m. each day, Mr. Isse's attendance at Friday prayers required a modification in his and other drivers' schedules.  Wyatt Decl.  at  ¶ 3. Mr. Isse testified inconsistently as to when he allegedly first had difficulty attending Friday prayers, see Isse Dep. at 29 ("Since Thomas Leathers came into the Department" in 1995) 13/; id. at 30-31 ("2002"); id. at 241-242 ("2000"),

---

13 /    Mr. Leathers joined Transportation Services in June 1995.  Wyatt Decl. at ¶ 2.

and as to how many times he purportedly missed, <u>see</u> <u>id</u>. at 42 ("at least 20 times" in four months); <u>id</u>. at 43 ("a little bit less than once a month"); <u>id</u>. ("Monthly, I missed like three times or two times"); <u>id</u>. at 45 ("At least monthly I missed four times, three times, two times, or one time."); <u>id</u>. at 48 ("At least three times I missed monthly.").  But there is no dispute that Mr. Isse was permitted to attend Friday prayers on many occasions.  Even assuming that his request was sometimes denied (Mr. Wyatt remembers only one time when he could not accommodate Mr. Isse because of scheduling problems, <u>see</u> Wyatt Decl. at ¶¶ 6-7), that is not evidence of religious animus.  <u>See</u> <u>Ahmad v. Nassau Health Care Corp.</u>, 274 F. Supp. 2d 185, 193 (E.D.N.Y. 2002) (employer's refusal to give employee time off for religious holiday held not to be evidence of religious animus where employee was allowed to take at least some time off, and employer had "legitimate scheduling concerns"), <u>aff'd</u>, 71 Fed. Appx. 98 (2d Cir. 2003).

Even assuming Mr. Isse's allegations to be true, moreover, the purported conduct is, as a matter of law, much too far removed from his actual termination to prove pretext. <u>Freedman</u> is again highly instructive.  In that case, the plaintiff alleged that his immediate supervisor "stormed out" of a meeting when he first requested religious accommodations and, when those requests were renewed, "expressed anger, even reluctance, at allowing the time off." <u>Freedman</u>, 255 F.3d at 840, 842.  The supervisor also made what the plaintiff perceived as an offensive comment about his Yarmulke.  <u>Id</u>. at 848.  Even though all of these alleged events occurred no more than a year before the plaintiff's termination, the District of Columbia Circuit found them legally insufficient to defeat the employer's summary judgment motion.  <u>Id</u>. at 842-843, 848-849 & n.1.

Likewise, in <u>Elmenayer v. ABF Freight Systems</u>, 2001 WL 1152815 (E.D.N.Y. Sept. 20, 2001), <u>aff'd</u>, 318 F.3d 130 (2d Cir. 2003), the Muslim plaintiff's supervisor made

23

negative comments about his request to attend Friday prayers, including remarking -- at the time that the plaintiff was disciplined for violating company policy and then lying about it -- that "he should think about the incident when he prayed on Fridays." Id at *3-4. Granting the employer summary judgment, the trial court held that this comment, "while insensitive, d[id] not show that [the supervisor's] explanation for disciplining [the employee] was false." Id. at 8. The Second Circuit affirmed that ruling on appeal. Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 135 (2d Cir. 2003).

There is even less connection between Mr. Isse's religious animus evidence and his discharge than in Elmenayer and Freedman. His few alleged comments -- at least one of which is not even about his religion, and none of which concern his employment -- were made, according to Mr. Isse, sporadically in response to terrorist incidents beginning several years before his termination. Isse Dep. 79-84. That some of the claimed remarks allegedly were made by Mr. Wyatt, who participated in the discharge decision, does not suffice to prove pretext. "To be probative, remarks by the decision-maker must have some nexus to the adverse employment decision." Waterhouse, 124 F. Supp. 2d at 12. Where, as here, the alleged remarks "had nothing to do with the decision to terminate the plaintiff and do not belie a discriminatory approach to employment decisions generally," they are legally insufficient to create a genuine issue for trial. Id. Accord Nuriddin v. Goldin, 382 F. Supp. 2d 79, 99 (D.D.C. 2005) ("isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions") (internal quotation marks omitted), aff'd, 2007 WL 1126199 (D.C. Cir. April 16, 2007); Hussain v. Principi, 344 F. Supp. 2d 86, 100 (D.D.C. 2004) ("'stray remarks, even those made by a supervisor, are insufficient to create a triable issue of discrimination where, as here, they are unrelated to an employment decision involving the plaintiff'") (quoting Simms v. U.S.

