IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMED ISSE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06-1422 (CK) |
| ) | |
| AMERICAN UNIVERSITY et al., ) | |
| ) | |
| Defendant. ) | |

**DECLARATION OF ANTHONY NEWMAN**

I, Anthony Newman, declare as follows:

1. My name is Anthony Newman. I have been the Director of Risk Management and Transportation Services at American University since August 2004. I have personal knowledge of the matters set forth in this declaration.

2. The Transportation Services department (the "department") employs approximately 23 full-time and part-time drivers. These shuttle drivers operate 30-foot or larger commercial transit buses and other university owned and leased vehicles. These buses transport students, faculty, and staff from AU's main campus located at 4400 Massachusetts Avenue to the Tenleytown metro station located at 40th and Albemarle Streets and to other University facilities, including the Tenley Campus located at Tenley Circle and the Washington College of Law ("WCL") located at 4801 Massachusetts Avenue. Drivers are expected to operate the buses safely and in accordance with all federal and local laws and university policies. The unit is supervised by Kevin Wyatt, the Shuttle Bus Supervisor. Mr. Wyatt reports directly to me.

3. At the time of Mohammed Isse's discharge, the department ran three separate routes. The routes were: 1) Main Campus to Tenley Campus and Tenleytown Metro (referred to within Transportation Services as "Metro 1", "Metro 2" and "Metro 3"); 2) Washington College of Law to Tenleytown Metro (referred to as "WCL Direct 1" and "WCL Direct 2"); and 3) Main Campus to Washington College of Law. Drivers receive route assignments on a weekly basis and routes are rotated daily. All day-time drivers receive a one hour break during which a scheduled driver – another member of the shuttle staff or Kevin Wyatt --- operates the regular driver's bus.

4. On March 1, 2005, at a regularly scheduled staff meeting, both I and Kevin Wyatt instructed all shuttle drivers that it is unsafe and against University policy to let passengers off the bus where there is no designated shuttle stop. I stated that such stops constitute a safety hazard because they encourage students and other riders to approach buses in traffic where they cannot always be seen by the shuttle bus drivers or by other vehicles. I also said that letting passengers off buses at non-designated stops posed similar concerns because disembarking passengers may not be seen or anticipated by surrounding vehicles. Mr. Isse was present at this meeting. This issue was also addressed during previous staff meetings, and the importance of avoiding unauthorized stops had been stressed by me and Kevin Wyatt on many occasions throughout 2004 and early 2005.

5. On April 11, 2005, I asked Kevin Wyatt to distribute a memorandum to all shuttle bus drivers that gave exact directions for all of the University's shuttle routes. The memorandum reiterated the long standing prohibitions regarding route and stop deviations. A true and correct copy of this memorandum is

attached as Exhibit 18 to defendants' memorandum in support of their summary judgment motion.

6. In addition, I and Kevin Wyatt advised all drivers in regularly scheduled staff meetings that on the main campus to the Tenleytown Metro route, when returning to the main campus drivers were to turn left onto Wisconsin Avenue from Albemarle Street, where there is a traffic light and not from Grant Road, where there is no traffic light. At these meetings, we told the drivers not deviate from the regular routes without getting permission from me or Kevin Wyatt. Mr. Isse was present at these meeting.

7. On April 11, 2005, I instructed Kevin Wyatt to post a notice on the driver's clipboard within the department. This memorandum stated that drivers should not deviate from normal routes without prior permission. A true and correct copy of this memorandum is attached as Exhibit 19 to defendants' memorandum in support of their summary judgment motion.

8. On April 4, 2005, I received a complaint from Tanisha Jagoe, the University's Director of Business Compliance, about Mr. Isse's operation of a shuttle bus she rode that day. Ms. Jagoe reported that shortly after 11:00am, Mr. Isse twice allowed passengers to get off his bus while stopped at traffic lights where there were no designated stops. Ms. Jagoe identified Mr. Isse as the driver. I spoke with Kevin Wyatt shortly after receiving the complaint who also confirmed that Mr. Isse was the relief driver for Metro 1 that day.

9. I instructed Mr. Wyatt to draft a disciplinary memorandum for "a Level II documented oral warning" for willful violations of safety rules. Since arriving at

the University, I have generally treated safety violations for shuttle drivers as a Level II offense under the University's progressive disciplinary policy. After having consulted with the University Human Resources department, I advised Mr. Wyatt to issue the disciplinary memorandum to Mr. Isse.

