IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMED ISSE, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> AMERICAN UNIVERSITY et al., ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 06-1422 (CK) |

**DECLARATION OF KEVIN WYATT**

I, Kevin Wyatt, declare as follows:

1. My name is Kevin Wyatt. I have been the Shuttle Operations Coordinator within Transportation Services at American University since January 9, 1999. I have personal knowledge of the matters set forth in this declaration.

2. I am responsible for the day to day supervision of approximately 23 full-time and part-time drivers. My direct supervisor is Anthony Newman, Director of Risk Management and Transportation Services. My previous supervisor was Thomas Leathers. Mr. Leathers was employed at the University from June 1995 to July 2004.

3. One of my responsibilities is to coordinate the shuttle operators' schedules and lunch breaks. All day-time drivers receive a one hour break during which a scheduled driver – another member of the shuttle staff or I --- operates the regular driver's bus. Lunch breaks are generally determined based upon the route assigned to the driver. Each bus route has with it a corresponding time in which the driver is given

an hour lunch break. The regular schedule includes staggered lunch breaks beginning at 9:30 a.m. and ending at 12:50 p.m.

4. Soon after assuming my responsibilities as shuttle operations coordinator, I became aware that Mr. Isse was a practicing Muslim and wanted to continue to attend Friday prayer sessions. Mr. Isse advised me that these sessions occurred between 1:10 to 2:10 each Friday.

5. I acknowledged Mr. Isse's request, told him I would accommodate it, and planned Friday lunch schedules so that Mr. Isse's lunch break would correspond with Friday prayer sessions. This accommodation required rearranging the regular schedule to allow Mr. Isse to take his lunch break outside of the normal lunch break period. This accommodation was well known to other drivers within the department since Mr. Isse was the only driver whose lunch break was at the same time and not dependent on the assigned route.

6. Over roughly the six year period I supervised Mr. Isse, I am aware of only one Friday prayer session which Mr. Isse could not attend because I could not accommodate his schedule.

7. Mr. Isse never complained to me about not being able to attend Friday prayers. As I mentioned above, I recall only one occasion sometime in late 2003 or early 2004 where I could not allow Mr. Isse to attend a Friday Prayer session because of scheduling problems. I recall Mr. Isse being upset. I am unaware of any formal complaint that he made to either the University Human Resources Department or my supervisors regarding his inability to attend Friday prayers. I first learned about Mr.

Isse's allegations concerning Friday prayers during Mr. Isse's appeal of his September 16, 2005 termination to the Unversity's Staff Personnel Review Board.

8. On March 1, 2005, at a regularly scheduled staff meeting, both I and Anthony Newman instructed all shuttle drivers that it is unsafe and against University policy to let passengers off the bus where there is no designated shuttle stop. Mr. Isse was present at this meeting. This issue was addressed during previous staff meetings, and the importance of avoiding unauthorized stops had been stressed by me and Tony Newman on many occasions throughout 2004 and early 2005.

9. On April 11, 2005, Mr. Newman asked me to distribute a memorandum to all shuttle bus drivers that gave exact directions for all of the University's shuttle routes. The memorandum reiterated the long standing prohibitions regarding route and stop deviations. A true and correct copy of this memorandum is attached as Exhibit 18 to defendants' memorandum in support of their summary judgment motion. I recall giving a copy to Mr. Isse by hand.

10. This memorandum supplemented discussions I had with drivers, including Mr. Isse, that on the main campus to the Tenleytown Metro route, when returning to the main campus drivers were to turn left onto Wisconsin Avenue from Albemarle Street, where there is a traffic light and not from Grant Road, where there is no traffic light.

11. I also have a longstanding practice of using the department bulletin board (the "clipboard") to disseminate information to drivers and supplement matters discussed at regular staff meetings. The department clipboard is located in a conspicuous place on the first level of the transportation services department building. On April 11,

2005, I posted a notice on the driver's clipboard. This memorandum stated that drivers should not deviate from normal routes without prior permission. A true and correct copy of this memorandum is attached as Exhibit 19 to defendants' memorandum in support of their summary judgment motion.

12. On April 4, 2005, Mr. Newman advised me that he received a complaint from Tanisha Jagoe, the University's Director of Business Compliance, about Mr. Isse's operation of a shuttle bus she rode that day. Mr. Newman advised me that Ms. Jagoe reported that Mr. Isse twice allowed passengers to get off his bus while stopped at traffic lights where there were no designated stops. I checked my records, confirmed that Mr. Isse was the relief driver for Metro 1 that day, and advised Mr. Newman of this fact.

13. Mr. Newman advised me to draft a disciplinary memorandum for "a Level II documented oral warning" for willful violations of safety rules based on the unauthorized stops that Ms. Jagoe reported Mr. Isse made on April 4. My draft was vetted through the Human Resources Department. Afterward, I issued the disciplinary memorandum to Mr. Isse.

14. On July 11, 2005, Mr. Newman advised me that William Suter, the University's Director of Physical Plant Operations, had reported to him that just before 7:00 am that day Mr. Suter observed shuttle bus #160 turn into the main campus without using a turn signal and then run a stop sign. Mr. Newman asked me to look into the matter and find out who was assigned to drive bus #160. My records showed that Mr. Isse was assigned to drive bus #160. I also secured a Citgo gas receipt signed by Mr. Isse showing that he had purchased gas that morning for the bus. A true and correct copy of this receipt is attached as Exhibit 11 to defendants' memorandum in support of their

summary judgment motion. I informed Mr. Newman of my findings, who after consulting with Human Resources, instructed me to issue a formal disciplinary warning. I issued the discipline ("Level II Written Warning") to Mr. Isse on July 26, 2005 for "careless, reckless, and slipshod work."

15. On September 15, 2005, Mr. Newman told me that he had received another complaint from Ms. Jagoe about Mr. Isse's driving. Mr. Newman told me that Ms. Jagoe had reported that during the past two morning rush hours, Mr. Isse had returned from the Tenleytown Metro stop by making a left turn onto Wisconsin Avenue not from Albemarle Street, where there is a traffic light, but from Grant Road, where there is no traffic light and had blocked 5 lanes of traffic as he crossed over Wisconsin Avenue.

16. Mr. Newman asked me to meet with Mr. Isse immediately and get his explanation. I met with Mr. Isse that afternoon. Mr. Isse denied taking Grant Road or otherwise deviating from approved routes. During the meeting, Mr. Isse said that he believed other drivers were taking the Grant Road turn and mentioned Mr. Weddle by name. I interviewed several shuttle operators, including Mr. Weddle and Monissa Segar, to determine whether other drivers were using Grant Road. Mr. Weddle reported that he stopped using Grant Road after he was told not to do so in the staff meetings. Everyone else reported using Albemarle Street. I reported my findings back to Mr. Newman. We discussed the matter and agreed that based upon Ms. Jagoe's report and Mr. Isse's prior disciplinary record, Mr. Isse should be terminated. Mr. Newman consulted with the Human Resources Department and his supervisor Ms. Kelshian before instructing me to issue the termination memo dated September 16, 2005.

17. I am aware that Mr. Isse claims that I refused to allow him to attend Friday prayers on numerous occasions from approximately 2000 to 2005 and that I and Mr. Thomas Leathers made comments derogatory to Muslims. I did not say any of the things attributed to me by Mr. Isse, nor have I made other comments derogatory to Muslims.

18. I was responsible for Mr. Isse's annual performance evaluations while he was under my supervision. True and correct copies of Mr. Isse's August 2004 and 2005 evaluations which I prepared are attached as Exhibit 40 and 41 to defendants' memorandum in support of their summary judgment motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 30, 2007