## Capital Reporting Company

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2       ------------------------X

3    MOHAMMED A. ISSE,           :          ⌐ ORIGINAL

4              Plaintiff,        :

5                               : Civil Action No.: 1:06cv04122

6         v.                    : Judge Colleen Kollar-Kotelly

7    AMERICAN UNIVERSITY,        :

8    et al.,                     :

9              Defendant.  :

10      ------------------------X

11                                     Washington, D.C.

12                          Tuesday, February 27, 2007

13   Deposition of:

14              MOHAMED A. ISSE

15   called for oral examination by Counsel for Defendant,

16   pursuant to notice at the American University, Office of

17   General Counsel, 4400 Massachusetts Avenue, Northwest,

18   Suite 270, Washington, D.C. 20016-8165, before

19   Oveda V. Hancock of Capital Reporting, a Notary Public

20   in and for the District of Columbia, beginning at 9:00

21   a.m., when were present on behalf of the respective

22   parties:
```

## Capital Reporting Company

Page 26

1  individual units? Do you know that?
2  A. Yeah, it was. Colleen, when she was there.
3  Q. Colleen Carson?
4  A. Yeah.
5  Q. All right. Just for the record, Colleen?
6  A. She was involved with the police department.
7  They divided the department.
8  Q. Right.
9  A. They separated the department. Colleen was
10 running the whole operation, then they separated the
11 departments. So transportation and the police
12 department, they were separate.
13 Q. Okay. Do you remember when that was?
14 A. Oh, I think in 2005, 2003, or 2004, something
15 like that.
16 Q. Okay. So the head of Shuttle Services was
17 Thomas Leathers; is that correct?
18 A. Yes.
19 Q. Okay. Now, Mr. Isse, is it fair to say you
20 are a Muslim?
21 A. Yes.
22 Q. When you came to the University, did anyone

Page 27

1  know here that you were a Muslim?
2  A. Yes.
3  Q. Would you say most people knew you what your
4  religion was?
5  A. The people I worked with knew I was Muslim,
6  some other students and stuff and the faculty, some of
7  them they see me like at Kay Chapel.
8  Q. Kay Chapel where you would go and pray?
9  A. Yeah. Go and pray, yeah
10 Q. Okay. So you're saying all the employees --
11 your coworkers, the shuttle bus drivers -- would know
12 you were Muslim because you were practicing?
13 A. Yeah.
14 Q. Also, the same for supervisors, they would
15 know you were Muslim?
16 A. Yes. I'm a Muslim, they know that.
17 Q. Okay. Did you attend Friday prayers here at
18 Kay Chapel?
19 A. What do you mean by that question?
20 Q. Did you ever attend Friday prayer? Let's
21 start, have you ever attended Friday prayers?
22 A. Yes, I did.

Page 28

1  Q. Okay.
2  A. Yeah.
3  Q. How often did you attend Friday prayers?
4  A. Well, I usually go Friday, like, to Friday
5  prayer. But I have a difficult time to go to Friday
6  prayer, with them letting me go to Friday prayer.
7  Q. Did you attend the Friday prayers?
8  A. Before, yes, I attended a couple of times. I
9  attended. After a little time, they give me a hard time
10 because of Friday prayer.
11 Q. Let's start from the beginning. You were here
12 from 1990?
13 A. Yes.
14 Q. Did you go to Friday prayers in 1990?
15 A. Yes.
16 Q. Nineteen ninety-one?
17 A. Yes.
18 Q. Ninety-two?
19 A. Yes.
20 Q. Ninety-three?
21 A. Yes.
22 Q. Ninety-four?

Page 29

1  A. Ninety-four? Is that right?
2  Q. Nineteen ninety-four, did you go to Friday
3  prayers?
4  A. Yes.
5  Q. Okay. Ninety-five?
6  A. Since Thomas Leathers came into the
7  Department, I have a difficult time.
8  Q. When you say you had a difficult time, the
9  date? This is significant, I imagine, for you when you
10 could not or you had a difficult time going to prayers.
11 When did that begin?
12 A. Oh, it started like -- I don't have it in
13 front of me but I have it.
14 Q. But, Mr. Isse, this is the central part of
15 your lawsuit; right?
16 A. Yes.
17 Q. So let me ask you a question. Your faith is
18 important to you; right?
19 A. Oh, yes.
20 Q. So you don't remember when it became difficult
21 for you to attend Friday prayers as we sit here today?
22 A. Yes, yes, yes.

8 (Pages 26 to 29)

## Capital Reporting Company

**Page 30**

1    Q.  Okay.  Help me understand.
2    A.  Yes.  I have to look over my papers.
3    Q.  I'm just asking now.  I'm just asking you, to
4    the best of your knowledge at this point, when did that
5    occur?
6    A.  Oh, yeah.  It occurred like in two thousand--?
7    I have to have dates.  I wrote it up.
8    Q.  I'm going to ask you about that.  To the best
9    of your knowledge now, and then we can talk about your
10   papers and refresh your memory, to the best of your
11   knowledge, when do you think that happened?
12   A.  It might --
13   Q.  If you can remember.
14   A.  Yeah.  Two thousand five, two thousand four,
15   two thousand three, and two thousand one.
16   Q.  Two thousand one?
17   A.  Two thousand.
18   Q.  I'm sorry, say that again.
19   A.  Two thousand three.
20   Q.  Right.
21   A.  Two thousand three.
22   Q.  Okay.  Let me, I want to be clear on this.

**Page 31**

1    You're saying in 2005 you had a problem going to Friday
2    prayers?
3    A.  Yes.
4    Q.  In 2004, you had a problem going to Friday
5    prayers?
6    A.  Yes.
7    Q.  In 2003, you had a problem going to Friday
8    prayers?
9    A.  Yes.
10   Q.  In 2002, did you have a problem going to
11   Friday prayers?
12   A.  In 2002, I have it but -- I have it, yes.
13   Q.  Okay.  So your testimony is 2002 also.  What
14   about 2001?
15   A.  I don't agree with that.
16   Q.  So you're not sure?  But you're sure of 2002
17   through 2005 when you departed the University you had a
18   problem?
19   A.  Yes.
20   Q.  A four-year period?
21   A.  Yeah.
22   Q.  Okay.

**Page 32**

1    A.  I mentioned that they were here in 2004, like,
2    in February or something like that.  I mentioned I
3    wanted to go to the Discrimination Office.
4    Q.  I'll ask you about that in a second, but tell
5    me about the documents that you wanted to look at.  What
6    documents do you have here with you today?
7    A.  Yes.  Right here, the one I was --
8        (Witness hands document to Mr. Khalid.)
9    Q.  BY MR. KHALID:  We don't need to mark this,
10   but let me just see what this is.  Is this all the
11   documents you have, or do you have other documents?
12   A.  Well, I have that one, but I don't have the
13   other one, my list.
14   Q.  I'm just asking you straight questions.  What
15   documents do you have here with you today?
16   A.  I have that one.
17   Q.  This is the only document you have?
18   A.  No, I have different papers, you know.  It's
19   not --
20   Q.  Do you have any papers that have anything to
21   do with this lawsuit?
22   A.  Yes.

**Page 33**

1    Q.  Okay.  So I'm asking you what they are.  Can I
2    take a look at the documents?
3        (The witness complies.)
4    Q.  BY MR. KHALID:  Mr. Isse, are all of these
5    documents that you provided to me and American
6    University in response to interrogatory and document
7    requests?  Did you provide all these documents to me?
8    A.  Not this one.  This one I just ask you for, I
9    think I give it to you.
10   Q.  Well, I'll tell you right now this document I
11   have not seen before, which is a document from the EEOC.
12   The second document I have not seen before.  The third
13   document I have not seen before.
14       This looks like documentation from the EEOC in
15   connection with your charge of discrimination, which I
16   requested in a document request.  So my question is, why
17   didn't you produce this to me?
