Capital Reporting Company

Page 138

1  the right way.
2     Q.  Wait a minute, Mr. Isse. I don't know what
3  that means. Aren't you saying that it was okay to do
4  because everyone was doing it, and there was
5  construction? Is that what you're saying? Because
6  that's something different. I just want to know, is
7  that what you're saying?
8     A.  I think you put me at a different angle I keep
9  telling you.
10    Q.  You say what you want. Obviously, I'm
11 listening to you. I just want to know.
12    A.  You have to listen to me, then.
13    Q.  I'm going to listen.
14    A.  Whatever they say, whatever they tell you, you
15 can have it. Whatever I say to you, you've got to make
16 a judgment, you know, or whoever. If it's not you, then
17 somebody else.
18    Q.  Right.
19    A.  So it's not me. I mean, I just tell you I did
20 it, but no one told me about it's a deviation. They
21 instruct me different ways.
22    Q.  But, Mr. Isse, don't you think it would be

Page 139

1  reasonable to conclude that you were lying if someone
2  asked you did you deviate from the route and you say no
3  when, in fact, you did take a left from Grant street
4  onto Wisconsin Avenue?
5     A.  I didn't deviate that way. The question, the
6  way you ask me is a different way.
7     Q.  Tell me how I should ask you. How should he
8  have asked you? I don't understand.
9     A.  Deviate is what they're saying. Usually, when
10 you go to the law school, when you're leaving Metro you
11 usually come this (indicating) way by Grant Avenue and
12 all these things, all that, the Metro site. They didn't
13 do it.
14       They just want to take a left to the building
15 of, what do you call it, American University, the
16 corner. You've got to go straight. Usually, we go this
17 way in front of the bus, like, Tenleytown. It was
18 normal. Then, when this became, like, traffic is very
19 jammed, they make it different ways to solve the
20 problem.
21       So we went to the law school when we picked up
22 people. You just go straight. It was Albemarle or the

Page 140

1  other one. I don't know exactly. That one would be a
2  deviation. But this one, no one told me that, guys.
3     Q.  So someone told you that you should take the
4  Albemarle Street to Wisconsin to return to campus?
5     A.  Yes. No, it's two different things. Law
6  School and Metro is different.
7     Q.  Right. But you were driving Metro that day;
8  right?
9     A.  Yes, I was. Yes.
10    Q.  Okay. From Metro, I don't want to talk about
11 the law school, from the Metro route which is the route
12 from main campus to Tenley, right --
13    A.  Yes.
14    Q.  -- were you instructed as well as other
15 drivers about taking Albemarle Street back to the
16 campus?
17    A.  No one do that. We were doing both sides.
18    Q.  What do you mean "both sides"?
19    A.  This (indicating) is Albemarle, right, we can
20 make a left on Grant Avenue, and both of them we do.
21    Q.  So the fact that the instructions are in
22 writing --

Page 141

1     A.  It was not in writing.
2     Q.  Let me ask you something, if I show you in
3  writing, is it going to be your testimony that that is
4  just fabricated, made up?
5     A.  The reason when we went to AU they have to
6  give me some kind of motive. They just make up, you
7  know.
8     Q.  So if there was another --
9     A.  And other people did the same thing.
10    Q.  Let me ask you something. Wait a minute.
11 Before we get into that, this is a separate question.
12    A.  A separate question.
13    Q.  So if there was another shuttle bus driver who
14 says, "Yeah, I got this notice, I received a notice
15 which says what the routes should be and to deviate or
16 not to deviate from the route and I received that," do
17 you think that that shuttle bus driver would be lying?
18    A.  Let me tell you one thing. Both of you are
19 counsel; is that right? It's two different things.
20 Who's your boss?
21    Q.  I'm not here to answer your questions. You're
22 here to answer my questions.

Capital Reporting Company

Page 142

1  A. I understand, but no one give it to me,
2  instructions. In that case, nobody give me instructions
3  to do that.
4  Q. But that wasn't my question. My question was,
5  if there is a document that says shuttle bus drivers are
6  not supposed to deviate, you're saying that was made up?
7  A. Maybe the other driver he told him everything,
8  these instructions, but he never give to me any
9  instructions.
10 Q. There were never any discussions that you had
11 with anybody about routes, about shuttle bus routes, in
12 staff meetings or discussions you would have had with
13 any of your supervisors about the appropriate routes to
14 take?
15 A. What do you mean?
16 Q. I'm saying did you have any discussions about
17 appropriate routes for Metro I either with shuttle bus
18 drivers or with your supervisors?
19 A. Oh, I don't remember who I talked to. But, I
20 mean, people when they work together they talk to each
21 other.
22 Q. So there were discussions about the route to

Page 143

1  take to the Metro?
2  A. I mean, to me, I don't know. I mean, I didn't
3  talk to somebody, a discussion, like that. But maybe
4  they can do whatever they want. But I didn't talk to
5  anybody.
6  Q. You never had a discussion with anyone? You
7  were never in that room? You were never in the room
8  when a discussion was had about the appropriate routes
9  to take on the Metro I?
10 A. Maybe they talk to a different person but not
11 to me.
12 Q. Wasn't traffic a major issue at this time?
13 Just the picture you pulled out, the construction,
14 wasn't that a major issue?
15 A. Of course.
16 Q. Okay. There were no discussions in the
17 department about appropriate routes to take in light of
18 the fact that there was all this traffic congestion?
19 A. Let me tell you one thing. Whatever they make
20 up or whoever did, I didn't do it. Nobody instruct me
21 in these things.
22 Q. I'm asking you was there any discussions about

Page 144

1  it, and you're saying there was not in your presence?
2  A. Maybe I wasn't there.
3  Q. I'm just asking you, there was never a
4  discussion in your presence about it, at a staff
5  meeting, with other drivers, or anything else?
6  A. I don't remember.
7  Q. Is that your testimony?
8  A. All I know is what I know, and I didn't talk
9  to anybody about this thing. I didn't talk to anybody.
10 Q. And you had no idea that you were supposed to
11 take a left from Grant?
12 A. No, that's the route we were taking.
13 Everybody was doing it.
14 Q. Is it your position that everyone was doing
15 it, so it was okay because even though we weren't
16 supposed to do it, it didn't matter?
17 A. That's not the question. The question is, is
18 it legal.
19 Q. No. I need to understand what you're saying.
20 A. Legally, I mean, we have to follow the legal.
21 This one will say "You did it, you did it." That isn't
22 the question. They don't have to prove it. They're

Page 145

1  saying, "Mohamed, we're giving you this instruction,
2  this thing, sign this." They never give me anything
3  like that.
4      Wyatt, he doesn't like me because I'm a
5  Muslim.
6  That's my religion. But he never give it to me. But
7  this thing is, what they call it, a pretext. There's
8  somebody behind these things. I don't mind whether I'm
9  out of the University. I mean, jobs are not only here.
10 But I'm fighting for the right thing, guys.
11 Q. I don't know what question you're answering.
12 A. The question is -- (Simultaneous discussion.)
13 Q. BY MR. KHALID: Your testimony, just so I'm
14 clear, you did not -- wait a minute -- you did not know
15 that you were not supposed to take a left off of Grant
16 onto Wisconsin?
17 A. I didn't even know that. Yeah, I didn't know
18 that.
19 Q. You thought it was perfectly fine to do that?
20 A. Yeah. I didn't even know that. Nobody
21 instructed me.
22 Q. And you didn't know what the approved route

37 (Pages 142 to 145)

Capital Reporting Company

Page 146

1 was?
2   A. I knew the other route, I knew it, but this
3 one no one told me about.
4   Q. Wait a minute. Wait, wait, wait. You knew
5 the other route?
6   A. I understand that you talk to me in a nice
7 way, but you're put me a different way.
8   Q. I'm not putting you any way. I'm here trying
9 to understand this. I don't want any confusion and
10 you're talking this way and that way, so we can go back
11 and forth.
12   A. Yes.
13   Q. There's another route? What do you mean by
14 that? You knew the other route you said. Help me
15 understand that.
16   A. Let me clear up this thing.
17   Q. Please.
18   A. When I take Grant Avenue, nobody instruct me
19 but I did it. I'm not lying to you. I did it.
20   Q. Okay. So you did it without anyone telling
21 you to do it?
22   A. Yes.

Page 147

1   Q. Okay.
2   A. I did it. I'm not lying to you.
3   Q. Okay.
4   A. I did it.
5   Q. Wouldn't you say that that would be deviating
6 from a bus route?
7   A. It doesn't mean that. There are lots of
8 different things.
9   Q. Why doesn't it mean that? Mr. Isse, why?
10   A. There is a lot of confusion.
11   Q. You took it upon yourself -- wait, wait,
12 before you say confusion. You can answer my question.
13 But you took it upon yourself to go another route. No
14 one told you to go that route. You made the decision.
15 That's not deviating from the route?
16   A. No, no, it's not.
17   Q. It's not?
18   A. No, not deviating. The question is --
19   Q. Is there a stop sign at Grant Avenue and
20 Wisconsin?
21   A. Yes.
22   Q. A traffic light?