Gov't Printing Office, 87 F. Supp.2d 7, 9 n.2 (D.D.C. 2000), aff'd, 435 F.3d 359 (D.C. Cir.),

cert. denied, 127 S. Ct. 494 (2006)).

Likewise, there is no meaningful connection between Mr. Isse's discharge and his

alleged difficulty attending Friday prayers, which he also claims began several years before his

discharge.  Isse Dep. at 42-43, 45, 48.  The requests for accommodation in Freedman and

Elmenayer occurred much closer in time to the plaintiffs' discharge and yet were held

insufficient to establish pretext.  See Freedman, 255 F.3d at 842-843 (one year); Elmenayer,

2001 WL 1152815 at *2-3 (eighteen months).  See also Khan v. Federal Reserve Bank of New

York, 2005 WL 273027, at *2, 6 (S.D.N.Y. Feb. 2, 2005) (no reasonable juror could conclude

that Muslim plaintiff was disciplined for requesting a schedule change for Ramadan where

discipline occurred less than four months after the request).

Furthermore, as Mr. Isse admits, his performance evaluations "throughout his

years of employment with the University were never less than satisfactory." Complaint ¶ 9.  In

particular, both of Mr. Wyatt's annual evaluations of Mr. Isse, completed in August 2004 and

August 2005, are, except for the notations of his disciplinary warnings in 2005, fully satisfactory.

Wyatt Decl. at ¶ 18; Exhibits 40, 41.  Given this undisputed evidence, no reasonable juror could

conclude that Mr. Wyatt -- who had known of Mr. Isse's religion for many years, Wyatt Decl. at

¶ 4 -- "set [him] up" and wanted to "get rid of [him]" in September 2005 because he is Muslim.

Isse Dep. at 111.  See Valles-Hall, ___ F. Supp. 2d at ___, 2007 WL 779385, at *28 (applying

"same actor" inference to conclude that adverse employment actions were not discriminatory

where same supervisor gave plaintiff a "perfect evaluation," among other favorable actions,

within prior fourteen months).

In sum, Mr. Isse cannot proffer any evidence to show that his termination for repeated safety infractions, violations of University policy, and insubordination was motivated by his religion.  It is axiomatic that Mr. Isse "'at all times'" bears "'[t]he ultimate burden of persuading the finder of fact that [the University] intentionally discriminated against'" him.  Id. at ___, 2007 WL 779385, at *19 (quoting Morgan v. Federal Home Loan Mortgage Corp., 328 F.3d 647, 651 (D.C. Cir. 2003)).  Because he cannot carry this burden, the Court should grant the University's motion for summary judgment on Mr. Isse's discriminatory discharge claim.

II.     **MR. ISSE'S CLAIM THAT HE WAS TERMINATED IN RETALIATION FOR REQUESTING A RELIGIOUS ACCOMMODATION FAILS AS A MATTER OF LAW**

Mr. Isse also alleges that Mr. Wyatt retaliated against him due to his request to attend Friday prayer services.  Complaint ¶¶ 18-24.  The University is entitled to summary judgment on this claim for two reasons.  First, Mr. Isse did not exhaust his retaliation claim before the EEOC, as Title VII requires.  Second, and in any event, the claim fails on the merits.  Mr. Isse cannot make even a prima facie case of retaliation, because there is no causal connection between his accommodation request, which he claims that he first made in 2000, and his discharge in September 2005.  He also has adduced no evidence that the University's legitimate nondiscriminatory reasons for his discharge are pretexts for retaliatory intent.