10. On July 11, 2005, William Suter, the University's Director of Physical Plant Operations, reported to me that just before 7:00 am that day he observed shuttle bus #160 turn into the main campus without using a turn signal and then run a stop sign. Mr. Suter put his complaint in writing in an e-mail to me dated July 19, 2005. I reported the incident to Kevin Wyatt and asked him to look into the matter and find out who was assigned to drive bus #160. Mr. Wyatt reported back to me that Mr. Isse was assigned to drive bus #160. Mr. Wyatt also secured a Citgo gas receipt signed by Mr. Isse showing that Mr. Isse had purchased gas that morning for the bus. A true and correct copy of this receipt is attached as Exhibit 11 to defendants' memorandum in support of their summary judgment motion. I consulted with the University's Human Resources Department concerning my decision to take disciplinary action against Mr. Isse in light of this safety violation. With HR approval, I instructed Mr. Wyatt to issue a formal disciplinary warning ("Level II Written Warning") to Mr. Isse on July 26, 2005 for "careless, reckless, and slipshod work."

11. On July 28, 2005, during a regular staff meeting I again reminded drivers to use Albemarle Street when returning to the main campus. I recall Mr. Isse being present at this meeting.

12. Mr. Isse met with me on August 4, 2005. In this meeting, Mr. Isse contested his prior disciplinary notices and described numerous purported improprieties

in the department but he did not allege discrimination. I summarized Mr. Isse's concerns in a memorandum to him dated August 8, 2005.

      13.      On April 9, I received a written complaint from Mr. Isse about the April 8 and July 26 disciplinary actions. I reviewed Mr. Isse's complaint with Ms. Beth Muha the Executive Director of HR and Ms. Pat Kelshian, the Executive Director of Risk Management both of whom were copied on the complaint. After doing so, I concluded that both warnings were justified based upon eyewitness reports by two individuals outside the department, including Ms. Jagoe who identified Mr. Isse as the driver of the first incident. I also found persuasive the fact that Mr. Isse was assigned to drive bus #160 on July 11 and there existed a gas receipt signed by Mr. Isse which placed him with the bus that same morning. On August 23, 2005, I sent Mr. Isse a letter advising him of my decision to uphold the discipline.

      14.      Unfortunately, Mr. Isse's performance did not improve in the months following the disciplinary warnings. Instead, Mr. Isse continued to violate safety rules. On September 15, 2005, I received another complaint from Ms. Jagoe about Mr. Isse's driving. Ms. Jagoe reported to me that during the past two morning rush hours, Mr. Isse had returned from the Tenleytown Metro stop by making a left turn onto Wisconsin Avenue not from Albemarle Street, where there is a traffic light, but from Grant Road, where there is no traffic light. Among other things, Ms. Jagoe reported that Mr. Isse blocked 5 lanes of traffic as he crossed over Wisconsin Avenue.

      15.      I asked Kevin Wyatt to meet with Mr. Isse immediately and get his explanation, if any. Mr. Wyatt reported back to me that in his discussion with Mr. Isse, Mr. Isse had denied taking Grant Road or otherwise deviating from the approved routes.

Mr. Wyatt also reported to me that he spoke with several other drivers who denied using Grant Road after we issued the April 11 directive not to do so. Based on Ms. Jagoe's report and Mr. Isse's prior disciplinary record, Kevin Wyatt and I agreed that Mr. Isse's employment should be terminated. I subsequently spoke with my supervisor Pat Kelshian, who concurred in the termination decision.

16. As I was the person ultimately responsible within the department for making personnel decisions, I contacted Grace Karmiol, Director of Policy and Regulatory Affairs in the University's Human Resources Department concerning my decision to discharge Mr. Isse. I notified Ms. Karmiol that Mr. Isse had denied the misconduct in question. As is customary, Ms. Karmiol drafted the termination memorandum on our behalf. When I spoke with Ms. Karmiol later that day, she advised me that while she was discussing the matter with her staff, one of her staff members, Brenda Harner, reported that she too was on Mr. Isse's bus that morning and could corroborate Ms. Jagoe's complaint. After speaking with Ms. Karmiol, I instructed Mr. Wyatt to terminate Mr. Isse's employment effective September 16, 2005 for careless and slipshod work, willful violation of safety rules and insubordination.

17. Attached as Exhibit **39** to defendants' memorandum in support of their summary judgment motion is a true and correct copy of a list of all University shuttle drivers whose employment was terminated between January 2002 and January 2007. The list reflects the date of termination and the reason for termination for each affected employee. In addition to the terminations described in the foregoing list, two drivers have received write-ups for Level II safety violations since I have been the Director of Transportation Services. The first driver, Edwin Weddle, received a write-up

on July 25, 2005 for overcrowding a bus and a second write-up on November 11, 2005 for failing to give the right of way to another vehicle. The second driver, Yosef Ayalew, received a write-up on October 20, 2005 for overcrowding his bus.

18. The University does not ask employees about their religious affiliations. I have no reason to believe that any other shuttle bus operators employed during Mr. Isse's tenure were Muslim.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 29, 2007