18   A.  I think I sent it to you.  You don't have it?
19   Q.  I don't have these documents.  I don't have,
20   particularly the first several documents I do not have.
21   Did you prepare your own documents in response, or did
22   the attorney who was helping you?

9 (Pages 30 to 33)

## Capital Reporting Company

Page 34

1    A.  I did it myself.
2    Q.  Okay.  Well, I should have a copy of this
3  entire packet.  Before we leave today, I need to make a
4  copy of that.
5    A.  Okay.  No problem.
6    Q.  I may need to ask you questions about it, too,
7  so I may need during the break to look at those
8  documents to see if there is anything that is relevant,
9  otherwise we will have to reconvene and do this again.
10  So I need to see that.
11    A.  Okay.
12    Q.  Okay.  Any other documents that you have here
13  today?
14    A.  I think I give it to you.
15    Q.  I'm going to give it to my law clerk to make a
16  copy, if you don't mind.
17    MR. KHALID:  You don't have to make it right
18  now.
19    MS. KRAUT:  Okay.
20    Q.  BY MR. KHALID:  What you're looking at has
21  nothing to do with this matter?
22    A.  No.  I give to you all these things.

Page 35

1    Q.  Okay.
2    A.  Whatever you send to me I send you back, you
3  know.
4    Q.  Okay.  Okay, let's try to move forward here.
5  We are talking about the issue of Friday prayers.
6    A.  Yeah.
7    Q.  Again, your testimony is that from 2001
8  through 2005 you had a problem with attending Friday
9  prayers.  So I'm asking you what problem did you have
10  attending Friday prayers, specifically?
11    A.  Specifically, he refused to let me go to them.
12    Q.  Who is "he"?
13    A.  Thomas Leathers and Wyatt.
14    Q.  Okay.  Let's start with Thomas Leathers.  So
15  you're saying that Thomas Leathers told -- well, you
16  tell me what Thomas Leathers told you.
17    A.  Yeah, the first thing, before they told me,
18  "You can't go to Friday prayer."  They say, "You can't
19  go to Friday prayer.  We don't have people."  And we
20  have people.  They can give you Friday prayers, but they
21  don't want me to practice my religion.  At the same
22  time, one day Wyatt told me, "Well, you cannot go to

Page 36

1  Friday prayer."
2    And I say, "Why?  This is discriminatory."
3    Q.  When did that happen?
4    A.  In 2004.
5    Q.  When in 2004?
6    A.  It was February.
7    Q.  So in February 2004, your testimony under oath
8  is that Wyatt told you that you cannot go to Friday
9  prayers?
10    A.  Yes.
11    Q.  Was he saying that you can't go --
12    A.  It was back in --
13    (Simultaneous discussion.)
14    Q.  BY MR. KHALID:  Let me ask, wait, was he
15  saying that you could not attend a Friday prayer session
16  or you could not go to any Friday prayer session?
17    A.  "You cannot go to Friday prayer," that's what
18  he said.
19    Q.  Okay.  So you understood that to mean you
20  could never attend Friday prayer?
21    A.  Yes.
22    Q.  Because?  Did he give you a reason?

Page 37

1    A.  Because he doesn't like I'm a Muslim.
2    Q.  And what is your basis for that?
3    A.  Because he knows I'm practicing my religion.
4    Q.  But what is your basis because you practice
5  your religion that he doesn't like it?  What facts do
6  you have?
7    A.  The facts?
8    Q.  Yes.  What facts do you have to support that?
9    A.  What do you mean "facts"?
10    Q.  What facts do you have?  You made a conclusion
11  that he does not like the fact that you are a Muslim.
12  What facts do you have to support that?
13    A.  I don't know.
14    Q.  What firsthand knowledge do you have to
15  support that conclusion that you just drew, that he
16  doesn't like you because you're Muslim?
17    A.  Because he never let me go there.
18    Q.  Okay.  So it's based upon the fact that he did
19  not allow you to go to the Friday prayers?
20    A.  Yes.
21    Q.  Okay.  So you have the Wyatt comment in
22  February 2004.  Were there any witnesses to that

10 (Pages 34 to 37)

## Capital Reporting Company

Page 42

1    A.  Yes.
2    Q.  Weekly?  Every week basically you had a
3  discussion with Kevin about this?  Every month?  How
4  often did you have a discussion with Kevin Wyatt about
5  the fact that you wanted to attend Friday prayers?
6    A.  When I go to Friday prayer, I tell him before
7  that "I'm going to go to Friday prayer" before I go
8  there.  Because he has to prepare for me to go, that I'm
9  going to go at that time, that free time.  I remember
10  him and I remember him at 1:30 or 1:10, "I'm going to
11  go to Friday prayer."
12    Q.  Let's start by saying this, when are Friday
13  prayers?  Between 1:10 and 2:10 on Friday?
14    A.  Yeah.
15    Q.  Okay.  Between 2001 and 2005, did you ever
16  attend Friday prayers?
17    A.  I missed it a lot of times.
18    Q.  Tell me, and this is important, how often did
19  you miss Friday prayers?  Say in a four-month period,
20  how often would you miss Friday prayers?
21    A.  I missed them at least, at least 20 times.
22  Twenty times I missed them.

Page 41

1  times in 2003, I believe, which would you mean you
2  missed it --
3    A.  I don't understand how you're asking me
4  questions.
5    Q.  So you're saying each month -- so you were
6  able to attend one Friday prayer in a month?
7    A.  Yeah, I attend them.  I go there and some days
8  I don't go to Friday prayers.  They give me a hard time
9    Q.  But your testimony is that you went to one
10  Friday prayer a month on average?  Is that what your
11  testimony is?
12    A.  What do you mean that?
13    Q.  I'm trying to understand how many Friday
14  prayers you attended Mr. Isse, so I don't want to dance
15  around this.  I want to be really clear because it's
16  important for the record.
17      It's important for this case to understand how
18  many sessions of prayers were you unable to attend,
19  because you're alleging here today that you couldn't
20  attend because your supervisor wouldn't let you or did
21  not accommodate your request.
22    I want to understand how many times in a given

Page 43

1    Q.  Twenty times.  From when to when?  In what
2  period did you miss it 20 times?  In a year period, say,
3  in 2004, how often would you say you missed Friday
4  prayers?
5    A.  In 2004?
6    Q.  Yes.
7    A.  I would say, like, 10 times.
8    Q.  So you're saying a little bit less than once a
9  month?
10    A.  Yes.
11    Q.  In 2003, how often did you miss Friday
12  prayers?
13    A.  In 2003?
14    Q.  Yes.
15    A.  In 2003, I missed them a lot of times.
16    Q.  Mr. Isse, this is important.  I need to
17  understand from you, to the best of your recollection
18  under oath, how many times do you think you missed
19  Friday prayers in 2003?
20    A.  Monthly, I missed like three times or two
21  times.
22    Q.  But you just told me that you missed it 10

Page 45

1  period, and let's take a year for example, that you were
2  not able to attend Friday prayers.  Now, you've now told
3  me that you missed three out of four sessions a month.
4  Basically, you were able to attend one Friday prayer a
5  month is what I've heard you say so far.  Am I right or
6  am I wrong?
7    A.  No, I don't understand how you ask me the
8  question.
9    Q.  Okay.  Let me just ask you very simply, how
10  many Friday prayers were you able to attend in 2003?
11    A.  Two thousand three?
12    Q.  Yes.
13    A.  I don't have it in front of me the record.
14    Q.  I understand but you have to approximate, if
15  you can, how many Friday prayers were you able to
16  attend?
17    A.  At least monthly I missed four, three times,
18  two times, or one time.
19    Q.  So you don't know how many times you missed