Page 148

1   A. No, it's a stop sign.
2   Q. Is there a traffic light at Albemarle?
3   A. Yes.
4   Q. Okay.
5   A. Yeah.
6   Q. Would it make sense that the reason why the
7 route was through Albemarle because there is a traffic
8 light?
9   A. I think they make up after that. They analyze
10 themselves.
11   Q. Okay. But we can agree here that at Albemarle
12 there is a stoplight; right?
13   A. That doesn't mean --
14   Q. Yes or no?
15   A. It doesn't mean that --
16   Q. Mr. Isse, is there a stoplight at Albemarle?
17   A. At Albemarle is there a stoplight? Yes.
18   Q. And Wisconsin?
19   A. Yes.
20   Q. There is no stoplight at Grant and Wisconsin?
21   A. Yes.
22   Q. That's all I want to know.

Page 149

1   A. But legally I can make a left turn.
2   Q. What you're saying is there is no left turn
3 sign there?
4   A. Yes, there is no left turn sign there.
5   Q. Is it your decision to decide what routes the
6 University decides to take?
7   A. No. No, one we have to look over instruction.
8 If you give me instruction, that's another case. When
9 you give me --
10   Q. Oh, I'm going to give you an instruction.
11   A. Okay.
12   Q. But before we even get into that, I just want
13 to be clear. Is it up to you to decide what routes the
14 University runs on the shuttle buses?
15   A. No.
16   Q. It's not your decision is it?
17   A. No, it's not my decision.
18   Q. It's not any shuttle bus driver's decision, is
19 it?
20   A. What do you mean?
21   Q. It's an administration decision to decide what
22 routes?

38 (Pages 146 to 149)

Capital Reporting Company

Page 150

1  A. Of course.
2  Q. All right. We agree on that?
3  A. Yes.
4  Q. You on that day made a decision to go on that
5  route?
6  A. I did make it.
7  Q. Wait. Mr. Isse, did you make a decision?
8  A. I did it. I'm not lying to you. I did it.
9  Q. I understand. So you made that decision?
10 A. But nobody told me that, guys.
11 Q. No one told you to do it, or no one told you
12 not to do it?
13 A. Not to do this.
14 Q. Did someone tell you not to do it?
15 A. No one told me not to do it, Grant Avenue.
16 Q. Did someone tell you to take Grant Avenue?
17 Did someone tell you to take Grant Avenue?
18 A. We were doing these things.
19 Q. Mr. Isse, did someone in the administration,
20 did Kevin Wyatt tell you to do it?
21 A. Yes. We were doing it long time ago.
22 Q. Did Kevin Wyatt tell you to do that?

Page 151

1  A. Yes.
2  Q. That's your testimony today?
3  A. Yes.
4  Q. Why didn't you raise that at your SPRB
5  hearing, that Kevin Wyatt told you that you could take
6  Grant Avenue?
7  A. Let me tell you, he set me up, this thing.
8  Q. This is the first time you've mentioned right
9  now, that Kevin Wyatt told you to do it. You appealed
10 this in the University SPRB hearing, and you never said
11 Kevin Wyatt told you to do it?
12 A. I can have some people testify here.
13 Q. Wait a minute.
14 A. This is up to you.
15 Q. Wait a minute. My question was simple. Did
16 Kevin Wyatt, who is your supervisor, or did Anthony
17 Newman tell you that you should take Grant Road? It's a
18 yes or no answer.
19 A. What do you mean?
20 Q. Did Kevin Wyatt or Anthony Newman, who are the
21 supervisors above you, tell you, "Mohamed, you can take
22 a left turn from Grant Avenue"? Did they tell you that?

Page 152

1  A. Well, let me tell you one thing. I don't
2  care. It's different now how you ask me the question.
3  Q. I asked you a straightforward question. Did
4  either of them tell you to take a left turn from Grant
5  Avenue? That's a straightforward question.
6  A. Yes. We were doing that thing. Wyatt knows.
7  Q. You're not even answering the question.
8  You're saying "We were doing it." That's a fair point,
9  and I'm going to ask you a couple of questions about
10 that. Did they tell you to take Grant Avenue? Yes or
11 no?
12 A. Wyatt.
13 Q. Wyatt?
14 A. Wyatt.
15 Q. Wyatt told you to take Grant Avenue?
16 A. Yes.
17 Q. When did he tell you to take Grant Avenue?
18 A. Well, by the time we have all the
19 construction, there is no way. Traffic is very jammed.
20 We do all these things, yes.
21 Q. What period did he tell you to take Grant
22 Avenue? When did he tell you to take it?

Page 153

1  A. All these things came out. When they fire me,
2  after that they make restricted there.
3  Q. So you're saying he told you before you were
4  fired? He told you and others to take Grant Avenue?
5  A. Oh, yeah, that's what he --
6  Q. Who else did he tell to take Grant Avenue?
7  A. I have witnesses.
8  Q. I'm asking you, who did he ask to take Grant
9  Avenue?
10 A. What?
11 Q. Who?
12 A. Who?
13 Q. What other witnesses did he tell to take Grant
14 Avenue?
15 A. Like, Victor, the shuttle driver, he used to
16 do that.
17 Q. So he told Victor to take Grant Avenue?
18 A. Yeah, Victor.
19 Q. Who else did he tell?
20 A. What's his name? Ron.
21 Q. Okay. So he told Victor and Ron to take Grant
22 Avenue.

39 (Pages 150 to 153)

(866)448-DEPO
www.CapitalReportingCompany.com

Capital Reporting Company

Page 154
1   A. William. They always doing that and other
2   people. I don't want to make impeachment to the people
3   there. I don't want impeachment to fall on other people
4   in that position, that situation. But some people did
5   the same thing. I talked to them, but I don't want to
6   mention their names.
7   Q. No, no, no, and I'm going to ask you right now
8   about it. Your claim is that other people did it, and
9   so you were being unfairly treated.
10  A. I'm a Muslim, that's why.
11  Q. You're a Muslim.
12  A. Yes.
13  Q. So you were being selected?
14  A. Yes.
15  Q. The other people who did it were who?
16  A. The people that worked there?
17  Q. Yes.
18  A. If I tell you, tomorrow they're going to fire
19  them.
20  Q. Well, did Wyatt or Newman know that they were
21  doing it?
22  A. Well, let me tell you clear, guys. I don't

Page 155
1   want to put the situation to those people there.
2   Q. Mr. Isse, you have brought a federal lawsuit,
3   which is public, in District Court alleging that the
4   University discriminates against you because you are a
5   Muslim, and you are not prepared to --
6   A. Are you guaranteeing those people they're
7   going to fire tomorrow?
8   Q. Let me finish. Am I going to guarantee? I'm
9   not going to guarantee a thing. I'm asking you a
10  question. I'm asking you who else was taking those
11  turns.
12      But even before I get to that question, the
13  fact that you said they will be fired tomorrow suggests
14  that you are aware that if the University knew that they
15  took this turn, that the University would take
16  disciplinary action against them?
17  A. Yes.
18  Q. Okay.
19  A. So do I put a situation like that to people.
20  Q. Also, the next step is that Kevin Wyatt -- is
21  it your claim that Kevin Wyatt knew that these people
22  took left turns?

Page 156
1   A. Yes, he know that, sir.
2   Q. And he knew who took left turns?
3   A. Yes.
4   Q. So why are you afraid to tell me now who those
5   people were because the University will fire them
6   tomorrow maybe? Why? Why does it matter?
7   A. What do you mean?
8   Q. What you're claiming is that Kevin Wyatt -- on
9   one hand, you're saying that Kevin Wyatt he would
10  terminate them tomorrow if he finds out they were taking
11  that left turn, but then you're telling me he is telling
12  these people to take the left turn. Which one is it?
13  A. I'm not clear how you're asking me that one.
14  Q. You don't want to give me names of people who
15  were taking left turns, because you are concerned that
16  they may be disciplined for it; right?
17  A. Yes. This thing coming out --
18  Q. So if that's true what you're saying, if Wyatt
19  was aware that people were taking left turns, then you
20  are also saying that he would have disciplined those
21  people?
22  A. No, he is hiding this thing. He knows that

Page 157
1   people did it, but they are friends and they told me
2   exactly, "We did it, Mohamed." You guys, the only thing
3   is I'm a Muslim, and that's why he fired me, nothing
4   else, guys.
5   Q. Who else was taking left turns?
6   A. I can give you William, people who have left
7   before.
8   Q. Well, no, all the people that you are aware of
9   at that time.
10  A. William.
11  Q. Andrade.
12  A. Andrade. Sean and Victor.
13  Q. What is Victor's last name? Rhodes, Victor
14  Rhodes.
15  A. Are these people your friends? Would you
16  consider them your friends?
17  Q. No.
18  A. Okay. So William, Sean, and Victor. Who else
19  were making left turns?
20  Q. Have I said Ron?
21  A. Ron?
22  Q. Yeah.