A.      **MR. ISSE DID NOT EXHAUST HIS RETALIATION CLAIM**

"Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge."  Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995) (citing 42 U.S.C. § 2000e-5(f)(1)).  "A Title VII lawsuit following the EEOC charge is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'"  Id. (quoting Cheek v.

Western & Southern Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994)).  As this Court recently

reaffirmed, "where a plaintiff has suffered from alleged retaliation before filing a[n]

administrative] complaint . . .[,] the plaintiff 'must include a retaliation claim in [his] complaint

in order to  preserve that claim.'"  Galdamez, 2005 WL 486161, at *7 (emphasis in original)

(quoting Marshall, 276 F. Supp. 2d at 54-55)).  14/  Accord  Pyne v. District of Columbia, 298 F.

Supp. 2d 7, 12 (D.D.C. 2002) (dismissing plaintiff's retaliation claim because "[r]etaliation

suffered before bringing the EEOC charge could have been -- and should have been -- included

in the original EEOC charge").  Mr. Isse manifestly did not satisfy the statutory exhaustion

mandate.

        In the administrative charge that he filed with the EEOC on January 4, 2006, Mr.

Isse did not allege retaliation.  Exhibit 35.  He identified the "cause of discrimination" by

checking the boxes labeled "religion," "age," and "national origin," but he did not check the

"retaliation" box.  Id.  As this Court has held,

>           this empty "check box" is a powerful piece of evidence
>           suggesting that Plaintiff did not mean to press a claim of
>           retaliation in his original complaint.  If Plaintiff had wanted
>           to assert that his termination was based, in whole or in part,
>           on retaliation for his complaints of discrimination, it would
>           have been both simple and obvious to check the
>           "retaliation" box.

Galdamez, 2005 WL 486161 at *7.

        Nor does the narrative portion of Mr. Isse's charge allege retaliation.  It does not

use the word "retaliation," and it does not contain any factual allegations to support a retaliation

claim.  Although the charge alleges that Mr. Isse was "denied a reasonable accommodation," it

---

14 /    Galdamez involved a complaint filed under the District of Columbia Human Rights Act,
D.C. Code Ann. § 2-1401, et seq., which has an exhaustion requirement parallel to Title VII's.
See Galdamez, 2005 WL 486161, at *7.

does not allege that he was terminated for requesting an accommodation.  Rather, the charge

alleges only that Mr. Isse was terminated for infractions for which shuttle drivers outside the

protected classes supposedly were not terminated.  Exhibit 35.

       In similar circumstances, numerous other courts have held that a charge alleging

discrimination does not exhaust a retaliation claim.  See, e.g., Stringer v. Stan Koch & Sons

Trucking, 2006 WL 212190, at * 5 (D. Minn. Jan. 27, 2006) (dismissing retaliation claim where

plaintiff "did not check the retaliation box on his EEOC complaint" and the EEOC charge did

"not allege that [plaintiff] was terminated or retaliated against for . . . requesting

accommodations"); Zenaty-Paulson v. McLane/Sunwest, Inc., 11 AD Cases 893, 2000 WL

33300666 (D. Ariz. Mar. 18, 2000) (dismissing plaintiff's claim that she was retaliated against

for requesting accommodation and observing that "[i]f the court were to find that Plaintiff's

claim for discrimination anticipates her claim for retaliation . . . then it would no longer be

necessary for the charge forms to list a separate box for retaliation").  See also Kolupa v. Roselle

Park District, 438 F.3d 713, 716 (7th Cir. 2006) (plaintiff whose charge "did not mention . . .

retaliation" and who "did not check the box that the form provided for people who wish to

complain about retaliation" did not exhaust retaliation claim); Miles v. Dell, 429 F.3d 480, 492

(4th Cir. 2005) (plaintiff did not exhaust retaliation claim because she "did not check the

retaliation box on her charge form, and the narrative explaining her charge made no mention of

retaliation"); Burke v. Gutierrez, 2006 WL 89936, at *12 (S.D.N.Y. Jan. 12, 2006) ("plaintiff did

not check the box listing retaliation . . . .  Nor is there any allegation of fact in the body of the

complaint which would suggest that plaintiff was claiming that he had been retaliated against").