20  it?  Because now you've said you've missed it one time,
21  two times.  You don't know how many times you missed
22  monthly the Friday prayers?

12 (Pages 42 to 45)

# Capital Reporting Company

Page 46

1    A.  I don't have my record in front of me, but I
2  have it.
3    Q.  Where do you have it?
4    A.  I have a notebook.
5    Q.  You have a notebook, and you wrote the prayers
6  in it?
7    A.  Yes.
8    Q.  Well, why didn't you produce that information
9  when I requested documents that were relevant to this
10  case?
11    A.  I just tell you in my words.
12    Q.  But, Mr. Isse, my discovery request to you,
13  which is how cases are conducted, I ask you for the
14  documents that you have that are related to this case
15  and you get to ask the University and Mr. Wyatt for
16  documents as well.  I know you know this because we've
17  spoken about it.
18       I made a request of you for documents related
19  to this case.  Now you're telling me that you don't
20  remember, but you have some notes somewhere in which you
21  wrote down the number of Friday prayers that you missed
22  or you made.  Why didn't you produce those to me?

Page 47

1    A.  Why?
2    Q.  Well, yes.  Why?
3    A.  If you want, I can give it to you
4    Q.  No, I do want it.  But I want to also know why
5  you didn't produce those records to me before I decided
6  whether to file a motion with the court or not.
7    A.  Maybe I don't understand what you're saying.
8  But whatever you requested of me, I thought those things
9  you needed I sent to you, you know.  But I have it
10  listed in notes I didn't go to Friday prayer.
11    Q.  Well, I'm going to need those notes, and we
12  may need to reconvene after I see those notes.  I need
13  the copy of those notes and any other documents you have
14  that have anything to do with this case.
15       I think my document request is pretty clear and
16  it includes notes, handwritten, anything that you have,
17  a document, or email communication.  Anything that is
18  related to this case I'm entitled to know about
19       So I guess my request is on the record that I
20  need to see a copy of those notes.  So, as you sit here
21  today, you're unsure of how many Friday prayers you
22  missed?

Page 48

1    A.  I have it.  I have it, and I will give it to
2  you.
3    Q.  No, I understand.  But I'm saying as we sit
4  here today you're unsure without those notes of how many
5  Friday prayers you missed?
6    A.  It was a long time ago, but I don't have it in
7  front of me.  I don't have it to give you exactly.
8    Q.  I wasn't even asking for exact.  I was asking
9  for approximations of how many Friday prayers.  You said
10  one, two, three; you said ten.  I've heard different
11  things now.  I've heard two or three different things.
12    A.  Let me tell you now, let me tell you.  I have
13  to tell you exactly how many times I missed.  At least
14  three times I missed monthly.  One time I go there.
15  When I argue with him, I go there, I say, "I'm going to
16  go there."  But other days I didn't go there.  I just
17  tell you I have a witness there that they refuse me.
18    Q.  Okay.  So your witnesses, your witnesses are
19  Victor Rhodes, who you said overheard that one
20  conversation that you Wyatt said in February?
21    A.  Yes.
22    Q.  Willie Spencer, who you said you spoke to

Page 49

1  about this issue?
2    A.  Yeah.
3    Q.  And you also said Willie overheard a
4  discussion that you and Kevin Wyatt had?
5    A.  Yes.
6    Q.  When was that?
7    A.  I don't remember the date.
8    Q.  What year was it?
9    A.  Two thousand four or two thousand five.
10    Q.  Okay.  So Willie Spencer had overheard
11  conversations in 2004 and 2005 between Wyatt and you
12  regarding Friday prayers.  Any other witnesses who
13  overheard discussions about Friday prayers between you
14  and Kevin Wyatt?
15    A.  William Andrade.
16    Q.  Who is William Andrade?
17    A.  He used to work with us.
18    Q.  Okay.  What did he overhear?
19    A.  He heard about that I couldn't go to Friday
20  prayer.
21    Q.  How did he hear about that?
22    A.  We were talking.

13 (Pages 46 to 49)

## Capital Reporting Company

Page 70

1  Q. Do you have a record, any notes or any other
2  indication that you met with Deadre or spoke with her
3  about the issue of Friday prayers?
4  A. When I see her or when I talked on the phone?
5  Q. Either one, either one. Do you have any notes
6  or anything that indicates --
7  A. I have that, I have it.
8  Q. You have that as well?
9  A. Yes.
10  Q. You need to produce those to me as well.
11  A. Of course, I have no problem with that.
12  Q. All right. So you called Deadre how often?
13  How many times?
14  A. I talked to her on the phone and I said,
15  "Deadre, Wyatt told me I cannot go to Friday prayer. I
16  couldn't believe at a University how these people they
17  discriminate against me as a Muslim or national origin.
18  Because if you're another origin, a national origin,
19  they don't treat you the right way." I said, "They know
20  I'm a Muslim. I'm a foreigner. Whoever they like, it's
21  favoritism."
22  Q. But what I'm asking you again is, you had the

Page 71

1  discussion with Deadre?
2  A. Yes.
3  Q. What happened at the end of that discussion?
4  A. "Deadre," I say, "I complained to these guys
5  many times how they discriminate. Now they're saying
6  you cannot go to Friday prayer. All in all HR they
7  don't solve this problem."
8  Q. Do you have a record of a complaint with HR
9  about this?
10  A. What do you mean?
11  Q. Did you file a written complaint?
12  A. I didn't write it.
13  Q. You never wrote it down?
14  A. I never wrote it down, but I just told her
15  verbally.
16  Q. Why would you not write it down, Mr. Isse?
17  A. What?
18  Q. Why would you not write it down?
19  A. Because, first of all, I just wanted to solve
20  the problem.
21  Q. Yes. But wouldn't it be fair to say that if what
22  you are describing happened over this period of time

Page 72

1  that the problem wasn't getting solved? Is that fair?
2  I don't want to put words in your mouth, but is it fair
3  to say this problem wasn't getting solved to your
4  satisfaction?
5  A. Oh, yes.
6  Q. Has it been happening for four years?
7  A. Yes.
8  Q. Four years?
9  A. Yes.
10  Q. And you never wrote it down?
11  A. I wrote some complaints.
12  Q. Is it your testimony here today that those
13  complaints include a complaint that you were not being
14  allowed to attend Friday prayers?
15  A. I told her verbally.
16  Q. Why would you not write it down, though?
17  A. Why?
18  Q. Yeah. I mean, is this not probably one of the
19  most important things, and I don't want to speculate,
20  but in terms of being allowed to pray on Friday, that's
21  an important issue for you; right?
22  A. Oh, yes.

Page 73

1  Q. Okay. Now, you've filed several complaints
2  with the University. You filed a complaint in February,
3  January of 2002? Do you remember that complaint?
4  A. Yes, I do.
5  Q. You filed a complaint in 2003, in March 2003;
6  is that right?
7  A. Yes.
8  Q. You filed another complaint in 2005, in
9  February 2005; is that correct? Do you remember that
10  complaint?
11  A. Yes.
12  Q. Do you remember your lawyers writing the
13  University in February 2005?
14  A. Yes.
15  Q. Okay. You also had a meeting with Anthony
16  Newman in I believe April 2005 to discuss employment
17  issues? Do you remember that meeting?
18  A. What do you mean?
19  Q. Did you ever meet with Anthony Newman to talk
20  about issues, practices, et cetera, at --
21  A. I don't know. I think you're speaking like
22  I'm a lawyer. I'm not a lawyer. I'm just asking you