40 (Pages 154 to 157)

Capital Reporting Company

Page 166

1  it? You went and you reported it to Kevin Wyatt?
2  A. Yes.
3  Q. So you reported to Kevin Wyatt that Waddle
4  took a left turn?
5  A. Yeah. When he gave to me this letter and I
6  see "Grant Avenue," I said, "Waddle also did these
7  things." They never say anything.
8  Q. So that was you, when you talked to him that
9  day you said someone else did it?
10 A. Yeah, Waddle, yeah.
11 Q. Okay. So that's the basis for why you say
12 Kevin knew that people were taking, Kevin Wyatt knew
13 that people were taking the left turn?
14 A. Yes, he knew that.
15 Q. You told him?
16 A. Yes.
17 Q. Okay. That's great, that's clear. You're
18 aware in the September 15 termination incident that
19 there is a witness who complained about your driving
20 that day to Kevin Wyatt?
21 A. What do you mean?
22 Q. Are you aware that a witness who was on the

Page 167

1  bus had complained to Kevin Wyatt about your driving
2  that day?
3  A. I'm not aware of that.
4  Q. You're not aware. Would you be surprised to
5  know that two witnesses complained about your driving?
6  A. That thing is pretext. They just wanted --
7  Q. So you're saying those witnesses were involved
8  in this?
9  A. Involved in this, yes.
10 Q. What is that basis of that? What facts do you
11 have?
12 A. The fact that I'm a Muslim.
13 Q. Do they know that you are a Muslim?
14 A. Yes.
15 Q. The witnesses knew you were Muslim, too?
16 A. Yes, yes.
17 Q. Okay. So you think they had a discriminatory
18 animus against you because you were Muslim?
19 A. A Muslim, yes.
20 Q. You're saying you believe they made it up?
21 A. It's pretext, you know, pretext.
22 Q. What's the basis of calling it pretext?

Page 168

1  A. I'm a Muslim.
2  Q. Okay. I'll show you Exhibit Number 7. Let me
3  describe what I gave you. This is an October 19, 1998,
4  memo from HR to Colleen Carson who was the head of, or
5  who oversaw at that time Shuttle Bus Services. This
6  memo reports the results of an investigation into a
7  complaint that you filed in or around October 1998. Is
8  that fair to say?
9        (Prior to going on the record,
10        Isse's Exhibit Number 7 was
11        marked for identification.)
12       (The witness perused the document.)
13 A. BY THE WITNESS: What do you mean?
14 Q. I just tried to describe what these documents
15 are. The first document, which is a memo from HR to the
16 head of the Shuttle Bus and Public Safety, reported what
17 the results of the investigation was to a complaint that
18 you filed?
19 A. Yes.
20 Q. Okay. That complaint had to do with an
21 incident between you and an officer. I think his name
22 was Michael Weight. Do you remember that incident?

Page 169

1  A. Yes.
2  Q. Is it fair to say that you filed a complaint
3  with Human Resources alleging verbal abuse and had
4  claimed that he had removed food from a microwave
5  improperly and that you all had an issue during one of
6  the shifts? Does that sound right to you?
7  A. Yes.
8  Q. Now, you took the time to file a complaint
9  about that incident where there was an issue about the
10 microwave, the food being in the microwave, the fact
11 that he removed it from the microwave. So you did take
12 the time to file a complaint about that.
13     I'm a little unclear about why you would take
14 the time to file a complaint about that issue, but
15 wouldn't take the time to file a complaint about again
16 the religious accommodation for Friday prayers or any of
17 the other derogatory comments that you have alleged were
18 made by Wyatt or Leathers while you were there.
19 A. I complain about this, that whatever he did
20 was not right. At the same time Colleen, I spoke to her
21 and Beth Hayes. She was in --
22 Q. Human Resources.

43 (Pages 166 to 169)

Page 174

1  Q. A student from AU. How did you know that
2  student? From campus?
3  A. I see them on the bus.
4  Q. In this letter, you are essentially making
5  your case why you feel like you are being retaliated
6  against or targeted, I should say, by Kevin Wyatt? Is
7  that fair to say?
8  A. Yes.
9  Q. I think you say, "I feel like I was targeted
10 because of racial, religious, and ethnic
11 discrimination." You also say you feel like you are
12 being targeted by Kevin Wyatt in retaliation for being
13 honest and forthcoming about corrupt practices at the
14 workplace. Again, this memo has no mention of the fact
15 that you feel like you were being retaliated against for
16 asserting your right to pray on Friday?
17 A. Well, I said religion.
18 Q. It simply, I mean, is a conclusion. There is
19 no detail about any of it.
20 A. I talked to them about it, whoever was there
21 at that time. They asked me was it religion, and I said
22 it is because I'm Muslim. I told them like that.

Page 175

1  Q. You told whom?
2  A. I think it was Deadre.
3  Q. In August 2005?
4  A. Yes.
5  Q. So you're saying that he didn't like Muslims,
6  so that's why it's religion. But your other part of
7  your claim is that he was retaliating against you
8  because you were telling him "I want to pray on Fridays
9  and you're not allowing me to pray on Fridays." Again,
10 no mention of that in this August 9, 2005, memo. Again,
11 I ask you why you would not have raised this with
12 Anthony Newman on August 9, 2005, or with Beth Muha, who
13 you cc'd this memo to?
14 A. The question was if I see Beth Muha I will
15 tell her, but she send me to different people, something
16 like a secretary.
17 Q. But you didn't write it.
18 A. That doesn't mean I can't address my --
19 Q. Okay.
20 A. -- I can address it.
21     (Prior to going on the record,
22     Isse's Exhibit Number 11 was

Page 176

1  marked for identification.)
2  Q. I will give you what has been marked Isse
3  Exhibit 11. This is a notice which says:
4      "Attention all shuttle operators: as of April
5  11, 2005, DO NOT deviate off of the normal routes for
6  any reasons except you have prior approval from Wyatt or
7  Newman first. Stay on Nebraska Ave. for the Metro and
8  WCL Direct routes."
9      Have you ever seen that?
10 A. (Perusing) It is right here, "Stay on
11 Nebraska Ave. for the Metro."
12 Q. Did you ever see this document? My first
13 question is, have you ever seen the document?
14 A. This one?
15 Q. Yes.
16 A. I see it now.
17 Q. Pardon?
18 A. I see it now, yes.
19 Q. You have seen it?
20 A. Yes.
21 Q. Okay. When did you see it?
22 A. I see this, like, when I got it from EEO.

Page 177

1  Q. I'm sorry?
2  A. I got a copy from EEO.
3  Q. Oh, the EEOC you mean?
4  A. Yeah.
5  Q. When did you first see this document, time
6  period?
7  A. When I filed with the EEO.
8  Q. When you filed your complaint with the EEOC?
9  A. Yeah.
10 Q. Where did you get the document from?
11 A. What?
12 Q. Where did you get it from?
13 A. AU.
14 Q. Are you saying "AU"? I'm not following you,
15 Mr. Isse.
16 A. Yes, it's right here.
17 Q. Are you saying from the University?
18 A. The University provide to the EEO, and I get
19 the document.
20 Q. Okay. So you saw this document during the
21 investigation of your complaint; right?
22 A. Yeah.

Page 178

1  Q. Okay. You did not see it while you were
2  employed at the University?
3     (Pause.)
4  A. BY THE WITNESS: You want me to wait for you?
5  Q. I'm waiting for your answer.
6  A. What are you waiting for?
7     MR. KHALID: Can you read back the last
8  question, please?
9     THE REPORTER: Sure.
10    (The reporter played back the question.)
11    "QUESTION. Okay. You did not see it while
12  you
13  were employed at the University?"
14  A. BY THE WITNESS: Yeah, this one I saw.
15  Q. Okay. When? When did you see it?
16  A. April.
17  Q. April?
18  A. Yes. April, yeah.
19  Q. So you've seen this document and you still
20  when asked by Kevin Wyatt whether you deviated from the
21  route, the Metro I route on September 15 when he asked
22  you, you still answered "No, I did not"? How do you

Page 179

1  reconcile that? How do you reconcile that statement
2  with the fact that you received this?
3  A. It wasn't saying Grant Avenue. They didn't
4  mention Grant Avenue. Nobody mentioned Grant Avenue.
5  Q. Well, but Grant Avenue wasn't an approved
6  route, was it? Is it your testimony that Grant Avenue
7  was an approved route?
8  A. Well, yes, no one say that when we were doing
9  it. Wyatt know that. He say we can do it, and we were
10 doing all things like that. But after that, a little
11 while they tried on me.
12 Q. Mr. Isse, I mean it says in bold: "DO NOT
13 deviate off of the normal routes for any reasons."
14 A. What does it mean "deviate"? It means you
15 can't change it.
16 Q. Don't change the normal route.
17 A. It doesn't say it. It has to be clear, guys.
18 Q. That's not clear with the bold? This is
19 Exhibit 11. I want to understand your thinking, I do.
20 "DO NOT deviate off the normal route." Are you telling
21 me that Grant Avenue was a normal route?
22 A. It was a normal route.