       The EEOC, moreover, did not consider retaliation to be part of Mr. Isse's charge

and did not investigate such a claim.  See Park, 71 F.3d at 907 ("At minimum, the Title VII

28

claims must arise from 'the investigation that can reasonably be expected to follow the charge of discrimination.'") (quoting Chisholm v. United States Postal Serv., 665 F.2d 482, 491 (4th Cir. 1981)).  The "Notice of Charge of Discrimination" that the agency sent to the University on January 25, 2006, identifies the "circumstances of alleged discrimination" with checkmarks in the boxes for "religion," "national origin," and "age," but the "retaliation" box is not marked. Exhibit 42.  When the EEOC investigator summarized the results of the agency's investigation to Mr. Isse in a "determination interview," she did not mention retaliation, and Mr. Isse "provide[d] no rebuttal or additional information."  Exhibit 37.  See also Exhibit 38 (letter prepared by EEOC investigator summarizing findings).  Any suggestion that Mr. Isse's "retaliation claim was one that would reasonably have been expected to follow from [the EEOC's] investigation is belied by the fact that the EEOC did not investigate retaliation in response to [his] charge."  Miles, 429 F.3d at 492 n.9.

       The District of Columbia Circuit has held that, although "the administrative charge requirement should not be construed to place a heavy technical burden on 'individuals untrained in negotiating procedural labyrinths,' . . . 'the requirement of some specificity in a charge is not a mere technicality.'"  Park, 71 F.3d at 907 (quoting Loe v. Heckler, 768 F.2d 409, 417 (D.C. Cir. 1985), and Rush v. McDonald's Corp., 966 F.2d 1104, 1111 (7th Cir. 1992)). Rather, Title VII's exhaustion requirement "serves the important purposes of giving the charged party notice of the claim and 'narrow[ing] the issues for prompt adjudication and decision.'"  Id. (quoting Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 472 n.35 (D.C. Cir. 1976)).  In this case, the undisputed documentary evidence reveals that the University had no notice that Mr. Isse intended to pursue a retaliation claim.  His administrative charge did not contain a retaliation claim, and the EEOC did not view the charge as encompassing such a claim.  The agency

therefore had no opportunity to consider the claim, and the University had no opportunity to conciliate it prior to this litigation.  For these reasons, Mr. Isse clearly did not exhaust his retaliation claim as required by Title VII, and the claim should be dismissed.

**B.    MR. ISSE'S CLAIM FAILS ON THE MERITS**

Even assuming <u>arguendo</u> that Mr. Isse exhausted his retaliation claim, the claim fails as a matter of law on the merits.  The <u>McDonnell Douglas</u> burden-shifting framework applies to Title VII retaliation claims.  <u>See</u> <u>Morgan</u>, 328 F.3d at 651.  A plaintiff establishes a prima facie case of retaliation by showing "'(1) that he engaged in protected activity; (2) that the employer took an adverse employment action; and (3) that there was a causal connection between the two.'"  <u>Id.</u> (quoting <u>Mitchell v. Baldridge</u>, 759 F.2d 80, 86 (D.C. Cir. 1985)); <u>Johnson</u>, 2006 WL 627154, at *37.  A causal connection can be established by showing a temporal proximity between the protected activity and the adverse action, "but only where the two events are 'very close' in time."    <u>Woodruff v. Peters</u>, 482 F.3d 521, 529 (D.C. Cir. 2007) (quoting <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273-274 (2001)).  The District of Columbia Circuit has held that a gap of eight or nine months is too long to establish a causal connection, <u>Mayers v. Laborers' Health & Safety Fund of North America</u>, 478 F.3d 364, 368 (D.C. Cir. 2007), and the Supreme Court has suggested that even "three and four months" are insufficient.  <u>Id.</u> (citing <u>Breeden</u>, 532 U.S. at 273-274).  Under these settled standards, Mr. Isse clearly cannot establish the requisite causal connection between his discharge and his requests to attend Friday prayers.