19 (Pages 70 to 73)

## Capital Reporting Company

Page 74

1  when you're talking like that you have to tell me a
2  simple way. You know, I don't know.
3      Q. Okay. I'm asking you, did you have a meeting
4  with Anthony Newman in April 2005?
5      A. April, yes.
6      Q. What did you and he talk about in that
7  meeting?
8      A. What do you mean "talk about"? I talk
9  different times, you know, I don't know, and at
10  different locations.
11      Q. Okay. You wrote something in April also in
12  2005 as well, another sort of complaint. I would call
13  it a complaint about issues. Do you remember that?
14      A. Two thousand five?
15      Q. Yes.
16      A. Just whenever they give me the letter, I'm
17  talking about this thing.
18      Q. We will go through the letters.
19      A. Yeah, we'll go through them.
20      Q. But what I'm saying is that you filed no less
21  than four or five complaints. Your attorneys filed
22  maybe two complaints, and you filed four or five

Page 75

1  complaints over the last couple of years. In any of
2  those complaints, did you raise the issue of Friday
3  prayers being an issue?
4      A. Yes. I talked to Deadre by phone and I talked
5  --
6      Q. Mohamed, you're not answering my question.
7      A. Really, I'm not clear what you're saying.
8      Q. Wait, I'm being very clear. In any of the
9  written complaints that you launched, that you filed, at
10  the University in which you wrote Beth Muha, the
11  director of Human Resources. You wrote Pat Kelshian I
12  believe on one of them who is the supervisor of
13  Transportation Services.
14      I think there is a letter addressed to Tony
15  Newman, who also is the manager of Transportation
16  Services. You've written Grace Karmiol in Human
17  Resources in the past.
18      So there are several complaints that you've
19  taken the time to write. In any of those complaints,
20  did you raise the issue of Friday prayer being a problem
21  for you?
22      A. I talked to them. When I give you the

Page 76

1  complaint, I talked to them. After that they
2  interviewed me. But I talked to them about I have a
3  difficult time for Friday prayer. But I mentioned it, I
4  didn't write it.
5      Q. Why not?
6      A. Why not?
7      Q. Why not? Why would you not bother to write
8  that down? Isn't it an important issue for you?
9      A. Of course.
10      Q. Why didn't you write it down?
11      A. What do you mean?
12      Q. Why didn't you include it in your complaint?
13      A. I just talk to them as a nice way to solve
14  this problem.
15      Q. But, Mr. Isse, you've testified here that this
16  problem was going on from 2002 to 2005, over a three-
17  year period. You started to write the university in
18  February of -- actually, you complained in 1998, but you
19  were having written communications with Human Resources
20  back in January 2002.
21      A. I talked to them verbally. I talked to her
22  verbally. I know you --

Page 77

1      Q. I'm just asking why you didn't include it.
2      A. I didn't mention it, but a lawyer told me
3  you've got to talk or say why I didn't mention this
4  thing. But you've got to talk to them when they
5  interview you. My lawyers told me that.
6      Q. So your testimony here is you didn't include
7  it because your lawyer advised you not to include it?
8      A. No, no, no, no.
9      Q. All right. I'm just asking you a very simple
10  question. Why did you not include that issue in all of
11  your complaints to the University?
12      A. I don't know. I didn't write it up, but I
13  tell them verbally.
14      Q. Your testimony is this is a very important
15  issue for you; right?
16      A. Yes, of course.
17      Q. Okay. I think we addressed that. You are
18  aware of the complaint processes, how to file a
19  complaint with the University; right?
20      A. What do you mean?
21      Q. I mean, you had had experience filing
22  complaints?

20 (Pages 74 to 77)

## Capital Reporting Company

Page 78

1    A.   Of course, yes.
2    Q.   You did actually raise the issue of Friday
3  prayers after you were terminated; is that correct?
4    A.   Yes.
5    Q.   Is it your belief as we sit here today that
6  you were terminated by Kevin Wyatt and Anthony Newman
7  because of your religion?
8    A.   Oh, yes.
9    Q.   Tell me what facts you have, firsthand
10  knowledge you have, to support that claim?
11    A.   What do you mean by that question.
12    Q.   It's a conclusion that you believe -- it's
13  your opinion, your thought, your assertion -- you were
14  fired because you're a Muslim?  It's one of your claims.
15  I'm asking you, what facts do you have to support that
16  claim?
17    A.   That is all, that is all, I couldn't go to
18  Friday prayer.
19    Q.   Okay.  So that's one.
20    A.   Yes.
21    Q.   What else?
22    A.   To practice my religion, that is all, the main

Page 79

1  issue is that one.
2    Q.   That's what?
3    A.   The main issue.
4    Q.   Okay.
5    A.   The main issue is that I am Muslim.
6    Q.   I understand.  I mean, your main issue is that
7  you weren't allowed to go to Friday prayer.
8    A.   Another thing is he accused me of terrorists.
9    Q.   So you're saying there were derogatory or
10  disparaging remarks that he made about Muslims or
11  terrorists in front of you?
12    A.   Yes, yes.
13    Q.   Did he say you were a terrorists or he said
14  "What's wrong with these people?"  What did he say?
15    A.   He said, "What's wrong with you people?"
16    Q.   Okay.  When did he say that?
17    A.   Oh, I guess 2002 or 2001?  One second.  First
18  of all, I have to tell you that one was when 9/11 came
19  and they say to me, "Mohamed, you've got to change your
20  name."
21    Q.   Who is "they"?
22    A.   Kevin Wyatt and Thomas Leathers.  We have a

Page 80

1  meeting, "Mohamed, you're a nice guy, but you've got to
2  change your name, man.  Terrorists, they're look for
3  Mohamed or Ahmed or something like that."
4    I said, "Why would I change my name?"
5    Q.   Did you take that to mean that they had
6  animosity or animus against you because you were a
7  Muslim or were they saying it because you might be --
8  well, how did you take that comment?
9    A.   It was like, it's not only, when they talked,
10  everybody, they laughed, "Mohamed," they laughed and
11  they said, "Mohamed, you should change your name maybe
12  to John or other things."
13    I said, "Why should I change my name?  What
14  reason?  I don't want to change my name."
15    And they said, "If you change your name--"
16    I said, "This country they have a record,
17  guys.
18  If you change your name, they have your name before."
19    Q.   Okay.  So that was that issue after 9/11?
20    A.   Yes, those things come after 9/11.  Then, they
21  say, "Mohamed, change it."  And I said, "I'm not going to
22    change my name."  "Mohamed, change your name

Page 81

1    otherwise you're
2  going to go back to your country."  I'm very upset when
3  they told me that.
4    Q.   Well, they were saying it as a joke?  How were
5  they saying it?  Well, how did you understand the
6  comment to be?  A joke?
7    A.   It was like a joke.  It was like a joke, but
8  it bothered me, yeah.
9    Q.   Right.
10    A.   Some kind of action, something happened before
11  to somebody before, like, a tourist.  "I'm not a
12  tourist, guys."
13    Q.   Did you tell them that it bothered you?
14    A.   I told them, "You guys, you need to change
15  your attitude."  I told them like that.
16    Q.   Okay.  What other derogatory comments were
17  made?
18    A.   Let me think about it.
19    (Pause.)
20    A.   BY THE WITNESS:  They came out with something