Page 180

1  Q. An accepted normal route?
2  A. Yes.
3  Q. A written route?
4  A. Yes.
5  Q. It was written?
6  A. Yes.
7  Q. It wasn't written. What document do you have
8  that shows that Grant Avenue would be a written?
9  A. What document do you have? You cannot tell
10 me.
11 Q. I'm going to show it to you in a minute what
12 the routes are, because the routes are in writing.
13 A. Okay.
14 Q. It's a document which I'm sure you've seen
15 before.
16 A. That's his word and my word, you know.
17 Q. It's a written document, Mr. Isse. It's the
18 route.
19 A. I think this one they make after that.
20 Q. What are the routes? Let me ask you
21 something.
22 A. Okay.

Page 181

1  Q. The Grant Avenue was an approved, normal route
2  for Shuttle Services between AU and Tenley campus?
3  A. At that time it was after that.
4  Q. When did it become, when you say "at that
5  time," what date did it become an approved route, and
6  then what date did it stop being an approved route?
7  A. All during what happened, construction.
8  Q. So you're saying the construction changed it
9  so that Grant Avenue then became an approved, normal
10 route?
11 A. Yes, the construction. Because there is no
12 way we can go Nebraska Avenue. It was shut down there.
13 They shut it down there.
14 Q. Albemarle Street, wait, why couldn't you take
15 Albemarle? The question is, can you take Albemarle and
16 a left on Nebraska?
17 A. We will do both sides because traffic is
18 jammed in the morning.
19 Q. But your argument is it would be faster,
20 quicker to do that because of the construction?
21 A. No, it's not that question there.
22 Q. What is the question there?

Capital Reporting Company

Page 182
1  A. The question is we were doing what he said.
2  He didn't say anything and he said, "You can do it, no
3  problem." So what this mean? You have to say when
4  you're doing deviate, you say you cannot do for Grant
5  Avenue. You have to say that clear, guys. You have to
6  be clear.
7  Q. I'll show you a document in a minute.
8  A. He said you can make a left turn there.
9  Q. What I want to be clear about is this is a
10 document that you received. Isse Exhibit 12.
11     (Prior to going on the record,
12     Isse's Exhibit Number 12 was
13     marked for identification.)
14 Q. BY MR. KHALID: I think maybe before I ask you
15 questions, why don't we take a 15-minute break or so.
16 Does that sound good to you?
17 A. Yes.
18     (Recess.)
19     MR. KHALID: Back on the record.
20 Q. BY MR. KHALID: Hopefully, they will be okay,
21 and I don't need to ask you questions about them because
22 I don't want us to have to come back.

Page 183
1  A. You have the right to ask me. You're
2  defending the University, and I'm defending myself. We
3  have to understand each other. Whatever they did before
4  it wasn't right. I won't do that.
5     MR. KHALID: What exhibit number was that
6  notice? Eleven.
7  Q. BY MR. KHALID: Before we get off, what do you
8  have in front of you? Number 12 or Number 13?
9  A. (Examining) Twelve.
10 Q. Twelve, okay. Before I ask you about twelve,
11 let me take that back and then I'll ask you about that
12 in a second.
13    MR. KHALID: Can you mark this as Isse Exhibit
14 11A?
15    THE REPORTER: Eleven A?
16    MR. KHALID: Yes. It really should be after
17 eleven.
18    (Isse's Exhibit Number 11A was
19    marked for identification.)
20 Q. BY MR. KHALID: Okay. Mr. Isse, I'm going to
21 give you this document and ask you about that, which has
22 been marked as Exhibit 11A. Have you seen that before?

Page 184
1     (The witness perused the document.)
2  A. BY THE WITNESS: Which one?
3  Q. Eleven A.
4  A. This (pointing) one?
5  Q. Yes.
6  A. I've never seen it. I just saw that. When I
7  asked EEO, I got a copy.
8  Q. I'm sorry? Say that again. I'm asking
9  whether -- oh, you're saying you saw it in our discovery
10 responses?
11 A. Yeah.
12 Q. The documents we sent to you is when you first
13 saw it?
14 A. When I asked the EEO, Equal Opportunity, for a
15 copy in discovery, it all came in a file.
16 Q. Okay. So you saw that in the EEO file?
17 A. Yeah.
18 Q. Now, but you're claiming you didn't see it in
19 April when you saw the Exhibit Number 11, which is what
20 you said you saw back in April, this (indicating)
21 exhibit, you didn't see the memo on top of that, which
22 is the "Route Summary"?

Page 185
1  A. This thing, after they fire me, when I went to
2  EEO, they provided these things.
3  Q. So it's your --
4  A. I didn't see it before.
5  Q. Okay. So it's your contention that this was
6  made after the fact?
7  A. Yeah.
8  Q. Why? What are you basing that on?
9  A. Based off they have to cover themselves.
10 Q. But, Mr. Isse, if someone said that they saw
11 this --
12 A. That's them.
13 Q. -- well, no, I have a question for you.
14 A. I understand. The case is if somebody told
15 you --
16    (Simultaneous discussion.)
17 Q. BY MR. KHALID: Mr. Isse, you've got to let me
18 ask. I'll let you answer questions. Let me ask
19 questions so that we're not here all day.
20 A. Okay, sure.
21 Q. This document, if someone said that they saw
22 this document, when I say "someone," another shuttle bus

47 (Pages 182 to 185)

## Capital Reporting Company

Page 186
1  driver or two or five or ten, if they said that they saw
2  this around this time, that they received it either on
3  the bulletin board or they got it by email or whatever,
4  would that change your mind?
5    A.  No, I'm not going to change my mind.
6    Q.  But didn't you just say that this was made up
7  after the fact that they fired you?
8    A.  Yes.
9    Q.  So you're claiming that this document was
10 prepared to cover up for your termination?
11   A.  Yes.
12   Q.  Just for your termination?
13   A.  Yes.
14   Q.  It's a coverup?
15   A.  Yes.
16   Q.  So I'm going to ask the question again.
17   A.  Sure.
18   Q.  If people, third parties, shuttle bus drivers,
19 your colleagues said or they verified that they saw this
20 document around the April/May time frame of 2005, would
21 that change your opinion at all?
22   A.  Not at all.

Page 187
1    Q.  Why not?
2    A.  I'm going to stick with whatever I have right
3  now.
4    Q.  Why not?  Why wouldn't it change your opinion?
5    A.  Why would I change my life?  I'm going to stay
6  there.  The fact, the cost of this, I'm going to go on.
7    Q.  That's not the question I'm asking you.  I'm
8  not asking you whether you are going to dismiss your
9  case.
10   A.  No, I'm not going to dismiss it.  Yeah, I'm
11 not going to back out.
12   Q.  What I'm asking you is if you find out that
13 people received this document around that time, does
14 that change
15   A.  That's --
16       (Simultaneous discussion.)
17   Q.  BY MR. KHALID:  Wait a minute.  Please let me
18 finish.  Is that going to change your opinion about
19 whether or not this document was created simply as a
20 coverup to justify your termination?
21   A.  It's not going to change it.
22   Q.  Okay.  That's fine.

Page 188
1    A.  It's not going to change it.
2    Q.  Now, in this document under "Route Summary,"
3  you see from "Main campus."
4    A.  (Perusing)  Also, now let me ask a question.
5  We can ask the DMV what days they provide this number
6  these buses.  The record of the DMV, we can ask them.
7    Q.  I'm not following you.
8    A.  The question is some buses, we can ask the DMV
9  to provide information when did they purchase, the
10 University.
11   Q.  When did the University purchase the buses?
12   A.  Yeah.
13   Q.  Okay.  Why?
14   A.  Because it's a fact.
15   Q.  Because of what?
16   A.  This thing is irrelevant information.
17   Q.  Irrelevant information?
18   A.  Yes.
19   Q.  Why is it irrelevant information?
20   A.  Because I've never seen 108.
21   Q.  You've never seen Bus 108?
22   A.  Yeah.

Page 189
1    Q.  But you've seen the other buses here?
2    A.  (Perusing)  Five also, I don't know five.
3    Q.  Okay.  So your testimony is you're not sure
4  about some of the buses that are listed here.  That's
5  fine.  I'm going to direct you down to on this memo.  It
6  indicates the shuttle "Route Summary":
7        "From the Main Campus: the shuttle starts on
8  the Main Campus makes a right on Mass Avenue, left
9  through Ward Circle onto Nebraska Avenue, left onto
10 Wisconsin Avenue, right onto Grant Street, left onto
11 40th Street, stops at the corner of 40th and Albemarle
12 Streets, Tenley Metro Station."
13       Then, below it talks about the stops which the
14 buses are supposed to make to pick up passengers.  Then,
15 at the top of the next page it talks about "To the
16 Campus," which is what you were driving when the
17 individuals complained about you on 15 September 2005,
18 when you were coming back from Tenley Campus.  Here it
19 says, according to this document, the "Route Summary":
20       "Starts on 40th Street, right onto Albemarle
21 Street, left onto Wisconsin Avenue, right onto Nebraska
22 Avenue, right onto Rockwood Parkway, right onto campus.