Although his testimony is inconsistent regarding when he first allegedly had difficulty attending Friday prayers, by his own account Mr. Isse requested (and frequently received) this accommodation for <u>several years</u> prior to his discharge, including as early as 2000.

Isse Dep. at 29, 30-31, 241-242. <u>See</u> <u>supra</u> at 22-23. The only alleged conversation about Friday prayers that he dates with any specificity occurred, according to his own testimony, in February 2004 -- more than a year and a half before his termination. Isse Dep. at 35-37. Under the settled law of this Circuit, this time period is far too long to permit a reasonable inference of retaliation. <u>See</u> <u>Mayers</u>, 478 F.3d at 368.

Even assuming that he could establish a causal connection, moreover, Mr. Isse has provided no evidence that the University's stated reasons for his discharge are pretexts for retaliation for his requests to attend Friday prayers. At this stage of the analysis, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered reasons are genuine." <u>Woodruff</u>, 482 F.3d at 530. For the same reasons discussed in Part I, above, Mr. Isse has failed to produce any positive evidence of pretext.

Mr. Isse has adduced no evidence from which a reasonable factfinder could conclude that Mr. Wyatt did not "'honestly believe[]'" that he had committed the infractions for which he was disciplined and discharged. <u>Id</u>. at 531 (quoting <u>Fischbach</u>, 86 F.3d at 1183). <u>See</u> <u>supra</u> at 13-17. Nor has he offered evidence that employees similarly situated to him were disciplined less severely. <u>Id</u>. at 18-21. And "no other record evidence indicates any retaliatory motivation on the part of" Mr. Wyatt, Mr. Newman, or the University. <u>Johnson</u>, 2006 WL 627154, at *38. On the contrary, the undisputed record evidence reveals that Mr. Wyatt gave Mr. Isse satisfactory performance evaluations in August 2004 and August 2005 -- less than one month before his discharge. Exhibits 40-41. No reasonable factfinder could conclude from this and the other record evidence in the case that Mr. Wyatt sought to discharge Mr. Isse in September 2005 because of religious accommodation requests that Mr. Isse allegedly began making five years earlier.

Because Mr. Isse did not exhaust his retaliation claim, and because he can neither establish a prima facie case of retaliation or carry his ultimate burden of proving that the real reason for his discharge was retaliation for his requests to attend Friday prayers, his retaliation claim should be dismissed.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant summary judgment to the University on both Mr. Isse's discriminatory discharge and retaliation claims and dismiss his Complaint in its entirety.

Respectfully submitted,


/s/  Hisham Khalid_____
Hisham R.O. Khalid, Esq. (D.C. Bar # 445494)
Associate General Counsel
American University
4400 Massachusetts Avenue, N.W.
Washington, D.C. 20016-2724
Tel. (202) 885-3285
Fax (202) 885-3273

Attorney for Defendants
American University and Kevin Wyatt

Dated:  May 31, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
MOHAMMED ISSE,                      )
                                                    )
              Plaintiff,                          )
                                                    )
       v.                                          )          Civil Action No. 1:06CV01422 (CKK)
                                                    )
AMERICAN UNIVERSITY, et al.,   )
                                                    )
              Defendants.                      )
_____)

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## THERE IS NO GENUINE DISPUTE

       Pursuant to Local Rule 56.1, defendants American University and Kevin Wyatt submit
the following statement of material facts as to which there is no genuine dispute:

       1.       Plaintiff worked as a full-time shuttle bus driver in American University's
Transportation Services Department from approximately 1990 until his termination on
September 16, 2005.  Exhibit 2; Complaint ¶¶ 8, 13.