21  like a list of, what do they call it, America has a list
22  of terrorists or something like that.  "Mohamed, your

21 (Pages 78 to 81)

# Capital Reporting Company

Page 82

1    country," he said, "Somalia is on the list of
2    terrorists," that's what he said.
3        Q.   I'm sorry? I didn't follow. They said--?
4    They said what?
5        A.   A list of terrorists, some countries have a --
6        Q.   Suspected terrorists, right.
7        A.   -- list of suspected terrorists.
8        Q.   Right.
9        A.   It's a list of names.
10       Q.   Right.
11       A.   I said, "Mohamed, your country is on the list
12   of terrorists." They said, "They're a part of
13   terrorists."
14           I said, "Don't tell me those things like
15   that."
16       Q.   Wait. They were saying what? They were
17   saying that there is a list of terrorists, a watch list?
18       A.   Yes.
19       Q.   What did they say?
20       A.   "Your country is a member of those countries."
21       Q.   Oh, Somalia?
22       A.   Yes.

Page 83

1        Q.   So Somalia was on the list.
2        A.   On the list of terrorists.
3        Q.   Okay.
4        A.   I told him, "Listen, don't tell me that, man.
5    Don't tell me those situations like that, man."
6        Q.   When did that happen?
7        A.   Oh. Like, I believe it was like, it was like
8    2003 or something.
9        Q.   Okay. 9/11 was -- right, so it was the 2003
10   period, okay. What other derogatory comments, if any?
11       A.   News or when something happen in, like, Iraq
12   or anything, "What's wrong with you people?"
13           I said, "Listen, if I'm Muslim, do you think
14   I'm a terrorist?"
15       Q.   How would they respond? Would they respond to
16   that, or would that be the end of the discussion?
17       A.   It's like a simple way of asking me, you know,
18   is there a relationship like I know about what happened
19   in Iraq. I'd say, "I don't know what's going on, guys."
20       Q.   But do you think that they were saying those
21   comments because they had a problem with you?
22       A.   They were referring to me. They were

Page 84

1    referring to me the incident that happened, and I'm part
2    of those things because I'm Muslim.
3        Q.   They were associating you with those bad
4    things?
5        A.   Yes.
6        Q.   Any other comments? You're saying generally
7    some news, when things happen in the war in Iraq they
8    would make comments here and there. You had mentioned
9    something about bombing, the U.K. bombing and when some
10   of the bombings occurred there, they made a comment,
11   "What's wrong?"
12       A.   Yeah, they said, "Mohamed, what's wrong with
13   these people? Why are they killing each other?"
14           "I don't know why they're killing each other.
15   That's up to them."
16       Q.   Mohamed, could they have been asking to try to
17   understand? I keep on asking this question and maybe
18   it's not a fair question, but how did you understand
19   that? Were they trying to engage you in terms of
20   understanding what was happening in the Middle East and
21   that you would have a perspective, or do you think that
22   they had a problem with you because you were Muslim?

Page 85

1        A.   Because they think I'm a bad guy.
2        Q.   You think they thought you were a bad guy?
3        A.   I am a bad guy because I'm related to these
4    things, that's what they think. They said, "You guys,
5    you need a doctor, a psychiatrist, that's what you
6    need," telling me like that.
7        Q.   Why do you think they thought you were a bad
8    guy because you were related to these things? I mean,
9    that's just your conclusion, or you have facts to
10   support that?
11       A.   Because I'm a Muslim.
12       Q.   It's your belief, though?
13       A.   It's a belief. Every Muslim is a terrorist,
14   that's what they believe.
15       Q.   But that's your belief?
16       A.   They believe, that's what they believe.
17       Q.   How do you know they believe that?
18       A.   Why he bring those things up? Why he bring up
19   these things?
20       Q.   Why did he ask you those questions?
21       A.   Those questions, yes. I mean --
22       Q.   So you're saying because he asked you those

22 (Pages 82 to 85)

## Capital Reporting Company

Page 106

1    A.  Walkie-talkie radio, I talk and talk, but he
2   never answer.
3    Q.  It was a radio?  Not a cell phone or anything?
4    A.  No, sir.  Another thing is one of the drivers
5   I told him, "This bus is not safe.  Can you go to
6   Vehicle Maintenance?  I adjust it but the heat, you
7   know, is not working and it's not safe."  I'll give you
8   the copy for "The Washington Post" also.
9    Q.  The weather?
10   A.  The weather.
11   Q.  Yes.
12   A.  How?  When the weather is like that and it
13  doesn't have heat, you know, that's another thing about
14  what can happen if I drive like that.
15   Q.  The question that was raised, as I look at
16  this memo, is whether or not you consulted before
17  stopping work, whether you tried to contact him or not.
18  There is a dispute between what you say and what he
19  says; right?  I mean, you're saying you tried to contact
20  him and he is saying he never got anything from you.
21  Okay, let's leave that.
22   A.  Yeah, let's leave it.  It was discriminatory.

Page 107

1    Q.  But the basis of that is what?
2    A.  Discriminatory.  I'm a Muslim.
3    Q.  Because you're Muslim?
4    A.  Yes, I'm a Muslim.
5    Q.  You're saying because you are Muslim?
6    A.  Yes.
7    Q.  Any other facts to support the fact that you
8   think this is discriminatory?
9    A.  Of course, other people did it and they never
10  charged them.
11   Q.  What other people did it?
12   A.  Like, some people, the bus broke down, the
13  same thing.  They never drive.  They never give no
14  warning.  Why I'm different than other people?
15   Q.  Did those other people try to contact anybody?
16   A.  I mean, they call Vehicle Maintenance.
17  Vehicle Maintenance they came there, and because of that
18  they never say anything.  They never say anything.  Why
19  did they treat other people a different way?
20   Q.  Okay.
21   A.  I have a record, guys.
22   Q.  What do you mean you have a record?

Page 108

1    A.  I have somebody who even did the same thing
2   like that the next week after the bus was serviced.
3    Q.  Okay.  Tell me who this person is?
4    A.  Kassaye is his last name.
5    Q.  Eyob?  The one you mentioned before?
6    A.  Yes.
7    Q.  What happened to Kassaye?
8    A.  His bus broke down.
9    Q.  Okay.
10   A.  They never give him anything.
11   Q.  Do you know who Kassaye called when the bus
12  broke down?
13   A.  I don't remember who he called.
14   Q.  Do you know who he called?  I'm not saying
15  remember.  Do you know who Kassaye called when the bus
16  broke down, who he spoke with about that?
17   A.  I don't know.
18   Q.  Okay.  I'm going to show you what has been
19  marked as Isse Exhibit 3.  Take a look at that document.
20      (Prior to going on the record,
21      Isse's Exhibit Number 3 was
22      marked for identification.)

Page 109

1       (The witness perused the document.)
2    A.  BY THE WITNESS: I wasn't driving this bus.
3    Q.  Before we get into that, have you seen this
4   document before?
5    A.  Yes, I've seen it.
6    Q.  What is it?
7    A.  He give it to me.  I wasn't driving.  I asked
8   him --
9    Q.  For the record, I know that --
10   A.  Discriminatory.
11      (Simultaneous discussion.)
12   Q.  BY MR. KHALID: One minute, one minute.  When
13  you say he gave it to you, this is a memo.  We need to