(866)448-DEPO
www.CapitalReportingCompany.com

## Capital Reporting Company

Page 190

1  Your testimony here today is that was not the
2  route?
3  A. I haven't seen this letter before.
4  Q. Is it your testimony today that that was not
5  the route?
6  A. What do you mean?
7  Q. What I just read to you as a route for Metro
8  I, does that sound like a familiar route to you to run
9  the buses from Metro I, which is the route between the
10 campus and Tenley Metro? I'll read it again:
11     "Starts on 40th Street, right onto Albemarle
12 Street, left onto Wisconsin Avenue, right onto Nebraska
13 Avenue, right onto Rockwood Parkway, right onto campus."
14     That route doesn't sound familiar to you?
15 A. I see now, but I haven't seen before. I
16 haven't seen before.
17 Q. I understand you said you haven't seen this
18 document before. That route, that route that I just
19 read to you, is that a route that you ever drove?
20 A. Whatever they are saying now, like, whatever
21 you mention to me is different. It is different because
22 I never had this outline before.

Page 191

1  Q. That is not my question to you.
2  A. What is the question you want?
3  Q. Is that a route that you ever drove before:
4  40th, Albemarle, Wisconsin, Nebraska, Rockwood?
5  A. Fortieth is Albemarle; is that right?
6  Q. Fortieth Street is where the Tenley -- I mean,
7  you drive so you should be more familiar than I. But
8  Fortieth Street is where the Metro is, Fortieth and
9  Albemarle, is it not?
10 A. Yeah.
11 Q. The corner of Fortieth and Albemarle, isn't
12 that where the Metro is?
13 A. Yes.
14 Q. Okay. So that's where it's stopping. So the
15 question is really simple. Fortieth, left onto
16 Albemarle -- I'm sorry, right onto Albemarle, left onto
17 Wisconsin, right onto Nebraska, right into Rockwood
18 Parkway, and then onto the campus, is that a route you
19 ever drove before?
20 A. I drove but the road is different. It is
21 different. Now they are making left former way.
22 Q. That's not my question.

Page 192

1  A. The question is?
2  Q. I'm just trying to ask a simple question.
3  A. The route, the route they say now that's the
4  way, but this memo came after that.
5  Q. After what?
6  A. After they fired me.
7  Q. That's your belief.
8  A. I am a hundred percent sure.
9  Q. Tell me what facts do you have to support
10 that?
11 A. Facts?
12 Q. Facts. What firsthand knowledge do you have
13 to say this memo came after you were fired?
14 A. The fact?
15 Q. Yeah.
16 A. The fact is sometimes signature. I have to
17 have your signature saying, "Mohamed, you can't do this
18 thing. You have to sign up."
19 Q. So who says that? This is according to you,
20 you have to have to have a signature?
21 A. I mean, the fact is you have to have some kind
22 of proof that we need.

Page 193

1  Q. Right.
2  A. But they made up after that.
3  Q. You keep on talking about conclusions. I'm
4  asking you what facts do you have to support that this
5  was not circulated to anybody, that it was made up after
6  you were terminated?
7  A. After. After they made it.
8  Q. What are you basing that on?
9  A. Guys, I never had it. I never seen it before.
10 Q. That's what you're basing it on?
11 A. Yes.
12 Q. Because you haven't seen it, they must have
13 made it after the fact?
14 A. Yes.
15 Q. Okay. You just saw it? That's your
16 testimony?
17 A. Yes.
18 Q. Okay. I will show you Exhibit Number 12.
19 Have you seen this before?
20 A. (Perusing) Yeah. This one, yes.
21 Q. Okay. It's an October 14 letter from Grace
22 Karmiol, who is in HR, to you in which she indicates

## Capital Reporting Company

Page 194

1  that your appeal, your internal appeal with the
2  University is going to be heard on a particular day.
3  Then, attached to that document is your statement of
4  appeal which you drafted, I presume?
5     A.  Mm-hmm.
6     Q.  Okay.  Did anyone help you with this appeal?
7     A.  Yes.
8     Q.  Okay.  Who did?
9     A.  One of the, a law school guy.
10    Q.  Who at the law school helped you?
11    A.  What do you mean?
12    Q.  Who helped you draft this appeal?  What's
13  their name?
14    A.  I don't have.  I mean, I don't have his name.
15    Q.  How did you find him?
16    A.  These guys I see all the time when driving the
17  bus and I see him, like, three years.
18    Q.  Student?  Teacher?  Staff?
19    A.  A student.
20    Q.  A student?
21    A.  Yeah.
22    Q.  At the law school?

Page 195

1     A.  Yeah.
2     Q.  How did it come to be?  Did you ask her if she
3  would --
4     A.  It's a he, he, he.
5     Q.  Did you ask him whether he would help you with
6  an appeal?
7     A.  Yes.
8     Q.  You met with him on one occasion or more?
9     A.  The letter?
10    Q.  Yes.
11    A.  Less than an hour.
12    Q.  Less than an hour to draft?
13    A.  Yes.  He just told me to outline, and I gave
14  it to him.
15    Q.  Okay.  And you don't remember his name?
16    A.  I don't remember.  At home I have his number.
17    Q.  Okay.  I want to be clear with you, though.
18  If you don't remember his name, that's fine.
19    A.  Yes, I don't remember.
20    Q.  If you know his name and you don't want to
21  say, that's not fine.  I take you at your word.  You say
22  that you don't remember his name.

Page 196

1     A.  I don't remember.  I don't remember his name.
2     Q.  Okay.  Well, when you remember, if you would
3  supplement that, and let me know what his name is.  I
4  appreciate it.  In this appeal, which is 10 days after
5  your termination, September 26, 2005, you raise the
6  basis of why you think you have been unfairly treated,
7  right?
8     A.  Yes.
9     Q.  I mean, you write down what you think happened
10  and why you were unfairly treated?  Is that fair to say?
11    A.  What do you mean?
12    Q.  I mean, this is the basis of why you think you
13  were terminated wrongfully from the University, what you
14  wrote here?
15    A.  Mm-hmm.
16    Q.  Right?
17    A.  Yeah.
18    Q.  This is the first time that you mentioned the
19  comment about Leathers and Wyatt telling you to change
20  your name because it was too Muslim; is that right?
21  Just so you're following, I'm on page three of your
22  September 26 document under "Retaliatory Action," the

Page 197

1  second paragraph.  This is the first time you wrote
2  anything about the comment regarding changing your name;
3  is that right?
4     A.  What do you mean?
5     Q.  What don't you understand about the question?
6     A.  You're telling me change your name.
7     Q.  What I'm saying is this is the first time that
8  you wrote down a complaint about the name, that Kevin
9  Wyatt and Thomas Leathers told you to change your name
10  because it was too Muslim.  Is that correct or not
11  correct?
12    A.  That I'm Muslim, because they look at your
13  name.  Mohamed is a very thick name, that's what they
14  say.
15    Q.  What I'm saying, what I'm asking you is, is
16  this the first time that you raise this issue?
17    A.  I tell HR discrimination, religion, and I tell
18  verbally.  What can I say more?
19    Q.  You told Deadre; right?
20    A.  Deadre, right.  What can I say more than that?
21  If I tell them, the next time I say, "I'm going to go to
22  the president, the president who can change those things

50 (Pages 194 to 197)

Capital Reporting Company

Page 198

1  like this environment."
2  Q. But, Mr. Isse, you never wrote, and again we
3  talked about --
4  A. It doesn't matter. It doesn't matter I can
5  mention --
6  (Simultaneous discussion.)
7  Q. BY MR. KHALID: Mr. Isse, I mean, you need to
8  let me finish, and I'll let you finish. That's how we
9  do it. Okay? You filed a complaint in 2002, January; a
10 complaint in March 2003; a letter from your attorney in
11 February 2005; and another complaint in August, I think
12 August 9, 2005. You also had a discussion with Tony
13 Newman, we will talk about that in a minute, in August
14 2005.
15     All of these times there were issues that you
16 raised about favoritism or other issues, pay, whatever
17 the issues that you were having in the employment
18 context. The first time you raised the issue of your
19 name was after you were terminated in this SPRB hearing;
20 is that correct or not?
21 A. When I sent the complaint I verbally tell he
22 doesn't like Muslims, and I'm a Muslim. He

Page 199

1  discriminated against Muslims. I say it verbally, but I
2  did not write it out.
3  Q. Okay.
4  A. It doesn't mean right now I mention here, but
5  I already tell them. I told them before, and they told
6  me we didn't find anything. What can I say?
7  Q. So it wasn't important enough to write up,
8  though?
9  A. No. It's a conclusion; it was not clear. The
10 conclusion they give to you, "We didn't find anything.
11 But we didn't find anything." I tell them I have
12 witnesses right there, and they never investigated it.
13 Q. You didn't raise it because you didn't think
14 it was worth raising?
15 A. No, it's worth but I tell them verbally.
16 Q. You didn't think it was worth writing it down?
17 A. No. I mean, when I finished the paper, one
18 thing I say, when they meet you, you've got to tell
19 them. I tell them religion. I tell them religious
20 matter. "Why is that?" I tell them, "He doesn't like
21 Muslim, and I'm a Muslim."
22 Q. But that's not what I'm asking just now.