       2.       Kevin Wyatt has served as the University's Shuttle Supervisor since January 1999
and was Plaintiff's direct supervisor.  Declaration of Kevin Wyatt ("Wyatt Decl.") at ¶ 2
(attached as Exhibit 3 to Defendants' Memorandum of Points and Authorities in Support of Its
Motion for Summary Judgment (hereinafter "Def. Mem.")); Complaint ¶ 6.  Mr. Wyatt has
reported to Tony Newman, the Director of Risk Management and Transportation Services, since
August 2004.  Declaration of Tony Newman ("Newman Decl.") at ¶ 1 (attached as Exhibit 1 to
Def. Mem.).  Mr. Newman's predecessor was Thomas Leathers, who worked in Transportation
Services from June 1995 until July 2004.  Wyatt Decl. at ¶ 2.

       3.       On many occasions during his employment in Transportation Services, Mr. Wyatt
allowed Plaintiff to modify his regular lunch schedule in order to attend Friday Muslim prayer

services.  Deposition of Mohammed Isse ("Isse Dep.") at 27-28 (attached as Exhibit 26 to Def. Mem.); Wyatt Decl. at ¶¶ 4-6.

4.      Mr. Wyatt gave Plaintiff a satisfactory performance evaluation in August 2004. Exhibit 40 to Def. Mem.  Mr. Wyatt's August 2005 evaluation of Plaintiff, except for noting the disciplinary warnings that Plaintiff received that year, was also satisfactory.  Exhibit 41 to Def. Mem.

5.      On April 4, 2005, Tanisha Jagoe, the University's Director of Business Compliance, reported to Mr. Newman that she was riding on a shuttle bus driven by Plaintiff that morning when she observed Plaintiff allow two passengers to get off the bus at two different locations where there were no designated shuttle stops.  Declaration of Tanisha Jagoe ("Jagoe Decl.") at ¶¶ 2-5 (attached as Exhibit 4 to Def. Mem.); Newman Decl. at ¶ 7; Exhibit 5 to Def. Mem.  Mr. Wyatt confirmed for Mr. Newman that Plaintiff was the scheduled relief driver on the bus that Ms. Jagoe was riding when she observed Plaintiff make unauthorized stops.  Newman Decl. at ¶ 7; Wyatt Decl. at ¶ 12.

6.      Mr. Newman and Mr. Wyatt frequently directed the shuttle drivers not to make unauthorized stops because they posed a safety hazard, including at a meeting on March 1, 2005. Newman Decl. at ¶ 4; Wyatt Decl. at ¶ 8; Declaration of Norman Porter ("Porter Decl.") at ¶¶ 2-3 (attached as Exhibit 6 to Def. Mem.); Declaration of Edwin Weddle ("Weddle Decl.") at ¶¶ 2-3 (attached as Exhibit 7 to Def. Mem.).

7.      Based on the information provided by Ms. Jagoe and Mr. Wyatt, and after consulting with the Human Resources Department, Mr. Newman directed Mr. Wyatt to issue Plaintiff a "Level II Documented Oral Warning," based on the April 4 unauthorized stops, for "willful violation of safety rules" on April 8, 2005.  Newman Decl. at ¶ 8; Wyatt Decl. at ¶ 13; Exhibit 8 to Def. Mem.

8.      The University's progressive discipline policy, which by its terms provides "guidelines" for supervisors to follow in cases of employee misconduct, categorizes offenses as Level I, Level II, or Level III, with Level III infractions being the most serious.  Three Level II offenses generally warrant dismissal under the policy.  Exhibit 9 to Def. Mem.  Since becoming Director of Transportation Services, Mr. Newman has regularly treated shuttle drivers' safety violations as Level II violations.  Newman Decl. at ¶ 8.