14  have the record clear so that when we're reading it we
15  understand what we're talking about.  This is a memo
16  from Kevin Wyatt to you dated April 8, 2005.  It is a
17  "Level II Documented Oral Warning for Willful Violation
18  of Safety Rules."  I've asked you if you have seen it,
19  and you said you have.  Do you remember when he gave it
20  to you?
21   A.  This letter?
22   Q.  Yes, this memo.

28 (Pages 106 to 109)

# Capital Reporting Company

Page 110

1  A.  Yes, I remember it.

2  Q.  Okay.  Do you want to explain to me how this

3  is evidence of discrimination?

4  A.  I ask him, "Listen, I wasn't driving this

5  bus."

6  Let's say, what's your name?

7  MS. KRAUT:  Julia Kraut.

8  THE WITNESS:  Julia, I ask you, do you have the

9  same handwriting?  Both of you, do you have the same

10  handwriting?  When you're writing something, do you have

11  the same handwriting?  Yes or no?

12  Q.  BY MR. KHALID:  Mr. Isse, I'm not here to

13  answer your questions.  You're here to answer mine.

14  A.  That's discriminatory.

15  Q.  Why?

16  A.  Because I'm a Muslim.

17  Q.  No.  But I want to understand the facts why

18  you believe, facts that support your claim why this memo

19  is discriminatory.  What facts do you have to support

20  the claim?  You filed a lawsuit in federal court.  What

21  facts do you have to support your position that this

22  letter is discrimination?

Page 111

1  A.  Because here he set me up.  I couldn't go to

2  Friday prayer.  So these things, I'm a Muslim and that's

3  why he is giving to me all these things.

4  Q.  You're saying he just doesn't like you because

5  you're a Muslim?

6  A.  Yes.

7  Q.  So he is trying to get rid of you?

8  A.  Yes.

9  Q.  What do you mean he set you up with the Friday

10  prayer?  I don't understand that.  Explain to me what

11  you mean.

12  A.  I mention this thing.  I said, "Friday prayer

13  is my religion, part of my religion."  I am very tough-

14  minded religiously going to attend my prayer practice.

15  Q.  You didn't file a complaint about that, did

16  you?

17  A.  What?

18  Q.  You didn't file a complaint about the Friday

19  prayer issue.

20  A.  I talked to them about it verbally.

21  Q.  I'm sorry?

22  A.  I talked to them verbally, but I didn't file

Page 112

1  one.

2  Q.  To?  To whom?  You spoke with whom?

3  A.  Deadre.

4  Q.  Deadre?

5  A.  Yes.

6  Q.  You spoke with her in, what, 2003, was it?

7  A.  In 2004.

8  Q.  Well, when did you speak with her in 2004?

9  A.  This morning I tell you February.  It was

10  February.

11  Q.  In 2004?

12  A.  Yes.

13  Q.  Okay.  And so you're claiming that because you

14  had a discussion with Deadre about that, this is why he

15  issued this memo?

16  A.  When this thing goes, smoke is going up

17  because of our situation.  I say you've got to treat a

18  human being the right way.  You've got to stop the

19  discrimination.  You have to be fair.  Even whether I

20  like you, I don't hate nobody.  I have to treat

21  everybody the right way.  We are human beings.  Some

22  people they do something, they never say anything.  Why

Page 113

1  I am different?

2  Q.  Mohamed, I don't know what question you're

3  answering right now.

4  A.  I don't understand.

5  Q.  Let's stick with the questions and answers.

6  I'm asking you about this memo, these issues in April

7  2005.  What I'm asking you is, what evidence, what facts

8  do you have to indicate or to support your claim that

9  this is discrimination?

10  A.  I'm a Muslim.

11  Q.  That's it?

12  A.  That I'm a Muslim.

13  Q.  That's all the facts you have to support that

14  this is evidence of discrimination --

15  A.  This is discrimination.

16  Q.  -- is that you're just a Muslim?

17  A.  Yes.

18  Q.  And that's why you got this memo?

19  A.  He tried to run me off the job.  That's what

20  he wanted.

21  Q.  He knew you were a Muslim in 2001?

22  A.  What?

29 (Pages 110 to 113)

## Capital Reporting Company

1 saying that this is, again, evidence of discrimination:
2 (a) because you are a Muslim --
3     A.  I'm Muslim.
4     Q.  -- and (b) because you told Wyatt in 2004,
5 early 2004, that you were going to go talk to Pat
6 Kelshian about issues in the department; right?
7     A.  Yes.  I think, yeah.
8     Q.  Anything else?
9     A.  What do you mean?
10    Q.  Any other facts that support your claim that
11 this is evidence of discrimination?  Any other facts
12 besides those facts that you're Muslim and you spoke
13 with Pat Kelshian in February 2004?
14    A.  Yes.
15    Q.  What else?
16    A.  What else do you mean?
17    Q.  What other facts?  I'm saying, do you have any
18 other facts besides those two that we just talked about?
19    A.  Yes.  Well, I couldn't go to Friday prayer
20 also.
21    Q.  Okay.  Friday prayer?
22    A.  Yes.

1     Q.  Help me understand Friday prayer.  You
2 couldn't go to Friday prayer.  Help me understand how
3 that is tied to this memo and the fact that he is trying
4 to get rid of you now according to you.
5     A.  Because he doesn't like me.
6     Q.  He doesn't like you?
7     A.  Yes.
8     Q.  Because you're Muslim?
9     A.  I'm a Muslim, yes.
10    Q.  Okay.  And you want to pray?
11    A.  Yeah, yes.
12    Q.  This memo talks about the fact that on April 4
13 you were observed dropping off passengers at an
14 unauthorized stop.  You deny that that occurred?
15    A.  Yes, I do.
16    Q.  Were you driving that bus?
17    A.  No, I didn't drive.
18    Q.  Did you relieve any buses on that day?
19    A.  What?
20    Q.  Let me take a step back.  Explain to me how
21 Public Safety or Transportation Services works for a
22 shuttle bus.  When people are relieving each other for

1 breaks, how does that work in the shuttle bus services?
2     A.  Part-time people drive the buses.
3     Q.  They relieve the full-time drivers?
4     A.  Yes.
5     Q.  Each full-time driver gets a break for how
6 long?
7     A.  An hour.
8     Q.  One hour a day or a shift?
9     A.  Yes.
10    Q.  Okay.  Have you ever relieved any buses?
11    A.  What do you mean?
12    Q.  Have you ever been assigned to relieve a bus
13 for a period of time during a shift?
14    A.  Relieve?
15    Q.  Relieve another driver so that driver can take
16 a break?
17    A.  Yes, I did.
18    Q.  Okay.  How often did you do that?
19    A.  Rarely.
20    Q.  Rarely?
21    A.  Yes.
22    Q.  How often is "rarely"?  In a month, how often

1 would you relieve people?
2     A.  Maybe, like, when somebody doesn't show up at
3 the job.
4     Q.  You would cover the shift?
5     A.  Yeah.  Maybe he say, "Can you do this bus?
6 You're going to drive this one."  So maybe somebody have
7 to give you the breaks like that.
8     Q.  Okay.  So how are you sure you were not
9 relieving that bus or on the Metro I bus on April 4?
10    A.  I wasn't driving.
11    Q.  Why?  Why do you say that?
12    A.  I told Wyatt, first of all, I wasn't driving
13 the bus.
14    Q.  Why do you say you weren't driving that bus?
15 How do you know you weren't driving that bus?
16    A.  I was driving another bus.
17    Q.  What bus were you driving?
18    A.  I was driving, like, the law school at that
19 time.
20    Q.  You were driving the law school route bus?
21    A.  Yes.
22    Q.  Which is from main campus to WCL, the law

31 (Pages 118 to 121)

## Capital Reporting Company

1  school?

2      A.  Yes.  I requested, "Kevin Wyatt why you give

3  me this letter?  I wasn't driving."  Then, there is a

4  route sheet saying what time or something like that, 9

5  o'clock or 10 o'clock, then when you sign your name over

6  here (indicating) in this corner you can identify the