Page 200

1  Because that's a conclusion when you say "He doesn't
2  like Muslims." I'm asking you specifically about
3  comments that he made about your name, or, for that
4  matter, any other derogatory comments about, you know,
5  the bombings or any of the things that you've said in
6  different places after you filed, after you're
7  terminated and you filed the suit, you raised. But none
8  of those issues from what I can tell, and I just want to
9  be clear, were raised in writing before you were
10 terminated?
11 A. Okay. You know, we have to understand each
12 other.
13 Q. Right.
14 A. What I said, I told them, Deadre, and I
15 explained how the discrimination and I tell them "He
16 doesn't like the Muslim." I didn't wrote them. You
17 have to investigate it. I have witnesses. They can
18 solve the problem, but they never solve any problem.
19 Q. I understand what you're saying.
20 A. It make it a little bit difficult.
21 Q. What you're saying, and tell me if I'm wrong,
22 what you're saying is because you had the meeting and

Page 201

1  you indicated "He doesn't like Muslims" you that to mean
2  that you filed a complaint, you filed what you needed to
3  do, and you don't need to get into the detail about
4  comments that were made about Muslims or anything else?
5  Is that right? I don't want to put words in your mouth.
6  I just want to understand why you didn't include that.
7  A. If already I tell them, what can I say else?
8  I already tell them, and nothing changed. Now, I mean
9  --
10 Q. But, Mr. Isse, you wrote a lot of things down
11 about a lot of details.
12 A. I tell them verbally. Are you going to change
13 or not? If you don't agree, we will go there. Yeah, we
14 will go there. They jury can decide it whenever they
15 see me. I'm going to express what I have.
16 Q. Let's move on. You also in the same paragraph
17 raise the issue of, "I also had a hard time getting
18 permission to use my one-hour lunch break to attend
19 Friday prayers for Muslim Student Association. I have
20 complained about this to Human Resources officials
21 several times," these are your words, "for example:
22 January 30, 2002 letter to Brenda K. Hamer, Policy

51 (Pages 198 to 201)

Capital Reporting Company

Page 218

1  Q. That's right?
2  A. Yeah.
3  Q. Okay. Again, in this letter, there is no
4  mention of any derogatory comments; the issue of your
5  name, which in fact is very close to after 9/11, by the
6  way; the issues of derogatory comments directed at
7  Muslims, bombings, et cetera; nor is there any comment
8  about any issue with attending Friday prayers. Is that
9  correct?
10 A. What do you want to know?
11 Q. I want an answer. Is that correct?
12 A. I didn't mention that, but I should, yes.
13 Q. Okay. So that when you went back to that
14 earlier Exhibit the SPRB appeal, when you write in the
15 appeal that "I raise this in my letters of January 2002
16 and March 2003--"
17 A. No, I just tell them verbally.
18 Q. Okay. But when you said "letters," then that
19 was a mistake? You meant orally you raised it?
20 A. Yes.
21 Q. So that was a mistake?
22 A. It was a mistake, yes.

Page 219

1  Q. It was wrong?
2  A. It was wrong.
3  Q. Incorrect? Not right?
4  A. It was not correct.
5  Q. Your appeal, which is on Exhibit 12, again
6  page 3 of Exhibit 12 under "Retaliatory Actions," this
7  is your writing:
8     "Since 1999, I have faced harassment and
9  discrimination from Thomas Leathers and Kevin Wyatt. I
10 feel this discrimination occurred on the basis of my
11 national origin and religion.
12    "For instance, Kevin Wyatt and Thomas Leathers
13 used to tell me to change my name because it was too
14 Muslim. I also had a hard time getting permission to
15 use my one-hour lunch break to attend Friday prayers for
16 Muslim Student Association.
17    "I have complained about this to Human
18    Resource
19 officials several times (for example: January 30, 2002
20 letter to Brenda K. Harner, Policy Analyst and March 27,
21 2003 letter to Beth Muha, Executive Director, Human
22 Resources)."

Page 220

1  We have now looked at those two letters.
2     There
3  is no mention of either of those two items.
4  A. What I mentioned orally or in writing, it
5  doesn't mean. But I tell them, HR. But if they don't
6  change it, if they don't correct the problem, why?
7  Q. You want someone to believe that you were
8  willing to get into a level of detail where you would
9  talk about pay increases, and I'll read the list, you
10 would talk about work hours, expanding the shuttle bus
11 supervision, varied pay, delaying payment for a drug
12 test, not assigning you to a day shift, singling you out
13 during your performance evaluation? You would take the
14    time to get into the detail
15 of writing all those things out so that HR could do a
16 review of the matter and to complain about that, but you
17 would not raise the two issues of derogatory comments
18 about your name and being a Muslim or attending Friday
19 prayers? You wouldn't write that down?
20 A. I tell them verbally. I tell them verbally.
21 Q. Your testimony is clear that you said it
22 orally. That's what your testimony is.

Page 221

1  A. Yes. Yeah, I tell them, I tell them. I have
2  witnesses. There's nothing wrong with that or whatever.
3  Q. You have what?
4  A. I have witnesses.
5  Q. Who are your witnesses that you told her
6  orally?
7  A. Yes. Victor was there and all the list I gave
8  you, the witnesses there.
9  Q. Well, wait a minute. The names of Victor was
10 a witness who you said overheard Kevin Wyatt tell you or
11 give you a hard time about Friday prayers. I was asking
12 you who is your witness that you filed a complaint, an
13 oral complaint, with HR that you were having problems
14 attending Friday prayers? Who? Who is a witness to
15 that?
16 A. I don't know. The question, I already give
17 you information.
18 Q. No, my question is very clear. You just said,
19 "I have witnesses." I'm asking you, what witnesses do
20 you have that you filed -- let me finish the question.
21 A. I have witnesses.
22    (Simultaneous discussion.)

56 (Pages 218 to 221)

Page 238

1  question?
2  A.  I just say I'm not going to answer now.
3  Q.  You don't have a choice to select what
4  questions you answer, Mr. Isse. You don't have that
5  choice. I don't want to raise it with the court and get
6  into a sanction proceeding, because we will have to
7  certify the question for the court and we will argue.
8  Do you have a basis for not answering that question, a
9  legal basis for not answering that question?
10      (No response.)
11  Q.  BY MR. KHALID:  The question outstanding is,
12  did you tell them that you were tape recording them?
13  A.  What?
14  Q.  Did you tell them that you were tape recording
15  them before or after?
16  A.  I will come back to that question.
17  Q.  It's not your choice.
18  A.  Hmm?
19  Q.  It's not your choice to come back to the
20  question.
21  A.  So what are we going to do?
22  Q.  Either you answer it, or you refuse to answer

Page 239

1  it. If you refuse to answer it, I'm going the ask the
2  court reporter to certify the question, and I'm going to
3  ask the court for sanctions because you refused to
4  answer this question. I'm just letting you know what is
5  going to happen.
6      I will tell you that the court doesn't look
7  favorably on an objection -- I don't even know what the
8  basis of your objection for not answering the question
9  is. You haven't even stated a basis why you don't think
10  you should have to answer that question.
11      (Pause.)
12  Q.  BY MR. KHALID:  It's a straightforward
13  question. Did you tell them or not? This memo says
14  that you recorded the conversation without their
15  knowledge. I'm asking you a straight question. Did you
16  tell them that you recorded the conversation either
17  before or after the conversation? Will it be news to
18  them if they were to learn that their discussion was
19  tape recorded?
20  A.  I didn't tell them.
21  Q.  Okay. I'm going to give you what has been
22  marked as Exhibit Number 20. This is your lawsuit in

Page 240

1  U.S. District Court, which is why we are here today.
2  I'm sure you've seen and read this document; is that
3  right? You've seen this and are aware of it; right?
4      (Prior to going on the record,
5      Isse's Exhibit Number 20 was
6      marked for identification.)
7      (The witness perused the document.)
8  A.  BY THE WITNESS:  Mm-hmm.
9  Q.  Yes?
10  A.  Yes.
11  Q.  She needs something, a word.  Paragraph 10,
12  page two:
13      "On numerous occasions during Isse's
14  employment, Wyatt denied Isse the right to attend Muslim
15  prayer sessions during regular midday breaks or
16  otherwise interfered with Isse's right to attend such
17  prayer sessions during his breaks."
18      I think we covered that, but let me be clear
19  that you are saying that on a regular monthly basis from
20  2001 until 2005, until you left, you were fired from the
21  University, Wyatt denied you the ability to go to your
22  Friday prayer sessions; correct?

Page 241

1  A.  Which paragraph?
2  Q.  Ten.
3  A.  (Perusing) Okay.
4  Q.  Your witnesses to that statement who can
5  support that Wyatt did not allow you to attend Friday
6  prayers are:  Victor Rhodes, Willie Spencer, William
7  Andrade, Ron Crowder, Sean Edwards, Abraham McDowell,
8  and Eyob Kassaye; is that correct?
9  A.  Yeah, yes.
10  Q.  Again, the period was from 2001 to 2005?
11  A.  What do you mean?
12  Q.  "On numerous occasions," you say. That's not
13  specific enough. I want to know when it started and
14  when it ended. It ended I assume when you left?
15  A.  Yes.
16  Q.  So it happened through the last day you were
17  working?
18  A.  Yes.
19  Q.  When did it start? What are you reading from
20  Mr. Isse?
21  A.  (Perusing) Yeah, it started in 2000 until
22  2005.