9.      William Suter, the University's Director of Physical Plant Operations, reported to Mr. Newman that on July 11, 2005 at about 7:00 a.m. he observed shuttle bus #160 turn into the main campus without using a turn signal and run a stop sign.  Newman Decl. at ¶ 9; Exhibit 10 to Def. Mem.  Mr. Wyatt confirmed to Mr. Newman that Plaintiff was assigned to bus #160 and showed Mr. Newman a signed gas receipt demonstrating that Plaintiff had purchased gas for the bus that morning.  Newman Decl. at ¶ 9; Wyatt Decl. at ¶ 14; Exhibit 11 to Def. Mem.

10.     Based on the information provided by Mr. Suter and Mr. Wyatt, and after consulting with the Human Resources Department, Mr. Newman directed Mr. Wyatt to issue Plaintiff a "Level II Written Warning," based on the July 11 incident, for engaging in "careless, reckless, or slipshod work," on July 26, 2005.  Newman Decl. at ¶ 9; Exhibit 12 to Def. Mem.

11.     On September  15, 2005, Ms. Jagoe reported to Mr. Newman that she had ridden Plaintiff's bus for the past two mornings and observed him take a left turn onto Wisconsin Avenue not from Albemarle Street, where there is a traffic light, but from Grant Road, where there is no traffic light.  Ms. Jagoe reported that on September 15 Plaintiff's bus blocked five lanes of traffic and that he honked his horn at least eight times at other drivers.  Newman Decl. at ¶ 13; Jagoe Decl. at ¶¶ 6-7; Exhibit 16 to Def. Mem.  Brenda Harner, a University Human

3

Resources Policy Analyst who was riding the same bus as Ms. Jagoe, confirmed Ms. Jagoe's report.  Newman Decl. at ¶ 15.

12.      Shuttle drivers were specifically instructed in an April 11, 2005, "Route Summary" memorandum to use Albemarle Street, not Grant Road, when returning from the Tenleytown Metro Station to the University's main campus.  Exhibit 18 to Def. Mem.  The Route Summary memorandum stated that "NO shuttle operator can change or deviate from the normal/regular shuttle routes without prior approval from Kevin and/or Tony Newman <u>FIRST</u>." <u>Id</u>. (emphases in original).  Other shuttle drivers recall receiving and discussing the Route Summary memorandum with Mr. Isse after it was distributed.  Porter Decl. at ¶ 4; Weddle Decl. at ¶ 4.  Drivers were also instructed to use Albemarle Street when returning to the main campus at a meeting on July 28, 2005.  Newman Decl. at ¶ 10.

13.      On April 11, 2005, Mr. Wyatt posted on the driver clipboard (a bulletin board in the Transportation Services Department) a notice stating in large, boldface type that drivers must not deviate from normal routes without prior permission.  Wyatt Decl. at ¶ 11; Exhibit 19 to Def. Mem.  Plaintiff admits that he saw this notice in April 2005.  Isse Dep. at 176-178.

14.      After consulting with his supervisor Pat Kelshian and Human Resources Specialist Grace Karmiol, who drafted the termination memorandum, Mr. Newman directed Mr. Wyatt to terminate Plaintiff's employment on September 16, 2005 based on his repeated infractions and insubordination in disobeying the direct order not to deviate from approved routes.  Newman Decl. at ¶ 15; Wyatt Decl. at ¶ 16; Exhibit 17 to Def. Mem.

15.      At the time of Plaintiff's termination, Mr. Wyatt interviewed other drivers, including Edwin Weddle and Monissa Segar, to determine whether they were using Grant Road.  Mr. Weddle stated that he stopped using Grant Road after he was told not to do so at a staff

meeting; the other drivers interviewed stated that they used Albemarle Street.  Wyatt Decl. at ¶ 16.

16.     Although Plaintiff initially denied to Mr. Wyatt that he made a left turn from Grant Road on September 15, Newman Decl. at ¶ 14; Wyatt Decl. at  ¶ 16; Exhibit 20 to Def. Mem., Plaintiff now admits that he did so.  Isse Dep. at 131, 134.