7  handwriting, and whoever is driving the bus his name is

8  there.  I requested that.

9      Q.  So you're saying when someone relieves a bus

10  driver --

11      A.  Let's say 10 o'clock, I have a number you see,

12  Mohamed is on at 10:00 or Victor or something like that,

13  so the number, the time frame, is there and my

14  handwriting is there.  So I tell you, and you said you

15  did; I did not.  "Can you give me the manifest at that

16  time?"

17          And he told me, "I throw it away."

18          I told him, "If somebody give you this letter

19  and say you did and you're supervisor, I mean, you have

20  to have a record, if somebody give me a warning saying

21  Level I, Level II, Level III."

22      Q.  Were you aware that someone identified you as

1  a driver on that bus that day?

2      A.  Ah, his friends or I don't know who, somebody

3  else, people.  How do they know who I am?  Let's say now

4  we talk on data record, my voice is there.  But, I mean,

5  it has to be a picture saying Mohamed was driving that.

6      Q.  Why does it have to be a picture?

7      A.  We need proof.

8      Q.  According to you, what kind of proof?  Beyond

9  reasonable doubt?

10      A.  Because I'm a Muslim guy.  I'm telling you

11  it's nothing else.  Why they fire me?  Because I'm a

12  Muslim, nothing else.

13      Q.  But are you saying that someone did not

14  positively identify you that day?

15      A.  Pretext.

16      Q.  Why is it pretext?

17      A.  Somebody make a complaint guys.

18      Q.  Somebody did make a complaint.  So why is it

19  pretext?

20      A.  Pretext because the reason I'm a Muslim.  The

21  only thing is they have to have some kind of reason.

22      Q.  Who made the complaint?

1      A.  Some lady.

2      Q.  Do you know who it is?

3      A.  I don't know, some other department.

4      Q.  Have you ever seen her before?  Have you ever

5  seen her on the bus?

6      A.  I don't know her, but you can request it.

7      Q.  And so your testimony here is that she was

8  mistaken or lied about the fact that it was you?

9      A.  It's up to her whether she lie.

10      Q.  Okay.

11      A.  It's up to her.

12      Q.  Would it be reasonable in your view for Kevin

13  Wyatt to receive a complaint that said you, Mohamed

14  Isse, was driving this bus and let off passengers in a

15  way that he shouldn't have?  Would that be reasonable or

16  unreasonable?

17      A.  In one way, it is reasonable; in one way, it

18  is not reasonable.

19      Q.  Which way is it?

20      A.  Reasonable.

21      Q.  Reasonable?

22      A.  Yeah.  You say Mohamed was driving.  I'm

1  telling you this was pretext.  It was not accurate.  The

2  pretext, it was not accurate.  I ask them can I have, if

3  my handwriting is there, I was driving that bus.  They

4  say "We throw away."  How are you going to throw away

5  If somebody say you're fired in the job, you have to

6  have some kind of record.

7      Q.  Well, Mr. Isse, they didn't fire you, they

8  wrote you up.

9      A.  What?

10      Q.  You weren't fired at that point.

11      A.  No, they didn't fire me, but letting me out of

12  the University.

13      Q.  So you're saying it's unreasonable because he

14  didn't keep the notes from the manifest?

15      A.  He didn't keep the notes.  He did not like me

16  I'm Muslim.

17      Q.  Okay.  Exhibit 4, would you take a look at

18  that?  Did you receive that memo?

19          (Prior to going on the record,

20          Isse's Exhibit Number 4 was

21          marked for identification.)

22          (The witness perused the document.)

32 (Pages 122 to 125)

## Capital Reporting Company

Page 126

1    A.  BY THE WITNESS:  Yes, I did.

2    Q.  It's dated July 26, 2005.  Do you remember the

3  incident?

4    A.  She give it to me, this letter.  "Why you give

5  to me this letter?"  Someone was driving that bus maybe.

6  In the morning, they came in the morning, and they

7  tested the buses.  They test in the morning.  They drove

8  the bus and came back to make sure everything okay.  I

9  say, "Mechanic was driving."

10   Q.  That's your belief, your claim, that you think

11 the mechanic was driving the bus?

12   A.  In the morning, usually they drive.

13   Q.  How often do they drive in the morning?

14   A.  Every morning.  Every morning they test.

15   Q.  How many mechanics are on staff, do you know?

16   A.  Four or five, something like that; I don't

17 know.

18   Q.  Do they get the keys directly from the driver?

19   A.  The key is inside.

20   Q.  So you put the keys in a central place after

21 you come back?

22   A.  Yeah.  They also have an additional key.

Page 127

1    Q.  So they wouldn't consult with the driver if

2  they took it?

3    A.  Yeah.

4    Q.  Would they consult with the driver?

5    A.  What do you mean?

6    Q.  Would they ask you or tell you, "I need to

7  take the bus for a moment?"

8    A.  Sometimes if you're there, they'll say, "We're

9  going to check the bus."  Sometimes.  He can do whatever

10 he wants.

11   Q.  Did anyone tell you they were taking that bus

12 that day?

13   A.  No one told me that.

14   Q.  Now, you were in the bus, and you claim that

15 you came back at 6:40 and then changed and went inside

16 and then started your shift at 7:00, right?

17   A.  Yes.

18   Q.  And so you're saying it couldn't have been you

19 that was driving this bus.  Incidentally, this is the

20 bus that someone else observed going through a stop sign

21 and not using a left-turn clicker.  Your position is it

22 wasn't you?  It must have been someone else?

Page 128

1    A.  Someone else.

2    Q.  Okay.  Would it be reasonable for Kevin Wyatt

3  to conclude that you were driving that bus based upon

4  the fact that someone reported that the bus was driving

5  onto campus at that hour?

6    A.  What do you mean?

7    Q.  In your view, is it reasonable for Kevin Wyatt

8  to conclude that you were the driver of that bus?

9    A.  Because he doesn't like me.  The only thing

10 now is good for him, I have to leave the University.  I

11 have to leave.  Why should I have done this thing

12 before?

13   Q.  Let me show you Exhibit 5.  You've seen that

14 memo before?

15         (Prior to going on the record,

16         Isse's Exhibit Number 5 was

17         marked for identification.)

18         (The witness perused the document.)

19   A.  BY THE WITNESS:  Yes.

20   Q.  What is it?

21   A.  I asked her to remove from my file.  It's

22 irrelevant because I didn't do this.  I talked in a nice

Page 129

1  way, and he say it's going to stay in your file.

2    Q.  Okay.  So this is his response where he says

3  it's going to stay in your file?

4    A.  Yes.

5    Q.  Okay.  Exhibit 6, this is a termination letter

6  to you of September 16.  Do you remember receiving that

7  letter?

8         (Prior to going on the record,

9         Isse's Exhibit Number 6 was

10        marked for identification.)

11        (The witness perused the document.)

12   A.  BY THE WITNESS:  Yes.

13   Q.  Okay.  Did you on 15 September take a turn

14 from Grant Street -- well, let me just not get into the

15 details.  Did you deviate from the shuttle bus route on

16 September 15, 2005?

17   A.  Is this (pointing) what you're talking about?

18   Q.  I'm sorry?

19   A.  Deviate from Grant Avenue, that's what you

20 say.

21   Q.  I'm asking if you deviated from the shuttle

22 bus route on September 15?

33 (Pages 126 to 129)

## Capital Reporting Company

Page 130

1    A.  I did not.
2    Q.  You did not?
3    A.  Yeah.
4    Q.  Your testimony is that you were driving on the