Capital Reporting Company

Page 242

1  Q. Okay. What are you reading from? What
2  document is in front of you that is refreshing your
3  memory?
4  A. Refreshing to me is, like, the EEO.
5  Q. Your complaint at the EEOC?
6  A. Yeah.
7  Q. Okay. You complained to the EEOC, and that's
8  the time period you put down in that complaint, 2000 to
9  2005; right?
10 A. What do you mean?
11 Q. I mean, you complained to the EEOC, and you
12 indicated that it started in 2000 and ended in 2005 or
13 continued?
14 A. When I left the job, yes.
15 Q. Two thousand to two thousand and five, five
16 years. Paragraph 12, page 3, you write:
17    "On July 26, 2005, Defendant Wyatt issued a
18 written warning to Isse that he had engaged in
19 'careless, reckless, or slipshod work' on July 11, 2005,
20 by entering a University gate without using turn signals
21 and running through a stop sign. Isse was not driving
22 the bus at the time these actions were observed and so

Page 243

1  told Wyatt and the University. Nevertheless, the
2  University refused to rescind the written warning.
3  Other non-Muslim drivers have engaged in the same or
4  similar conduct and have not been subject to
5  discipline."
6     Please indicate for me who, Mr. Isse, engaged
7  in running a stop sign and not using a turn signal and
8  was not written up.
9  A. Norman.
10 Q. I'm sorry? What's Norman's last name?
11 A. Norman.
12 Q. Norma or Norman?
13 A. Norman, N-o-r-m-a-n.
14 Q. Okay. What happened?
15 A. They were doing the same thing.
16 Q. So you're saying Norman ran through a stop
17 sign and was not written up?
18 A. Yeah, they were not written up.
19 Q. When did Norman drive through a stop sign?
20 A. I always see him.
21 Q. You saw him?
22 A. Yeah.

Page 244

1  Q. Did Kevin Wyatt see him?
2  A. I don't know that.
3  Q. Okay. Well, how did Kevin Wyatt write him up
4  if he didn't see him, or did someone report it to Kevin
5  Wyatt?
6  A. Someone there they report it, but they don't
7  say anything.
8  Q. Who reported what? Who reported what?
9  A. Like, well, he did it a lot of times, all the
10 time, and a lot of people complained.
11 Q. Who is "a lot of people"?
12 A. I have the --
13 Q. No, Mr. Isse, okay.
14 A. Yeah, whatever they say.
15 Q. Okay. Who else besides Norman?
16 A. Norman, Edward.
17 Q. I'm sorry?
18 A. Edward, Edward.
19 Q. Edward?
20 A. Yeah.
21 Q. Edward ran a stop sign?
22 A. Yeah, and he was doing a left turn on Grant

Page 245

1  Avenue.
2  Q. Okay. And he ran a stop sign?
3  A. Yeah.
4  Q. Who reported what? Who reported that?
5  A. I did it.
6  Q. You did what?
7  A. I did it. He did the same thing, but they
8  didn't do any actions.
9  Q. Wait a minute. You reported what? What did
10 you report?
11 A. Edward, he did the same thing.
12 Q. You reported that Edward had taken --
13 A. Taken the left turn.
14 Q. Oh, the left turn. You're not talking about
15 the stop sign anymore? Now you're talking about a left
16 turn?
17 A. Yes.
18 Q. Okay. You're saying Edward -- now, earlier on
19 you said Wardell or something, Wardell had made a left
20 turn. I asked you, and you never mentioned Edward.
21 A. Yeah, Edward. I don't remember the name
22 exactly.

62 (Pages 242 to 245)

Page 246

1 Q. You reported that Edward took a left turn on
2 Grant Avenue?
3 A. Yeah.
4 Q. To Kevin Wyatt?
5 A. Yeah.
6 Q. When you were getting disciplined?
7 A. Yeah. I told him Edward did it, but nobody
8 say anything. Why am I different?
9 Q. Did you report it to -- had you ever reported
10 it earlier about Edward taking a left turn or running a
11 stop sign to Kevin Wyatt?
12 A. You're talking about me?
13 Q. Yeah. I'm asking you. First, start with you.
14 Did you report it?
15 A. Well, I talked to Wyatt, but he didn't say
16 anything.
17 Q. I'm sorry?
18 A. I talked to Wyatt when I'm leaving the job and
19 I told him "You discriminate. Edward did the same
20 thing. Why am I different?"
21 Q. But had you reported that before?
22 A. It's not important. It's not important.

Page 247

1 It's, like, it was not right. I just tell him, you
2 know. Yeah.
3 Q. I understand. But you were telling him as you
4 were being disciplined "He did it, too, Edward did it,
5 too?"
6 A. Yeah. Other people say "We're going to
7 testify we did it." What's his name, Ron, he said, "I
8 did it."
9 Q. Did Edward have prior discipline?
10 A. I don't know that.
11 Q. You wouldn't have access to his disciplinary
12 file, would you?
13 A. I don't know, no.
14 Q. It's true you had two prior disciplinary memos
15 about safety; right?
16 A. What do you mean?
17 Q. I mean, you were disciplined in April and in
18 July; right?
19 A. Mm-hmm.
20 Q. So you had two prior disciplines that
21 occurred?
22 A. I didn't do that. That's what they make up.

Page 248

1 Q. You're claiming you didn't do it. But you had
2 two prior disciplinary memos; correct?
3 A. Yes. That look like.
4 Q. Who else? Who else besides Norman and Edward
5 were running through stop signs or violating department
6 rules?
7 A. Some of them were in there, but they said,
8 "Mohamed, we cannot tell. We did all things." I talked
9 to them, some of them, and they said, "Mohamed we did
10 it, but we never get any problem."
11 Q. Okay.
12 A. "We never get any problem."
13 Q. The question is, did someone report that to
14 Wyatt?
15 A. Huh? He knew that.
16 Q. Mr. Isse?
17 A. Yes, yes, some of them, yes.
18 Q. Who is that? Who is "some of them"?
19 A. I cannot give you --
20 Q. Well, Mr. Isse, you have to support what
21 you're saying. Did someone report it? Do you have
22 firsthand knowledge, besides speculating and assuming,

Page 249

1 do you have firsthand knowledge that someone reported to
2 Kevin Wyatt that other drivers were violating the rules?
3 A. Okay. I did it. I reported Monissa. I tell
4 she's doing the same thing, like a left turn, leaving
5 the bus all the time. They never give her any warning.
6 Q. Okay. So you have Monissa.
7 A. Yes.
8 Q. And how do you know Monissa didn't get any
9 warning?
10 A. I talked to them, even Tony Newman. But they
11 never say anything.
12 Q. How do you know Monissa doesn't have any
13 warnings?
14 A. At that time I observed she didn't get
15 anything. I know that they never give it to her.
16 Q. How do you know that?
17 A. Well, people talk. People say something, you
18 know.
19 Q. Did you talk to Monissa about it?
20 A. I didn't talk to.
21 Q. You did not speak to Monissa?
22 A. No.

## Capital Reporting Company

Page 250

1  Q. So as we sit here today, you don't know
2  whether Monissa got a warning or not?
3  A. At the time she didn't get it. At the time I
4  was there she didn't get it.
5  Q. And how do you know that? You didn't speak
6  with her, did you?
7  A. But these people when they have a problem they
8  say, "I got a letter."
9  Q. You're assuming she didn't get any warning
10 because she didn't tell you? Is that right?
11 A. It seems to me, it seems to me.
12 Q. It seems to you?
13 A. Yeah.
14 Q. Okay. Norman, Edwards, Monissa. Anyone else?
15 A. Norman he come in late all the time and --
16 Q. I'm asking about safety violations. I'm
17 talking about running a stop sign. Because that's what
18 we're talking about, running a stop sign. You said no,
19 this is unfair. Other people have done this stuff.
20     You know, I'll read from your complaint:
21 "Other non-Muslim drivers have engaged in the same or
22 similar conduct and have not been subject to

Page 251

1  discipline." I want to know who those other non-Muslim
2  drivers were who have run stop signs or engaged in
3  safety infractions.
4  A. The only thing I know is those guys, Monissa
5  --
6  Q. Well, okay, Monissa you said did what?
7  A. She did the left turn.
8  Q. Where? On Grant you mean?
9  A. Yes.
10 Q. Okay. And Edward, what did he do?
11 A. Edward he did it.
12 Q. He did a left turn on Grant?
13 A. Yeah, and a stop sign.
14 Q. And he ran a stop sign?
15 A. Yes.
16 Q. Where did he run the stop sign?
17 A. All the time when we are sitting there he
18 don't stop.
19 Q. You observed him do that?
20 A. What?
21 Q. You saw him run a stop sign?
22 A. Yeah.