17.     Several other University shuttle drivers have been terminated for safety violations, including failing to secure a bus that crashed into a parked car; driving recklessly and under the suspicion of driving under the influence; and leaving a running bus unattended. Newman Decl. at ¶ 16; Exhibit 39 to Def. Mem.  Other drivers have received Level II warnings short of the three generally required for termination for safety infractions such as driving an overcrowded bus and failing to give the right of way to another driver.   Newman Decl. at ¶ 16.

18.     On September 26, 2005 Plaintiff filed a written appeal of his termination to the University's Staff Personnel Review Board ("Review Board").  Exhibit 21 to Def. Mem.  A Hearing Panel consisting of three University administrators from other departments conducted a full evidentiary hearing and subsequently rejected Plaintiff's appeal.  Exhibits 31, 32 to Def. Mem.

19.     Plaintiff admits that his representation to the Review Board that he complained about being unable to attend Friday prayers and about anti-Muslim comments to the Human Resources Department in 2002 and 2003 was false.  Exhibits 21, at 3, 22-23 to Def. Mem.; Isse Dep. at 218-219.

20.     Plaintiff filed numerous written complaints about various aspects of his employment throughout his tenure at the University, including a 1998 complaint about an altercation he had with another employee over microwave use and leaving work early, Exhibit 27

to Def. Mem.; 2002 and 2003 complaints to the Human Resources Department about a variety of concerns, including inadequate pay and his supervisor's refusal to help him clean his bus, Exhibits 22 and 23 to Def. Mem.; a 2005 complaint about two Level I warnings that he received for not reporting to work and for stopping a route without permission, Exhibit 28 to Def. Mem.; a memorandum to Mr. Newman with copies to Mr. Newman's supervisor Pat Kelshian and a Human Resources officer challenging his April 8 and July 26, 2005 Level II warnings, Exhibit 14 to Def. Mem.; and his appeal to the Review Board, Exhibit 21 to Def. Mem.

21.    Acting Provost Ivy Brooder reviewed the Review Board's findings and affirmed its recommendation that Plaintiff's termination be upheld.  Exhibits 33, 34 to Def. Mem.

22.    Plaintiff filed an EEOC charge against the University on January 4, 2006, in which he identified the "cause of discrimination" by checking the boxes marked "religion," "age," and "national origin," but not "retaliation."  Exhibit 35 to Def. Mem.  The narrative portion of the charge did not use the word retaliation and did not allege any retaliatory conduct. Id.

23.    The "Notice of Charge of Discrimination" that the EEOC sent to the University on January 25, 2006, identifies the "circumstances of alleged discrimination" with checkmarks in the boxes for "religion," "national origin," and "age," but the "retaliation" box is not marked. Exhibit 42 to Def. Mem.  The EEOC investigator's memorandum summarizing her "determination interview" with the Plaintiff does not mention retaliation and states that he "provide[d] no rebuttal or additional information."  Exhibit 37 to Def. Mem.

24.     On May 9, 2006, the EEOC issued Plaintiff a "Dismissal and Notice of Rights"

stating that the agency was "unable to conclude" from its investigation of Plaintiff's charge "that

the information obtained establishes a violation of the statutes."  Exhibit  36 to Def. Mem.


Respectfully submitted,


/s/ Hisham Khalid_____
Hisham R.O. Khalid, Esq. (D.C. Bar # 445494)
Associate General Counsel
American University
4400 Massachusetts Avenue, N.W.
Washington, D.C. 20016-2724
Tel. (202) 885-3285
Fax (202) 885-3273

Attorney for Defendants
American University and Kevin Wyatt

Dated:  May 31, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Motion for Summary

Judgment and supporting materials was served this 31st day of May, 2007, by first-class

U.S. mail, postage prepaid, upon:

Mohammed Isse
4939 Carriage Park Road
Fairfax, VA 22032


_/s/ Hisham Khalid_____
Hisham Khalid