5   normal route between main campus --
6    A.  Let me tell you one thing.
7        (Simultaneous discussion.)
8    Q.  BY MR. KHALID:  Let me finish my question,
9   then you can clear it up.  You were driving on the route
10   between the main campus and Tenley?
11    A.  Yes.
12    Q.  Okay.  Your testimony is you did not deviate
13   from the established route?
14    A.  What do you mean?  I don't quite understand
15   that question.
16    Q.  I'm asking if you deviated from the shuttle
17   bus route.  Don't all buses have a route?  Each shuttle
18   bus has a route?
19    A.  Let me tell you one thing.  They have some
20   kind of construction in that area, all that area.  You
21   can ask, they have some construction there.  At the same
22   time I did it.  No one told me about that, and I did it.

Page 131

1    Q.  I'm sorry?  What?
2    A.  Left turn, I did it.  There is no sign say
3   that.  Everybody was doing the same thing.
4    Q.  Okay.  Wait a minute.  So you're saying you
5   did deviate from the route?
6    A.  I don't know what the question is.
7    Q.  Mr. Isse, I'm asking a very simple question.
8   I asked you if you deviated from the route on that day,
9   and you responded no.
10    A.  It's not clear.  Maybe the way you talk to me,
11   maybe it's different.  You're talking to somebody like
12   professional lawyers.  I'm not a lawyer.  Lawyers maybe
13   you can communicate easier.
14    Q.  I'm asking very straight questions, Mr. Isse.
15   "Deviate" means going away from the shuttle bus route.
16    A.  No, I did not deviate.
17    Q.  You did not deviate?
18    A.  Yeah.  But I did that, I made a left turn.
19    Q.  You made a left turn where?
20    A.  On Grant Avenue.
21    Q.  Okay.  From Grant Avenue onto Wisconsin
22   Avenue?

Page 132

1    A.  Yes, I did it.  I'm not lying to you.
2    Q.  Okay.  But that's not the normal route, right?
3    A.  It's the normal route.  Nobody told me about
4   it.
5    Q.  What?
6    A.  It's the normal route that I take.
7    Q.  Are the routes for the shuttle bus published
8   anywhere?
9    A.  Let me tell you one thing.
10    Q.  Mr. Isse, I need you to answer my questions.
11   You can tell me what you want, but I'm asking you
12   basically yes or no questions.
13    A.  What do you mean?  What do you mean?  Tell me
14    Q.  Are the routes for the shuttle bus published
15   anywhere in Transportation Services?
16    A.  Some, some place, some locations.
17    Q.  Okay.  So there are established routes for
18   each route; right?
19    A.  Some of those, not every one.
20    Q.  What do you mean "some"?  What routes are not
21   published?
22    A.  Not published what you call Grant Avenue,

Page 133

1   nobody publishes it.  No one told me about that.
2    Q.  No one told you what about that?
3    A.  No left turn.
4    Q.  Let me ask you something.  If there is a route
5   that is established and then you deviate from that route
6   --
7    A.  They just make it up, establish it by the time
8   they fire me.  All those things like that, they claim
9   those things.
10    Q.  So you don't see it as important?
11    A.  I didn't see it.  When you tell me something,
12   you've got to tell me, you know, something in writing or
13   something.  I'm a human being.  We've been going a long
14   time on this thing.
15    Q.  No, I'll show you something in a minute.  What
16   I'm asking you is that obviously other bus drivers --
17   well, I won't.  Let me strike that.
18    A.  Let me tell you.  There are a lot of things
19   behind these things.  They're just backing up each other
20   all along.  I mean, why shouldn't I do a long time ago
21   these things?  I should have done a lot of mistakes
22   before, but I didn't do them.  I didn't do this thing.

34 (Pages 130 to 133)

# Capital Reporting Company

Page 134

1    Q.   Mr. Isse, wait. I don't want to get off into
2    conjecture. I want to ask you, you know, some straight,
3    clear questions.
4    A.   Okay.
5    Q.   On that day, September 15, you took a left
6    turn from Grant Avenue onto Wisconsin Avenue; right?
7    A.   I did it.
8    Q.   Okay.
9    A.   I'm not going to lie to you.
10   Q.   Okay.
11   A.   Yeah.
12   Q.   When you were confronted about that, when
13   Wyatt asked you a question about that afterwards, did
14   you take that left, how did you respond?
15   A.   What do you mean?
16   Q.   Did Wyatt ask you about whether or not you had
17   taken the route?
18   A.   No, he didn't tell me that.
19   Q.   He didn't tell you that?
20   A.   No, he didn't tell me that.
21   Q.   In his memo to you, he cites, he says in
22   Exhibit 6 at the bottom: "In addition, when I spoke to

Page 135

1    you yesterday," on the 15th, "and asked you if you had
2    deviated from the specific route to and from the Metro
3    station or any other route and you responded no." He
4    wrote this in your termination letter. Did that happen?
5    A.   What do you mean? I don't get you
6    specifically.
7    Q.   He is asking you, he said, "I spoke with you
8    yesterday," and he said, "I asked you if you had
9    deviated from specific route to and from the Metro
10   station or any other route and you responded no," you
11   did not deviate from the route. Did that happen? Did
12   you tell him no, you didn't deviate from the route?
13   You're under oath, too, I'll remind you.
14   A.   Yes, that wasn't published that one.
15   Q.   That's not my question.
16   A.   What do you mean?
17   Q.   My question is, Did you tell him that? Yes or
18   no. Did you tell him? When he asked you whether you
19   deviated from the route, did you say no, you hadn't
20   deviated from the route?
21   A.   I didn't deviate.
22   Q.   Okay. So you did tell him that?

Page 136

1    A.   Yeah.
2    Q.   Why do you claim that you didn't deviate from
3    the route?
4    A.   Because no one told me about it. Is he just
5    going to make up --
6    Q.   No one told you about what? You didn't know
7    what the route was between Tenley and --
8    A.   Let me tell you, be clear about that
9    statement.
10   Q.   Please.
11   A.   Yes.
12   Q.   Please.
13   A.   Please. I mean, everybody was doing the same
14   thing. Metro was doing the same thing.
15   Q.   That's a different question.
16   A.   A different question.
17   Q.   That's a different question. We will get to
18   that question.
19   A.   Everybody was doing the same thing, but no one
20   told me that. I'm a human being. I'm not
21   interconnected to information. I don't know what come
22   into your mind. You have to give me something. I have

Page 137

1    to see those things.
2    Q.   So you're saying, let me get this right,
3    you're saying because no one told you that it was not
4    okay to deviate from the route that it was okay to
5    deviate from the route? Is that what you're saying?
6    You're saying no one told you --
7    A.   I think you --
8    (Simultaneous discussion.)
9    Q.   BY MR. KHALID:  Wait a minute. Let me make
10   sure I understand.
11   A.   I'm unclear about what you're saying.
12   Q.   What I'm saying is you're testifying here that
13   you didn't deviate from the route. You said it to Kevin
14   Wyatt on September 15. You said it right now to me,
15   that you didn't deviate from the route.
16        I'm asking you what that means, and you're
17   saying you didn't deviate from the route because no one
18   told you what the route was. Is that what your
19   testimony is, that you didn't know what the route was
20   between Tenley campus and the main campus?
21   A.   I don't know what you're saying, but I'm just
22   saying everything has to be permission. We have to get

35 (Pages 134 to 137)