Page 252

1  Q. Well, did you report it to Kevin Wyatt?
2  A. I tell him one time.
3  Q. When did you tell him? So you actually
4  reported one of your fellow drivers?
5  A. Yeah. I say it verbally, but I didn't write a
6  complaint about it in legal ways.
7  Q. Yes, but you told them verbally. You said
8  that verbally is a complaint. Before, you said verbally
9  was a complaint when you were talking about your Friday
10 prayer. You said it was a complaint; right?
11 A. Yeah. The way you're saying it, if you
12 complain, you need some kind of record.
13 Q. No. I'm asking you did you complain about
14 Edwards to Wyatt and you said "Yeah, I did." Is that
15 right?
16 A. Yes.
17 Q. You told Wyatt that "Edwards is running stop
18 signs"?
19 A. Yes.
20 Q. Just Edwards? Anyone else?
21 A. I don't know are there other people.
22 Q. Then, when did you tell on Edwards?

Page 253

1  A. I don't know, like, the date, the date that I
2  tell. No, I don't remember the date.
3  Q. Do you have any idea when it was? Two
4  thousand two? Two thousand three? Two thousand four?
5  Two thousand five?
6  A. Two thousand five.
7  Q. Two thousand and five?
8  A. Yes.
9  Q. Any time earlier?
10 A. A lot of people, I seen some people that
11 complain while he is driving also.
12 Q. I'm sorry?
13 A. I seen some people complained and I tell him,
14 "This guy I seen before. He didn't do the stop sign.
15 He do all those things." But they never do anything any
16 actions.
17 Q. So you were having a discussion with Wyatt and
18 you said he was running stop signs in 2005?
19 A. Yes.
20 Q. Okay. Do you know if Wyatt ever talked to
21 Edwards and disciplined him?
22 A. At the time I was there I didn't hear anything

64 (Pages 250 to 253)

Capital Reporting Company

Page 254

1  about him disciplining him.
2  Q. So you are unaware?
3  A. Yeah.
4  Q. Okay. With Norman, again -- okay, so Edwards,
5  Monissa and Norman. Anyone else?
6  A. So far that's all I know about.
7  Q. Those are the three non-Muslim drivers who
8  engaged in same or similar conduct --
9  A. Mm-hmm.
10 Q. -- who were not subject to discipline?
11 A. Yes.
12 Q. You're assuming that they are not subject to
13 discipline. You don't know that?
14 A. I know that I'm the only one.
15 Q. To your belief?
16 A. I know that.
17 Q. To your knowledge?
18 A. Yeah, to my knowledge, yes.
19 Q. Right. To your knowledge?
20 A. Yeah.
21 Q. Paragraph 13: "On September 16, 2005,
22 defendant Wyatt and the University terminated Isse's

Page 255

1  employment with the University for 'deviating from the
2  approved route,' allegedly in violation of instructions
3  issued by Wyatt. Isse was not presented with alleged
4  instructions prior to the conduct cited. Other non-
5  Muslim drivers have engaged in the same or similar
6  conduct and have not been subject to discipline."
7  Q. Again, those people who were subject to same
8  or similar conduct and were not disciplined -- I'm sorry
9  engaged in same or similar conduct and have not been
10 disciplined are who?
11 A. Ron told me that.
12 Q. I'm sorry?
13 A. Ron Crowder he told me that also. He did it
14 but they never give him any warning.
15 Q. Who was it?
16 A. Ron.
17 Q. Ron, yeah. He told you that he took that left
18 turn and he never get anything and he wasn't
19 disciplined.
20 A. Yeah.
21 Q. How did Wyatt know that he did it?
22 A. Because it is illegal. I mean, people was

Page 256

1  illegal doing all those things and so they say,
2  "Mohamed, why you different?"
3  Q. Mr. Isse, how did Wyatt know Ron was taking
4  that turn?
5  A. The question is, if the other people did it or
6  some people the same thing they did and one person is,
7  say, disciplined, then it is discriminating.
8  Q. The question is, if the supervisor knew of
9  other people who did it or not, that's my question to
10 you. That is my question to you.
11 A. He knew it.
12 Q. You said he knew. How do you know he knew it?
13 A. Like, he did it all the time and nobody give
14 him any warning or discipline.
15 Q. I'm not following you at all. How did he
16 know? How did Wyatt know that these other people were
17 taking that turn, besides what you have testified to?
18     You said you told him that Edwards, I believe,
19 took that turn. After he was disciplining you, you told
20 him, "Hey, I'm not the only one. Edwards did it as
21 well. How did Wyatt know other people were taking that
22 turn?

Page 257

1  A. Wyatt he know that, but the only thing he made
2  the excuse to excuse the University to say, "Mohamed,
3  reckless." If I'm reckless, I should have been reckless
4  a long time ago.
5  Q. You said "He knew." How did he know other
6  people were taking that turn?
7  A. How?
8  Q. How did he know other people were taking that
9  turn?
10 A. He know that because he is the manager. He
11 know that.
12 Q. You assume he knows that? Was he at the turn?
13 Was he at the turn signal? Does he stay at Albemarle,
14 Grant Street, and Pennsylvania Avenue? I'm asking you,
15 how do you know that? What personal knowledge do you
16 have that Wyatt knew that other people were taking that
17 turn?
18 A. I only know that some of the guys did this and
19 they never --
20 Q. That's a fair answer. You know that some
21 people did it and they were not written up. You don't
22 know if Wyatt knew or not with the exception of when you

65 (Pages 254 to 257)

Capital Reporting Company

Page 258

1  told Wyatt, according to your testimony, that Edwards
2  did it?
3      A. Yeah.
4      Q. Right?
5      A. Yes.
6      Q. Okay. Your Count One is that it says that you
7  were terminated because of your religion. So you're
8  saying, it's your allegation, that the reason that Wyatt
9  decided to write you up was because you're Muslim? He
10 wanted to get rid of you because you are a Muslim and
11 because wanted to attend Friday prayers; is that right?
12 I'm just looking at your complaint, Count One.
13     A. I don't see it that way.
14     Q. I'm just looking at your complaint. Count One
15 of your complaint which is on page three says, "Unlawful
16 termination in violation of Title VII."
17     A. (Perusing) Okay.
18     Q. It goes on to say that you were terminated
19 because of your religion. I'm asking you what facts you
20 have to support it? Is it correct you were terminated
21 because you are Muslim? That's your position?
22     A. Yes.

Page 259

1      Q. He decided to write you up because he did not
2  like the fact that you were a Muslim?
3      A. Yes.
4      Q. He decided to terminate you because--?
5      A. I'm a Muslim.
6      Q. You are a Muslim and also because, is this
7  correct, you wanted to pray on Fridays?
8      A. Yes.
9      Q. And he did not like that? That's your
10 position?
11     A. Yes.
12         (Prior to going on the record,
13         Isse's Exhibit Number 20 was
14         marked for identification.)
15         (The witness perused the document.)
16     Q. Okay. Isse Exhibit 21. This is your witness
17 list. I just want to ask you a couple of quick
18 questions about these people. Number four, Ron Crowder,
19 we have already talked about Ron Crowder. What facts
20 does Ron Crowder have? Well, if you call Ron Crowder,
21 what will he have to say?
22     A. What?

Page 260

1      Q. If you called Ron Crowder as a witness, what
2  would you expect him to say?
3      A. He will say, like, they discriminate against
4  me, I'm a Muslim, and I couldn't go to Ramadan break
5  time.
6      Q. When was that again, Mohamed? What date?
7  When was that? Help me with the date of that again.
8  Two thousand and four?
9      A. Two thousand or two thousand and one.
10     Q. I think you have already said it, but I'm just
11 trying to remember. Okay. All right, so Crowder he is
12 going to talk about the fact that you weren't allowed or
13 weren't accommodated to go to Ramadan breakfast in 2001
14 or '02 or sometimes thereabouts; right?
15     A. Yes.
16     Q. Anything else he would testify to?
17     A. That's all I know.
18     Q. Okay. Sean Edwards, what would he testify to?
19     A. Sean Edwards he know that I couldn't go to
20 Ramadan.
21     Q. Again, in 2001 and 2002?
22     A. Yeah.

Page 261

1      Q. What about 2003 and 2004, what about Ramadan
2  then?
3      A. Sometimes I worked in the morning time.
4      Q. I see.
5      A. Yeah.
6      Q. So 2001 and 2002, you were working the day
7  shift?
8      A. Yeah.
9      Q. Okay. The shift that starts at 3:30?
10     A. Yeah. Sometimes I worked the nighttimes and
11 sometimes the mornings.
12     Q. So Sean Edwards also would testify about
13 Ramadan 2001 and 2002?
14     A. Yeah.
15     Q. Okay. Anything else that he would testify to?
16     A. They always talk to me, they also say "bad
17 man."
18     Q. Who is "they"?
19     A. Thomas and Wyatt.
20     Q. Okay. You were saying they were joking to
21 you?
22     A. Yeah.

66 (Pages 258 to 261)