UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMED ISSE,

    Plaintiff,

     v.

    Civil Action No. 06-1422 (CKK)

AMERICAN UNIVERSITY, *et al.*,

    Defendants.

**MEMORANDUM OPINION**
(February 25, 2008)

*Pro se* Plaintiff, Mohammed Isse, brings this action against his former employer, Defendant American University ("Defendant" or the "University"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, alleging that the University unlawfully terminated his employment as a shuttle bus driver because of Plaintiff's Muslim religion and Somalian national origin. Plaintiff's Complaint also includes a retaliation claim, which Plaintiff has now abandoned, and names as an additional defendant Plaintiff's immediate supervisor at the University, Kevin Wyatt. Defendant has moved for summary judgment, seeking to dismiss this case in its entirety. Upon a searching consideration of the filings currently before the Court, the attached exhibits, the relevant case law, and the entire record herein, the Court concludes that genuine issues of material fact exist as to Plaintiff's unlawful termination claim. The Court shall therefore DENY-IN-PART Defendant's Motion for Summary Judgment, insofar as it relates to that claim. In so doing, the Court clarifies that Plaintiff's unlawful termination claim represents his sole triable claim; Plaintiff has abandoned his retaliation claim, which the Court shall dismiss, and although Plaintiff alleges that Defendant failed to reasonably accommodate his

religious observance, he cannot pursue those allegations as a separate claim.  Further, because the

Court agrees with Defendant that Plaintiff may not pursue his unlawful termination claim against

Mr. Wyatt individually, the Court shall GRANT-IN-PART Defendant's Motion for Summary

Judgment to the extent it relates to Mr. Wyatt individually.

## I: BACKGROUND

The Court begins its discussion of the facts by noting that this Court strictly adheres to

the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7(h) (formerly Rule 7.1(h)).  The

local rules for summary judgment "assist[] the district court to maintain docket control and to

decide motions for summary judgment efficiently and effectively." *Jackson v. Finnegan,*

*Henderson, Farabow, Garret & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996).  "Requiring strict

compliance with the local rule is justified both by the nature of summary judgment and by the

rule's purposes. . . . The procedure contemplated by the rule thus isolates the facts that the parties

assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts

of the record." *Id.* (quoting *Gardels v. CIA*, 637 F.2d 770, 773 (D.C. Cir. 1980)).  "[A] district

court should not be obliged to sift through hundreds of pages of depositions, affidavits, and

interrogatories in order to make [its] own analysis and determination of what may, or may not, be

a genuine issue of material fact." *Id.* (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir.

1988)).

In the instant action, the Court has already afforded Plaintiff an extra chance to comply

with Local Civil Rule 56.1, guided by the "well-established practice of construing a *pro se*

party's pleadings liberally." *See United States v. Palmer*, 296 F.3d 1135, 1143 (D.C. Cir. 2002)

(citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam)).  On August 21, 2007, the

Court found that Plaintiff's original "Statement of Material Facts in Dispute" failed to comply

with Local Civil Rules 7(h) and 56.1, as well as with this Court's October 11, 2006 and April 27,

2007 Scheduling and Procedures Orders, which specifically advise the parties that "[t]he Court

strictly adheres to the dictates of Local Civil Rules 7(h) and 56.1 and may strike pleadings not in

conformity with these rules." *See Isse v. Am. Univ.*, Civil Action No. 06-1422, Orders (D.D.C.

Oct. 10, 2006 and Apr. 27, (2006) (citing *Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002));

*Isse*, Order (D.D.C. Aug. 21, 2007). Alerting Plaintiff as to the purpose and requirements of the

Local Civil Rules, the Court struck Plaintiff's Opposition in its entirety and gave Plaintiff

another opportunity to file a compliant Statement of Material Facts in Dispute. *See Isse*, Order

(D.D.C. Aug. 21, 2007).

      Plaintiff's revised Opposition is accompanied by a paragraph-by-paragraph Reply to

Defendant's Statement of Material Facts as to Which There is No Genuine Dispute ("Plaintiff's

Reply Statement"), as well as a separate Statement of Material Facts in Dispute ("Plaintiff's

Statement"). Plaintiff's Statement and his Statement partially comply with Local Civil Rules

7(h) and 56.1; Plaintiff supports some, but not all, of his factual assertions with specific citations

to the factual record. Nevertheless, in light of the fact that Plaintiff is proceeding *pro se* and has

already been given an opportunity to revise his statement, the Court has not attempted to solicit

additional record evidence that Plaintiff has failed to provide. Rather, pursuant to Local Civil

Rule 56.1, in resolving the present summary judgment motion, the Court "assumes that facts

identified by the moving party in the statement of material facts are admitted, unless such a fact

is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 56.1;

7(h). The Court therefore treats as admitted all facts alleged by Defendant that are supported by

record evidence and not specifically contradicted by Plaintiff.  The Court has also considered the

facts adduced by Plaintiff in his Statement, to the extent that they are supported by record

evidence, and cites directly to the record, where appropriate, to provide additional information

not covered in either of the parties' statements.

      *A.*     *Plaintiff's Employment by the University*

      Plaintiff, Mohammed Isse, is a practicing Muslim and a native of Somalia.  *See* Pl.'s

Opp'n, Ex. 4 (Isse Aff. ¶¶ 1, 3).  Plaintiff worked as a full-time shuttle bus driver in Defendant

American University's Transportation Services Department from approximately 1990 until his

termination on September 16, 2005.  Def.'s Stmt. ¶ 1; Pl.'s Reply Stmt. ¶ 1.  Beginning in

January 1999, Plaintiff's direct supervisor was Kevin Wyatt, the University's Shuttle Operations

Coordinator.  Def.'s Stmt. ¶ 2; Pl.'s Reply Stmt. ¶ 2; Def.'s Ex. 3 (5/30/07 Wyatt Decl.) ¶ 2.

Since August 2004, Mr. Wyatt has reported to Anthony Newman, the University's Director of

Risk Management and Transportation Services.  Def.'s Stmt. ¶ 2; Pl.'s Reply Stmt. ¶ 2; Def.'s

Ex. 1 (5/29/07 Newman Decl.) ¶¶ 1-2.  Before reporting to Mr. Newman, Mr. Wyatt reported to

Thomas Leathers, who was employed in the Transportation Services Department from June 1995

until July 2004.  Def.'s Stmt. ¶ 2; Pl.'s Reply Stmt. ¶ 2; Def.'s Ex. 3 (5/30/07 Wyatt Decl.) ¶ 2.

      The University adheres to a progressive discipline policy, which provides "guidelines" for

supervisors to follow in taking disciplinary action.  Def.'s Ex. 9 (Disciplinary Policy - Revised

May 2005) at 51; Def.'s Stmt. ¶ 8; Pl.'s Reply Stmt. ¶ 8.  The disciplinary policy categorizes

employee offenses as Level I, Level II, and Level III offenses, with Level III offenses being the

most severe and usually warranting immediate dismissal.  Def.'s Ex. 9 (Disciplinary Policy) at

51-53; Def.'s Stmt. ¶ 8; Pl.'s Reply Stmt. ¶ 8.  Three Level II offenses generally warrant

dismissal under the policy.  *Id.*  According to Mr. Newman, since becoming Director of

Transportation Services, he has generally treated safety violations by shuttle drivers as Level II

offenses.  Def.'s Ex. 1 (5/29/07 Newman Decl.) ¶ 9.

The record only contains Plaintiff's last two performance evaluations, from 2004 and

2005, both of which were completed by Mr. Wyatt.  *See* Def.'s Exs. 40 and 41 (Isse Perf. Evals).

Although Plaintiff's 2005 evaluation notes the disciplinary warnings that Plaintiff received

during that year (which are discussed in great detail below), Defendant describes each evaluation

as satisfactory, and Plaintiff so described them in his Complaint.  Def.'s Stmt. ¶ 4; Compl. ¶ 9.[1]

B.    *Plaintiff's Complaints Regarding His Supervisors*

Over the course of his employment, Plaintiff filed numerous written complaints with

members of the University's Human Resources and Risk Management staffs.  Def.'s Stmt. ¶ 20;

Pl.'s Reply Stmt. ¶ 20.  Plaintiff specifically complained about an altercation with another

employee, *see* Def.'s Ex. 27 (9/14/98 Mem. re: Investigation of Complaint - M. Isse); inadequate

pay, his evaluations, delayed payment of a bill for a drug test, and Mr. Wyatt's refusal to help

Plaintiff clean his bus, *see* Def.'s Ex. 22 (1/30/02 Letter from M. Isse to B. Harner); perceived

favoritism towards other employees, *see* Def.'s Ex. 23 (3/27/03 Letter from M. Isse to M. Muha);

an oral warning Plaintiff received for an unplanned absence, *see* Def.'s Ex. 28 (4/5/05 Letter

from G. Karmiol to M. Isse) and Def.'s Ex. 29 (2/1/05 Letter from Plaintiff's attorney to K.

Wyatt); and a written warning Plaintiff received for leaving his bus during a shift, *see* Def.'s Ex.

28 (4/5/05 Letter from G. Karmiol to M. Isse) and Def.'s Ex. 30 (2/3/05 Letter from Plaintiff's

---

[1] In his Reply Statement, Plaintiff contests Defendant's description of his 2005 evaluation
as satisfactory, noting that he received marks that could be viewed as unsatisfactory on 3
assessments.  Pl.'s Reply Stmt. ¶ 4.

attorney to K. Wyatt).

In two of those written complaints, Plaintiff made general references to feeling discriminated against on the basis of his religion and national origin.  *See* Def.'s Ex. 22 (1/30/02 Letter from M. Isse to B. Harner) ("I feel that I am being discriminated against perhaps because I am an immigrant.  I am also sensitive to the religious factor, as I am a Muslim."); Def.'s Ex. 23 (3/27/03 Letter from M. Isse to M. Muha) (I reported in January what I felt was discrimination on the basis of national origin and religion at my workplace. . .  I feel that discrimination and psychological harassment persists.").  Plaintiff did not, however, describe any specific incidents that bear an obvious connection to his religion or national origin.  Def.'s Exs. 22 and 23.  In particular, Plaintiff's 2002 and 2003 letters did not include complaints about either an alleged refusal by Mr. Wyatt to accommodate Plaintiff's request to schedule his lunch breaks on Fridays so that he could attend Muslim prayer sessions, or about allegedly anti-Muslim/anti-Somalian comments made by Mr. Wyatt.  Def.'s Stmt. ¶ 19;[2] Def.'s Exs. 22 and 23.  Nevertheless, as

---

[2] In a September 26, 2005 written Appeal of his termination (discussed below), Plaintiff stated: "Since 1999, I have faced harassment and discrimination from Thomas Leathers . . . and Kevin Wyatt . . . . I feel this discrimination occurred on the basis of my national origin and religion.  For instance, Kevin Wyatt and Thomas Leathers used to tell me to change my name because it was too Muslim.  I also had a hard time getting permission to use my one-hour lunch break to attend Friday prayers for [sic] Muslim Student Association.  I have complained about this to Human Resource officials several times (for example: January 30, 2002 letter to Brenda K. Harner, Policy Analyst and March 27, 2003 letter to Beth Muha, Executive Director, Human Resources).  Def.'s Ex. 21 (9/26/05 Appeal of Term.).  Defendant asserts that the final sentence of this paragraph is "false" because Plaintiff's 2002 and 2003 letters do not reference either alleged anti-Muslim/anti-Somalian comments or Friday prayer sessions.  *See* Def.'s Stmt. ¶ 29.  However, it appears that Plaintiff intended the sentence in question to refer to his complaints about perceived harassment and discrimination by Mr. Leathers and Mr. Wyatt, not to specific complaints about anti-Muslim/anti-Somalian comments and Friday prayer sessions.  Pl.'s Reply Stmt. ¶ 19; *see also* Def.'s Ex. 26 (2/27/07 Isse Dep. at 218:3-220:20).  Plaintiff's written Appeal, while not entirely clear, therefore does not appear to be "false" in any way.

discussed below, it is clear that Plaintiff alleges as much at this point in time.

### 1. Friday Prayer Sessions

According to Plaintiff, "[o]n many occasions, on a regular basis during my employment at American University, defendant Kevin Wyatt refused to allow me to attend Friday Muslim prayers." Pl.'s Stmt ¶ 1; Pl.'s Ex. 4 (Isse Aff.) ¶ 1. Although Plaintiff's evidence in support of this allegation is somewhat muddled, it is clear that a factual dispute exists as to whether Mr. Wyatt, in fact, acceded to Plaintiff's request for a religious accommodation.

Plaintiff supports his assertion with the affidavit of Ron Crowder, a former part-time bus driver at the University, who states that "Mr. Wyatt discriminated against Mr. Isse because of his religion; he did not let him pray all the time," Pl.'s Ex. 1 (8/13/07 Crowder Aff.) ¶ 6, as well as the affidavit of Will Spencer, who worked in the same building as the Transportation Services Department, and states that he "observed discrimination against Mr. Isse on a regular basis. Mr. Isse's prayer times were on Friday, and he was either denied the right to pray and/or he was not given enough time to do so," Pl.'s Ex. 2 (8/14/07 Spencer Aff.) ¶ 3.[3] Plaintiff does not proffer any evidence of how frequently he was unable to attend Friday prayer sessions, and his deposition testimony on this subject is highly inconsistent. *See* Def.'s Ex. 26 (Isse Dep.) at 42:18-22 ("I missed them at least, at least 20 times" in four months); 43:1-10 ("like, 10 times" in 2004); 43:11-21 ("In 2003, I missed them a lot of times . . . Monthly, I missed like three times or two times."); 45:17-18 ("At least monthly I missed four, three times, two times, or one time.").

---

[3] Plaintiff also proffers the affidavit of Sean Edwards, another shuttle driver, who states that he "witnessed Mr. Wyatt denying Mr. Isse the ability to pray." Pl.'s Ex. 3 (8/14/07 Edwards Aff.). Mr. Edwards' affidavit does not specifically refer to Friday prayer sessions, but states that "[d]uring Ramadan, Wyatt threatened Mr. Isse when he wanted time off to pray." *Id.*

Plaintiff's testimony is also inconsistent as to when he first encountered difficulty attending Friday prayers. *Id.* at 29:5-7; 31:1-19 ("Since Thomas Leathers came into the Department, [in 1995,] I have a difficult time."); 31:10-15 (indicating difficulty attending prayers in 2002 but not 2001); 241:10-242:14 (indicating difficulty attending prayers from 2000 through 2005).

Despite these inconsistencies, the gist of Plaintiff's testimony is clearly that Mr. Wyatt repeatedly denied Plaintiff's requests to schedule his Friday lunch break around Muslim prayer sessions. This allegation is strongly contested in Mr. Wyatt's Declaration. According to Mr. Wyatt, soon after becoming Shuttle Operations Coordinator, he "became aware that Mr. Isse was a practicing Muslim and wanted to continue to attend Friday prayer sessions . . . between 1:10 and 2:10 each Friday." Def.'s Ex. 3 (5/30/07 Wyatt Decl.) ¶ 4. Mr. Wyatt further avers:

> I acknowledged Mr. Isse's request, told him I would accommodate it, and planned Friday lunch schedules so that Mr. Isse's lunch break would correspond with Friday prayer sessions. This accommodation required rearranging the regular schedule to allow Mr. Isse to take his lunch break outside of the normal lunch break period [which runs from 9:30 a.m. to 12:50 p.m. and includes staggered breaks based upon the driver's assigned route]. This accommodation was well known to the other drivers within the department since Mr. Isse was the only driver whose lunch break was at the same time and not dependent upon the assigned route.

*Id.* ¶¶ 3, 5. Mr. Wyatt continues to state, "[o]ver roughly the six year period that I supervised Mr. Isse, I am aware of only one Friday prayer session which Mr. Isse could not attend because I could not accommodate his schedule." *Id.* ¶ 6. Mr. Wyatt asserts that Plaintiff never complained to him about not being able to attend Friday prayers and that he only remembers Plaintiff being upset when he could not attend the one Friday prayer session due to a scheduling difficulty. *Id.* ¶ 7. Finally, Mr. Wyatt avers that he did not learn of Plaintiff's complaints regarding Friday prayers until Plaintiff appealed his termination in September 2005. *Id.* Other than Mr. Wyatt's

Declaration, Defendant does not proffer any evidence of how frequently Plaintiff was able to

attend Friday prayer sessions. Instead Defendant focus on Plaintiff's admission that he was able

to attend Friday prayers at times. *See* Def.'s Stmt. ¶ 3. Notwithstanding this undisputed fact,

there is a genuine dispute as to how frequently Plaintiff was able to attend Friday prayers, and

how willingly Mr. Wyatt accommodated Plaintiff's request to schedule his Friday lunch break

around prayer sessions.

### 2.    *Allegations of Anti-Muslim and Anti-Somalian Comments*

There is also a clear factual dispute as to whether Mr. Wyatt and his former supervisor,

Mr. Leathers, made various comments that Plaintiff describes as anti-Muslim or anti-Somalian.

For his part, Mr. Wyatt avers, "I am aware that Mr. Isse claims that . . . I and Mr. Thomas

Leathers made comments derogatory to Muslims. I did not say any of the things attributed to me

by Mr. Isse, nor have I made other comments derogatory to Muslims." Def.'s Ex. 3 (5/30/07

Wyatt Decl.) ¶ 17. In contrast, Plaintiff proffers his own affidavit, in which he avers that

"Defendant Kevin Wyatt said things to me like I should change my name after September 11th,

asking why we Muslims do that in reference to bombings in Iraq, . . . mentioned terrorism and

directed those comments to me and others." Pl.'s Ex. 4 (Isse Aff.) ¶ 2.[4]   According to Plaintiff,

---

[4] Both Plaintiff and Mr. Spencer describe comments allegedly made by Mr. Leathers. *See* Pl.'s Ex. 2 (8/14/07 Spencer Aff.) ¶ 4; Pl.'s Ex. 4 (Isse Aff.) ¶ 4. This evidence is not relevant because it is uncontroverted that Mr. Leathers ceased working in the Transportation Services Department in July 2004, and therefore could not have played any role in either the September 2005 decision to terminate Plaintiff or the events that led to that. Mr. Spencer's affidavit also asserts that he wrote a letter of commendation for Plaintiff, as well as a letter of recommendation for another University employee named Hilliard. Pl.'s Ex. 2 (8/14/07 Spencer Aff.) ¶ 5. According to Mr. Spencer, Mr. Newman agreed to put "Hilliard's letter in his file but not Isse's." *Id.* There is a clear factual dispute as to Mr. Spencer's version of the events: Mr. Newman maintains that he "never received a commendation letter for Curtis Hilliard," that he "was not in Mr. Hilliard's chain of command, [and had] no authority to view or access his records," and that

the "comments about my religion and where I am from (Somalia) by Defendant Wyatt became

worse after [September 11, 2001]." *Id.* ¶ 3.[5]  During his deposition, Plaintiff also testified that

Mr. Wyatt and Mr. Leathers made various comments, including "you're a nice guy, but you've

got to change your name, man.  Terrorists, they're look[ing] for Mohamed or Ahmed or

something like that," and "change your name otherwise you're going back to your country."

Def.'s Ex. 26 (Isse Dep.) at 78:9-81:15.  According to Plaintiff, Mr. Wyatt and Mr. Leathers told

him that Somalia was on a list of countries associated with terrorism, and asked Plaintiff "What's

wrong with you people?" "when something happen in, like, Iraq or anything."  *Id.* at 81:20-84:5.

While the record is far from clear as to precisely what comments Plaintiff alleges Mr. Wyatt

made and when, it is obvious that a factual dispute exists as to whether Mr. Wyatt made

comments that could be perceived as anti-Muslim or anti-Somalian.

     *C.*     *Events Leading to Plaintiff's September 2005 Termination*

     Significant factual disputes also abound with respect to the events leading up to the

termination of Plaintiff's employment with the University in September 2005.  Plaintiff's

termination was precipitated by complaints regarding Plaintiff's "reckless driving from university

---

"Mr. Wyatt saved the e-mail [that Mr. Spencer sent commending Plaintiff] and put a copy in the Transportation Services Department's files."  Def.'s Reply Ex. C (9/19/07 Suppl. Newman Decl.) ¶¶ 1-2.  The Court cannot resolve this factual dispute, but concludes that it is not material because Mr. Spencer only states that he "believe[s] Hilliard is not a Muslim."  Pl.'s Ex. 2 (Spencer Aff.) ¶ 5.  In the absence of evidence as to Mr. Hilliard's religion, the Court cannot conclude that the incident Mr. Spencer alleges is not probative of religious animus.

    [5] Mr. Crowder's affidavit also describes various comments that Mr. Wyatt allegedly made, which Plaintiff perceives as anti-Muslim or anti-Somalian.  *See* Pl.'s Opp'n, Ex. 1 (8/13/07 Crowder Aff.) ¶¶ 2-4.  It is not clear whether the statements that Mr. Crowder describes overhearing were actually made to Plaintiff, as opposed to Mr. Leathers.  *See id.* ¶ 2 (describing statement allegedly made by Mr. Wyatt to Mr. Leathers).

staff members," which led to two disciplinary warnings. *See* Def.'s Ex. 17 (9/16/05 Term. Letter). Plaintiff denies being involved in the incidents for which he received the two disciplinary warnings, and disputes key facts regarding the third incident. The Court addresses each in turn.

###### 1. April 8, 2005 Warning

At various staff meetings in late 2004 and early 2005–and in particular on March 1, 2005–Mr. Newman and Mr. Wyatt instructed all shuttle drivers that it is unsafe and against University policy to let passengers off of the bus where there is no designated shuttle stop. Def.'s Stmt. ¶ 6; Def.'s Ex. 1 (5/29/07 Newman Decl.) ¶ 4; Def.'s Ex. 3 (5/30/07 Wyatt Decl.) ¶ 8; Def.'s Ex. 6 (5/30/07 N. Porter Decl.) ¶ 2; Def.'s Ex. 7 (5/30/07 E. Weddle Decl.) ¶ 2. Plaintiff does not dispute being present when such warnings were given. *See* Pl.'s Reply Stmt. ¶ 6.

On April 4, 2005, Tanisha Jagoe, the University's Director of Business Compliance, reported to Mr. Newman that while riding on a shuttle bus driven by Plaintiff that morning she observed Plaintiff allowing two passengers to disembark while the bus was stopped at traffic lights where there were no designated shuttle stops. Def.'s Stmt. ¶ 5; Def.'s Ex. 4 (5/29/07 Jagoe Decl.) ¶¶ 2-5; Def.'s Ex. 5 (4/4/05 e-mail from T. Jagoe to A. Newman). Defendant proffers Ms. Jagoe's Declaration, in which she avers that she has been a regular rider of the University's shuttle buses since August 2004, that she was riding the 11:10 shuttle between the University's Main Campus and the Tenleytown Metro stop (the "Metro 1 bus") on April 4, 2005,[6] and that she

---

[6] During 2005, the Transportation Services Department operated three separate shuttle routes: (1) the University's Main Campus to its Tenley Campus and the Tenleytown Metro stop (the "Metro 1," "Metro 2," and "Metro 3" buses); (2) Washington College of Law to the Tenleytown Metro (the "WCL Direct 1," and "WCL Direct 2" buses); and (3) Main Campus to Washington College of Law. Def.'s Ex. 1 (Newman Decl.) ¶ 3.

"recognized the driver of the . . . shuttle bus [in question] as Mohammed Isse. I was familiar

with Mr. Isse because I had often ridden on shuttle buses operated by him." Def.'s Ex. 4 (Jagoe

Decl.) ¶¶ 2-4. Defendant also proffers Ms. Jagoe's April 4, 2005 e-mail to Mr. Newman

reporting the incident, in which Ms. Jagoe states, "I believe Mohammed was driving," and refers

to "Mohammed" letting passengers off. Def.'s Ex. 5 (4/4/05 e-mail from T. Jagoe to A.

Newman).[7]

After receiving Ms. Jagoe's e-mail, Mr. Newman spoke with Mr. Wyatt, who reported to

Mr. Newman that he checked his records and confirmed that Plaintiff was the scheduled relief

driver on the Metro 1 bus that Ms. Jagoe reported riding when she observed the unauthorized

---

[7] Plaintiff asserts that "Ms. Jagoe's Declaration is false," seizing upon what he perceives as a discrepancy between her use of the words "recognize" and "familiar with" in her May 2007 Declaration and her use of the word "believe" in her April 4, 2005 e-mail. *See* Pl.'s Reply Stmt. ¶ 5; Pl.'s Stmt. ¶ 7. Plaintiff's attempt to undermine Ms. Jagoe's credibility is irrelevant to the Court's consideration of Defendant's Motion for Summary Judgment, which turns only on whether genuine disputes of material fact exist. *See Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) (On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence."). Moreover, the Court notes that Ms. Jagoe has filed a Supplemental Declaration in support of Defendant's Reply Memorandum, in which she clarifies that "[b]y stating 'I believe Mohammed was driving,' I did not mean to suggest that I had any doubt that Mr. Isse was the driver." Def.'s Reply Ex. A (9/20/07 Jagoe Suppl. Decl.) ¶ 2. Plaintiff also levels a number of other allegations in an attempt to challenge Ms. Jagoe's credibility. *See* Pl.'s Stmt. ¶¶ 10, 13 (speculating that Ms. Jagoe had a "personal" relationship with Mr. Wyatt and Mr. Newman and that she was aware of Plaintiff's history of complaints to the Human Resources department); *see also* Def.'s Reply, Ex. A (Jagoe Suppl. Decl.) ¶ 3 (denying previous knowledge of Plaintiff's complaints to Human Resources). These efforts are unavailing on a motion for summary judgment, and are also unsupported by record evidence. In particular, although Plaintiff suggested during his deposition that Ms. Jagoe identified him as the driver of the Metro 1 bus because he is Muslim, he offers no factual support for his abject speculation. Def.'s Ex. 26 (Isse Dep.) at 122:22-124:11. In contrast, Ms. Jagoe avers that she did not know Plaintiff's religion when she reported that he was driving the Metro 1 bus on April 44, 2005. Def.'s Ex. 4 (Jagoe Decl.) ¶ 8.

stops.  Def.'s Stmt. ¶ 5; Def.'s Ex. 1 (Newman Decl.) ¶ 7; Def.'s Ex. 3 (Wyatt Decl.) ¶ 12.[8]  Mr.

Newman then "instructed Mr. Wyatt to draft a disciplinary memorandum for 'a Level II

documented oral warning' for willful violations of safety rules."  Def.'s Ex. 1 (Newman Decl.) ¶

9; Def.'s Ex. 3 (Wyatt Decl.) ¶ 13; Def.'s Stmt. ¶ 7.  After consulting with the University Human

Resources department, Mr. Newman advised Mr. Wyatt to issue the disciplinary memorandum to

Plaintiff.  Def.'s Ex. 1 (Newman Decl.) ¶ 9; Def.'s Ex. 3 (Wyatt Decl.) ¶ 13; Def.'s Stmt. ¶ 7.

The disciplinary memorandum, dated April 8, 2005, is entitled "AU Staff Policy Level II

Violation: Willful Violation of Safety Rules," describes Ms. Jagoe's account of the April 4, 2005

incident, and states that "[a]ny future violations will result in further disciplinary actions

including termination."  Def.'s Ex. 8 (4/8/05 Mem. from K. Wyatt to M. Isse).[9]

        Plaintiff maintains that he "never dropped off passengers at unauthorized stops," Pl.'s

Reply Stmt. ¶ 5, and during his deposition testified that he was driving a law school route

bus–rather than the Metro 1 bus–on April 4, 2005.  Def.'s Ex. 26 (Isse Dep.) at 121:8-122:2.  As

such, there is a clear factual dispute between Mr. Wyatt's contention that Plaintiff was the

scheduled relief driver for the Metro 1 bus, *see* Def.'s Ex. 3 (Wyatt Decl.) ¶ 12, and Plaintiff's

assertion that he was not driving the bus in question.  The Court notes that Defendant has not

---

        [8] During 2005, all day-time shuttle drivers received a one hour break during which a
scheduled relief driver operated the regular driver's bus.  Def.'s Ex. 1 (Newman Decl.) ¶ 3.

        [9] While the University disciplinary policy lists "willful violation of safety rules" as a
Level 1 offense, *see* Def.'s Ex. 9 (Disciplinary Policy) at 51, Plaintiff does not contest Mr.
Newman's assertion that he has "generally treated safety violations for shuttle drivers as a Level
II offense under the University's progressive disciplinary policy," Def.'s Ex. 1 (Newman Decl.) ¶
9.  Nor does Plaintiff assert that the disciplinary warnings he received failed to comply with the
University's discipline policy.  Rather Plaintiff offers the speculative conclusion that the April 8,
2005 disciplinary memorandum "was not for any driving violations for unauthorized stops but to
get rid of me because of my religion and national origin," Pl.'s Reply Stmt. ¶ 7.

proffered documentary evidence, such as a schedule or route sheet, in support of Mr. Wyatt's

claim that Plaintiff was the scheduled relief driver.[10]

###### 2.     July 26, 2005 Warning

On July 11, 2005, William Suter, the University's Director of Physical Plant Operations,

observed shuttle bus #160 turn into the University's main campus without using a turn signal and

run a stop sign.  Def.'s Stmt. ¶ 9; Def.'s Ex. 1 (Newman Decl.) ¶ 10; Def.'s Ex. 10 (7/19/05 e-

mail from W. Suter to A. Newman).  According to Mr. Newman, Mr. Suter reported the incident

to Mr. Newman verbally on July 11, 2005 and then put his complaint in writing in an e-mail

dated July 19, 2005.  Def.'s Ex. 1 (Newman Decl.) ¶ 10; Def.'s Ex. 10 (7/19/05 e-mail).  Mr.

Newman reported the incident to Mr. Wyatt and asked Mr. Wyatt to determine who was assigned

to drive bus #160 on the day in question.  Def.'s Ex. 1 (Newman Decl.) ¶ 10; Def.'s Ex. 3 (Wyatt

Decl.) ¶ 14; Def.'s Stmt. ¶ 9.  Mr. Wyatt avers that his "records showed that Mr. Isse was

assigned to drive bus #160," and that he "secured a Citgo gas receipt signed by Mr. Isse showing

that [Plaintiff] had purchased gas that morning" for bus #160.  Def.'s Ex. 3 (Wyatt Decl.) ¶ 14.

That gas receipt does not identify the time that the gas was purchased.  *See* Def.'s Ex. 11

(7/11/05 Citgo receipt).

Based on the information provided by Mr. Wyatt, Mr. Newman "consulted with the

University's Human Resources Department," and "[w]ith HR approval, [] instructed Mr. Wyatt

to issue a formal disciplinary warning ('Level II Written Warning') to Mr. Isse . . . for 'careless,

---

[10] During his deposition, Plaintiff testified that he asked Mr. Wyatt for a copy of the route sheet for April 4, 2005 and that Mr. Wyatt told Plaintiff that he had thrown the route sheet away. *See* Def.'s Ex. 26 (Isse Dep.) at 122:2-17.  While Mr. Wyatt does not respond to this assertion, Plaintiff's testimony constitutes only inadmissible hearsay evidence, which does not establish that Mr. Wyatt actually threw away the route sheet.

reckless, and slipshod work.'" Def.'s Ex. 1 (Newman Decl.) ¶ 10; Def.'s Ex. 3 (Wyatt Decl.) ¶

14; Def.'s Stmt. ¶ 10.  The resulting July 26, 2005 disciplinary memorandum is entitled "Level II

Written Warning: Careless, Reckless, or Slipshod Work," describes Mr. Suter's account of the

July 11, 2005 incident, and states that "[a]ny repetition of this behavior or other violations of

university policy will result in additional disciplinary action up to and including termination of

employment."  Def.'s Ex. 12 (7/26/05 Mem. from K. Wyatt to M. Isse); Def.'s Ex. 3 (Wyatt

Decl.) ¶ 14; Def.'s Stmt. ¶ 10.

Plaintiff maintains that he "was not driving the bus at the time and did not do what was

alleged by Mr. William Suter," who Plaintiff notes did not actually identify the driver of the #160

bus.  Pl.'s Reply Stmt. ¶ 9.  According to Plaintiff, on July 11, 2005, he picked up the #160 bus at

approximately 6:10 a.m., drove to the gas station and filled the bus, and returned the bus to a

shuttle stop on the University's main campus at approximately 6:40 a.m.  *See* Def.'s Ex. 14

(8/9/05 Mem. from M. Isse to A. Newman); Def.'s Ex. 26 (Isse Dep.) at 126:2-128:1.  Plaintiff

asserts that he left the bus at the shuttle stop, went to move his car, and returned to the

University, where he went inside to change into his uniform.  *Id.*  According to Plaintiff, at 7:00

a.m., he was driving the #160 bus out of the University's main campus, rather than entering the

main campus as Mr. Suter reported.  *Id.*  Plaintiff therefore asserts that someone else must have

been driving the #160 bus when Mr. Suter observed it entering the main campus, and speculates

that a mechanic might have been testing the bus before Plaintiff took it out for the day.  *Id.*

According to Plaintiff, mechanics did not always inform drivers before taking buses out in the

morning, and no one told him they were taking the #160 bus out on the morning of July 11, 2005.

Def.'s Ex. 26 (Isse Dep.) at 127:1-13.  As with the April 4, 2005 incident, a clear factual dispute

exists based on Plaintiff's assertion that he was not driving the bus when Mr. Suter observed it.

On August 4, 2005, Plaintiff met with Mr. Newman.  Def.'s Ex. 1 (Newman Decl.) ¶ 12.
According to Mr. Newman, Plaintiff "contested his prior disciplinary notices and described
numerous purported improprieties in the department but [] did not allege discrimination."  *Id.*
Mr. Newman's account of the August 4, 2005 meeting is supported by an August 8, 2005
memorandum that Mr. Newman states he wrote to document his conversation with Plaintiff.  *Id.*;
Def.'s Ex. 13 (8/8/05 Mem. from A. Newman to M. Isse).[11]  On August 9, 2005, Plaintiff
submitted a written complaint to Mr. Newman, seeking removal of the April 8, 2005 and July 26,
2005 disciplinary warnings.  Def.'s Ex. 14 (8/9/05 Mem. from M. Isse to A. Newman).  Plaintiff
asserted that he was not driving the Metro 1 route on April 4, 2005, and that he was not driving
the #160 bus at the time when Mr. Suter observed it entering the University's main campus.  *Id.*
Plaintiff further stated, "I feel like I was targeted because of racial, religious, and ethnic
discrimination," and "I feel like I am being unjustly and unfairly targeted by Kevin Wyatt in
retaliation for being honest and forthcoming about corrupt practices at the work place."  *Id.*

Plaintiff copied his complaint to the University's Executive Director of Human
Resources, Beth Muha, as well as the Executive Director of Risk Management, Pat Kelshian.  *Id.*
Mr. Newman reviewed Plaintiff's complaint with Ms. Muha and Ms. Kelshian, and "concluded
that both warnings were justified based upon eyewitness reports by two individuals outside the
department, including Ms. Jagoe who identified Mr. Isse as the driver of the first incident."

---

[11] Based on Mr. Newman's August 8, 2005 memorandum, it appears that Plaintiff raised
not only the April 8, 2005 and July 26, 2005 disciplinary memoranda, but also a variety of
allegations of improprieties by other shuttle drivers and Mr. Wyatt (relating to payment for hours
not worked, but not alleging discrimination), as well as previous discipline Plaintiff received for
an absence.  Def.'s Ex. 13 (8/8/05 Mem.).

Def.'s Ex. 1 (Newman Decl.) ¶ 13.  Mr. Newman, "also found persuasive the fact that Mr. Isse

was assigned to drive bus #160 on July 11 and there existed a gas receipt signed by Mr. Isse

which placed him with the bus that same morning." *Id.*  Mr. Newman therefore sent Plaintiff an

August 23, 2005 memorandum informing Plaintiff of his decision to uphold the two disciplinary

warnings. *Id.*; Def.'s Ex. 15 (8/23/05 Mem. from A. Newman to M. Isse).  Mr. Newman stated

that he felt "confident the reprimands are justified," and that  "the write-ups were issued neither

in retaliation nor due to racial, religious or ethnic discrimination as you allege." *Id.*

###### 3.     *September 16, 2005 Termination*

On September 15, 2005, Ms. Jagoe reported to Mr. Newman that, while riding metro

route shuttle buses driven by Plaintiff on the mornings of September 14 and 15, she observed

Plaintiff making a left turn onto Wisconsin Avenue from Grant Road, where there is no traffic

light, rather than from Albemarle Street, where there is a traffic light.  Def.'s Stmt. ¶ 11; Pl.'s

Reply Stmt. ¶ 11; Def.'s Ex. 16 (9/15/05 e-mail from T. Jagoe to K. Wyatt).  Ms. Jagoe further

reported that, in turning from Grant Road, Plaintiff blocked five lanes of traffic and honked his

horn at other drivers at least eight times.  *Id.*[12]

According to Defendant, shuttle drivers were specifically instructed in an April 11, 2005

"Route Summary" memorandum to use Albemarle Street when returning to the University's

main campus from the Tenleytown Metro stop.  Def.'s Stmt. ¶ 12; Def.'s Ex. 18 (4/11/05 Route

---

[12] Plaintiff asserts that Ms. Jagoe's September 15, 2005 e-mail demonstrates a national
origin-based bias because she states that she "wanted to remind him he was on a bus and not in
his taxi cab." Pl.'s Stmt. ¶ 8 (citing Def.'s Ex. 16 (9/15/05 e-mail from T. Jagoe to K. Wyatt)).
Plaintiff proffers no other evidence of bias on Ms. Jagoe's part, and it is entirely unclear how and
whether Ms. Jagoe's statement was intended to refer to Plaintiff's national origin.

Summ. Mem.); Def.'s Ex. 1 (Newman Decl.) ¶ 5; Def.'s Ex. 3 (Wyatt Decl.) ¶ 9.[13]  The Route

Summary memorandum that Defendant proffers specifically states "NO Shuttle operator can

change or deviate from the normal/regular shuttle routes without prior approval from Kevin

[Wyatt] and/or Tony Newman **FIRST**.  **Failure to follow this guideline will result in**

**disciplinary actions**."  Def.'s Ex. 18 (Route Summ. Mem.) (emphasis in original).  Defendant

also proffers the Declarations of two other shuttle bus drivers who recall Mr. Wyatt distributing

the Route Summary memorandum to all drivers on approximately April 11, 2005, and

specifically stating to drivers that they were to take Albemarle Street rather than Grant Road and

were not to deviate from the route without prior permission.  Def.'s Ex. 6 (Porter Decl.) ¶ 4; Ex.

7 (Weddle Decl.) ¶ 4.  Those drivers also "recall discussing the issue with several drivers

including Mr. Isse around the same time period" and state that "Mr. Isse was well aware of the

proper shuttle routes and the fact that drivers were not allowed to deviate from these routes

without approval from Mr. Newman or Mr. Wyatt."  Def.'s Ex. 6 (Porter Decl.) ¶ 5; Ex. 7

(Weddle Decl.) ¶ 5.

      On April 11, 2005, Mr. Newman also instructed Mr. Wyatt to post a notice on a bulletin

board within the Transportation Services Department.  Def.'s Stmt. ¶ 13; Pl.'s Reply Stmt. ¶ 13;

Def.'s Ex. 1 (Newman Decl.) ¶ 7; Def.'s Ex. 3 (Wyatt Decl.) ¶ 9.  The notice stated: "Attention

all shuttle operators: as of April 11, 2005 <u>DO NOT deviate</u> off of the normal routes for any

reasons except you have prior approval from Wyatt or Newman first.  Stay on Nebraska Ave. for

the Metro and WCL Direct routes."  Def.'s Ex. 19 (4/11/05 Notice) (emphasis in original).

---

[13] It appears that the focus on shuttle routes in April 2005 was due to heavy construction
in the area.  *See* Def.'s Mem. 7; Def.'s Ex. 26 (Isse Dep.) at 143:12-15.

Plaintiff admits having seen the notice in April 2005. Pl.'s Reply Stmt. ¶ 13; Def.'s Ex. 26 (Isse Dep.) at 176:2-178:18. Plaintiff also admits that on September 15, 2005 he took the left turn onto Wisconsin Avenue from Grant Road, rather than Albemarle Street (although he denies the remainder of Ms. Jagoe's description of his driving that day). Pl.'s Reply Stmt. ¶ 11. However, Plaintiff denies having been told that the approved Metro shuttle route used Albemarle Street rather than Grant Road. *Id.* ¶ 14.[14] During his deposition, Plaintiff testified variously that Mr. Wyatt told Plaintiff and other shuttle bus drivers that they could take Grant Avenue and that Mr. Wyatt was aware that shuttle bus drivers were using Grant Avenue and did not tell them not to do so. Def.'s Ex. 26 (Isse Dep.) at 150:9-157:21. According to Plaintiff, he did not deviate from the normal route without prior approval because his Grant Road route was a "normal route." Pl.'s Reply Stmt. ¶ 14; Def.'s Ex. 26 (Isse Dep.) at 138:19-21. Plaintiff specifically denies receiving the April 11, 2005 Route Summary memorandum, Pl.'s Reply Stmt. ¶ 12; Pl.'s Ex. 4 (Isse Aff.) ¶¶ 10-11, and during his deposition, speculated that the Route Summary memorandum was created after his termination, Def.'s Ex. 26 (Isse Dep.) at 184:2-193:14. Plaintiff offers no support for this assertion, other than his contention that he did not see it until after he filed his EEOC charge. *Id.*[15] Nevertheless, a factual question clearly exists as to whether

---

[14] According to Mr. Newman and Mr. Wyatt, they advised shuttle bus drivers to take Albemarle Street rather than Grant Road and told the drivers not to deviate from the regular routes without prior permission at regularly scheduled staff meetings that Plaintiff attended, including one held on July 28, 2005. Def.'s Stmt. ¶ 12; Def.'s Ex. 1 (Newman Decl.) ¶¶ 6, 11; Def.'s Ex. 3 (Wyatt Decl.) ¶ 10. Plaintiff generally denies being aware that Grant Road was not an approved route, and does not specifically respond to Defendant's claim of a July 28, 2005 meeting. Pl.'s Reply Stmt. ¶ 23.

[15] In his Affidavit, Plaintiff states that the "University does not inform its drives [sic] of new routes and would often switch routes without informing them." Pl.'s Ex. 4 (Isse Aff.) ¶ 10. Plaintiff's assertion is echoed in Mr. Crowder's Affidavit, which states that the "department

Plaintiff was aware, as of September 2005, that the only approved Metro shuttle route ran via Albemarle Street rather than Grant Road.

In any event, after receiving Ms. Jagoe's e-mail on September 15, 2005, and believing that Plaintiff's use of Grant Road constituted an unapproved route deviation, Mr. Newman asked Mr. Wyatt to meet with Plaintiff and get Plaintiff's explanation for using Grant Road. Def.'s Ex. 1 (Newman Decl.) ¶ 15; Def.'s Ex. 3 (Wyatt Decl.) ¶ 16. According to Mr. Wyatt, Plaintiff "denied taking Grant Road or otherwise deviating from approved routes," and stated that he believed other drivers were using Grant Road. Def.'s Ex. 3 (Wyatt Decl.) ¶ 13. As a result, Mr. Wyatt reports interviewing several other shuttle operators to determine whether they were using Grant Road. *Id.* According to Mr. Wyatt, all other drivers responded that they had only used Albemarle Street since being told not to use Grant Road during staff meetings. *Id.*; *see also* Def.'s Ex. 20 (9/15/05 e-mail from K. Wyatt to A. Newman).[16] Mr. Wyatt reported his findings to Mr. Newman, and the two "discussed the matter and agreed that based upon Ms. Jagoe's report and Mr. Isse's prior disciplinary record, Mr. Isse should be terminated." Def.'s Ex. 3 (Wyatt Decl.) ¶ 16, Def.'s Ex. 1 (Newman Decl.) ¶ 15.

---

would switch the routes often and a lot of the times no one would tell me what the new route was. The new route was not posted on the bus or on the board in the office. There were many occasions when I had no idea what the new route was." Pl.'s Ex. 1 (Crowder Aff.) ¶ 7. Mr. Crowder's statement that he was often unaware of route changes is not evidence that he was unaware of the department's alleged prohibition on using Grant Road after 2005.

[16] According to Plaintiff, Mr. Wyatt's claim that he interviewed other shuttle bus drivers "has to be false" because Mr. Wyatt does not name the drivers he interviewed. Pl.'s Reply Stmt. ¶ 15. However, Mr. Wyatt's Declaration specifically states that he interviewed Edwin Weddle and Monissa Segar, *see* Def.'s Ex. 3 (Wyatt Decl.) ¶ 16, Mr. Wyatt's September 15 e-mail refers to speaking to "Leslie and Mike West," *see* Def.'s Ex. 20, and in their Declarations both Norman Porter and Edwin Weddle deny taking Grant Road after being instructed not to do so in April 2005, *see* Def.'s Ex. 6 (Porter Decl.) ¶ 7; Def.'s Ex. 7 (Weddle Decl.) ¶ 7.

Mr. Newman then discussed the decision to terminate Plaintiff with Ms. Kelshian and with Grace Karmiol, Director of Policy and Regulatory Affairs in the University's Human Resources Department.  Def.'s Ex. 1 (Newman Decl.) ¶¶ 15-16.  Ms. Kelshian concurred in the decision, and Ms. Karmiol drafted the termination memorandum on Mr. Newman's behalf.  *Id.*  Ms. Karmiol also advised Mr. Newman that one of her staff members, Ms. Harner, reported being on Plaintiff's bus on the morning of September 15 and could corroborate Ms. Jagoe's complaint.  *Id.* ¶ 16; *see also* Def.'s Reply Ex. B (9/20/07 Harner Decl.).  After that conversation, Mr. Newman instructed Mr. Wyatt to terminate Plaintiff's "employment effective September 16, 2005 for careless and slipshod work, willful violation of safety rules and insubordination."  Def.'s Ex. 1 (Newman Decl.) ¶ 16.  Mr. Wyatt's September 16, 2005 termination memorandum describes Ms. Jagoe's complaint, the safety risk posed by turning from Grant Avenue, and the April 8, 2005 and July 26, 2005 warnings that Plaintiff received.  *See* Def.'s Ex. 17 (9/16/05 Mem. from K. Wyatt to M. Isse).  The memorandum further explains that Plaintiff's alleged insubordination consisted of disregarding specific instructions not to deviate from the approved route, and states that Plaintiff made a misrepresentation when he told Mr. Wyatt that he had not deviated from the approved route.  *Id.*  Significantly, Plaintiff altogether denies speaking to Mr. Wyatt on September 15, 2005, Pl.'s Ex. 4 (Isse Aff.) ¶ 13, thus creating another genuine factual dispute.

On September 26, 2005, Plaintiff filed a written appeal of his termination to the University's Staff Personnel Review Board ("Review Board').  Def.'s Ex. 21 (9/26/05 Appeal of Term.).  Plaintiff denied receiving the April 11, 2005 Route Summary memorandum, as well as any involvement in the incidents underlying in the April 8, 2005 and July 26, 2005 disciplinary

memoranda. *Id.* Plaintiff's appeal also states, "I was terminated by my supervisor Kevin Wyatt in retaliation for my disclosures and complaints about racial and religious discrimination. I also suspect that my termination was timed to occur before I could talk to Pat Kelshian." *Id.*[17] The Review Board appointed a Hearing Panel of three University administrators from other departments, who held a hearing on Plaintiff's appeal. Def.'s Stmt. ¶ 18; Def.'s Ex. 31 (10/14/05 Letter from G. Karmiol to M. Isse); Def.'s Ex. 32 (11/28/05 Mem. from M. Mikklesen to I. Broder).[18] On November 17, 2005, the Hearing Panel voted to recommend to the University's Acting Provost that she affirm Plaintiff's termination and dismiss his appeal. *Id.* In a memorandum to Acting Provost Broder regarding Plaintiff's appeal, the Chair of the Review Board stated:

> Based upon the evidence presented by Mr. Newman and Mr. Wyatt at the Hearing, the [Review Board] concluded that on April 4, 2005 at 11:15am, Mr.

---

[17] According to Plaintiff's written appeal, when he told Mr. Newman that he intended to ask Ms. Kelshian and Ms. Muha to remove the April 8 and July 26, 2005 citations from his file, Mr. Newman became upset and tried to talk Plaintiff out of speaking with them. Def.'s Ex. 21 (9/26/05 Appeal of Term.). Plaintiff asserts that he met with Mr. Newman on September 8, 2005, but that they failed to reach a resolution, and that he therefore went to Ms. Kelshian's office on September 14, 2005 to attempt to schedule a meeting. *Id.* Plaintiff states that the "close timing between my attempt to see Pat Kelshian and the receipt of my termination notice is a signal that I was being terminated in retaliation for my disclosures." *Id.* Plaintiff does not, however, include this allegation in either his complaint or his Opposition, even where he alleges that he was terminated in retaliation for requesting a religious accommodation.

[18] Plaintiff denies Defendant's assertion that the Hearing Panel conducted a "full evidentiary hearing," but does not indicate any procedural defects with the hearing or substantiate his claim that the hearing was a "farce." Def.'s Stmt. ¶ 18, Pl.'s Reply Stmt. ¶ 18. Moreover, Plaintiff's claim is belied by the fact that Plaintiff was advised in advance of the hearing of his rights to challenge the composition of the Hearing Panel and bring witnesses and/or an advisor to the hearing. *See* Def.'s Ex. 31 (10/14/05 Letter from G. Karmiol to M. Isse). Further, based on the Hearing Panel's memorandum affirming Plaintiff's termination, it appears that Plaintiff testified on his own behalf during the hearing. Def.'s Ex. 32 (11/28/05 Mem. from M. Mikkelsen to I. Broder).

Isse was driving the Metro 1 bus; on July 26, 2005 at 7:00am that Mr. Isse was driving bus #160 entering through Fletcher Gate; and on or around September 16, Mr. Isse did deviate from the approved route from Tenley Metro stop to the [University] campus. We found that [Mr. Isse's] termination was unrelated to his complaints of racial and religious discrimination.

*Id.* The University's Acting Provost affirmed the Review Board's recommendation that Plaintiff's termination be upheld. Def.'s Stmt. ¶ 21; Def.'s Ex. 33 (11/29/05 Mem. from G. Karmiol to I. Broder); Def.'s Ex. 34 (12/9/05 Letter from G. Karmiol to M. Isse).

D.      *Plaintiff's Allegations of Disparate Discipline*

In his written appeal of his termination Plaintiff asserted, "I feel like I am being unfairly targeted because other drivers have also been taking Grant Avenue and making a left turn from there," but does not identify the alleged "other drivers." Def.'s Ex. 21 (9/26/05 Appeal of Term.). During his deposition, Plaintiff identified various drivers whom he alleges used Grant Road or ran stop signs. *See* Def.'s Ex. 26 (Isse Dep.) at 242:17-254:20; 255:7-258:5. However, Plaintiff admits that he has no knowledge of other drivers' disciplinary histories. *Id.* Further, while Plaintiff testified during his deposition that he informed Mr. Wyatt of at least two drivers' alleged safety violations, his testimony in this respect is unclear at best, and he does not proffer evidence that either Mr. Wyatt or Mr. Newman was aware of many of the violations he alleges. *Id.*[19]

In contrast to Plaintiff's allegations of disparate discipline, Defendant proffers a list of other University shuttle drivers who have been terminated for safety violations, including failing to secure a bus that crashed into a parked car; driving recklessly and under suspicion of driving

---

[19] To the extent that Plaintiff's allegations are based on what he alleges other drivers told him, rather than his own observation of other drivers, Plaintiff's testimony constitutes inadmissible hearsay. *See* Def.'s Ex. 26 (Isse Dep.) at 255:7-258:5.

under the influence; and leaving a running bus unattended.  Def.'s Stmt. ¶ 17; Def.'s Ex. 1

(Newman Decl.) ¶ 17; Def.'s Ex. 39 (list of terminated shuttle drivers).  Plaintiff does not dispute

that other drivers have been terminated for safety infractions, but argues that the infractions for

which they were terminated are "grossly unproportional" to the violations for which he was

disciplined.  Pl.'s Reply Stmt. ¶ 17.  In addition, Mr. Newman avers that other University shuttle

drivers have received Level II warnings for safety infractions such as driving an overcrowded bus

and failing to give the right of way to another driver.  Def.'s Stmt. ¶ 17; Def.'s Ex. 1 (Newman

Decl.) ¶ 17.  Plaintiff does not dispute this assertion.  Pl.'s Reply Stmt. ¶ 17.

     *E.*    *Procedural History*

     Plaintiff filed an EEOC charge against the University on January 4, 2006, which

identified religion, age, and national origin–but not retaliation–as "cause[s] of discrimination."

Def.'s Stmt. ¶ 22; Pl.'s Reply Stmt. ¶ 22; Def.'s Ex. 35 (1/4/06 EEOC Charge).  The narrative

portion of Plaintiff's charge does not allege that he was terminated for either his complaints to

Human Resources or for requesting a religious accommodation.  *Id.*; Def.'s Stmt. ¶ 23; Pl.'s

Reply Stmt. ¶ 23.  On May 9, 2006, the EEOC issued Plaintiff a "Dismissal and Notice of

Rights" stating that the agency was "unable to conclude" from its investigation of Plaintiff's

charge "that the information obtained establishes a violation of the statutes."  Def.'s Ex. 36

(5/9/06 Dismissal and Notice); Def.'s Stmt. ¶ 24; Pl.'s Reply Stmt. ¶ 24.  Plaintiff filed his

Complaint in this action on August 10, 2006.

## II: LEGAL STANDARDS

     A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56©); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must

do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001), *aff'd*, 328 F.3d 647 (D.C. Cir. 2003); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases). "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." *Marshall*, 276 F. Supp. 2d at 47 (quoting *Celotex Corp.*, 477 U.S. at 327).

### III: DISCUSSION

Plaintiff's Complaint includes two claims: Count One asserts that Defendant unlawfully terminated him because of his religion, in violation of Title VII, *see* Compl. ¶¶ 15-17; Count Two asserts that Plaintiff was terminated in retaliation for requesting a reasonable accommodation of his religion, *id.* ¶¶ 18-24. However, in a Notice filed along with his Opposition, Plaintiff stated that he would "not pursue his claims for retaliation or for age and race discrimination but pursues this matter only on religious and national origin discrimination."

26

*See* Pl.'s Notice and Opp'n to Def.'s Mot. for Summ. J.[20]  Notwithstanding his asserted "effort to narrow the issues," *id.*, Plaintiff's Opposition includes various allegations not strictly confined to his claim of unlawful termination on the basis of religion or national origin.  As a result, and in light of the fact that Plaintiff is proceeding *pro se* in this action, the Court initially clarifies that Plaintiff may only pursue that limited claim in this action.  The Court then continues to consider Defendant's Motion for Summary Judgment with respect to that claim, ultimately concluding that genuine issues of material fact preclude summary judgment.

### A.  *Plaintiff's Unlawful Termination Claim Represents His Sole Triable Claim*

In addition to Defendant, American University, Plaintiff's Complaint names Mr. Wyatt as an individual party defendant to this action.  *See* Compl., Caption.  Pursuant to D.C. Circuit law, however, an individual may only be sued under Title VII in his or her official capacity.  *See Gary v. Long*, 59 F.3d 1391, 1399 (D.C. Cir. 1995).  Moreover, a claim against Mr. Wyatt in his official capacity would essentially "merge" into Plaintiff's action against the University.  *Id.*  As such, the Court shall dismiss Mr. Wyatt as a party defendant to this action.

Turning to the various allegations included in Plaintiff's EEOC charge, Complaint, and Opposition, as noted above, Plaintiff has abandoned his retaliation claim, which alleged that Plaintiff was terminated because he complained when Mr. Wyatt refused to schedule Plaintiff's lunch breaks so as to allow him to attend Friday prayer sessions.[21]  Nevertheless, in his

---

[20] Plaintiff's Complaint did not include claims for age or race discrimination, *see generally* Compl.; Plaintiff included a claim of age–but not race–discrimination in his EEOC charge, *see* Def.'s Ex. 35 (1/4/06 EEOC Charge).

[21] Despite having abandoned his retaliation claim, Plaintiff repeatedly refers to Defendant "retaliating" against him in his Opposition.  *See, e.g.*, Pl.'S opp'n at 6.  The Court therefore notes that Plaintiff cannot pursue a claim for retaliation because he failed to exhaust his administrative

Opposition, Plaintiff appears to attempt to recast those allegations into an independent claim that

Defendant failed to accommodate his religious practice.  *See* Pl.'s Opp'n at 5, 9-12.  Defendant

argues that Plaintiff cannot pursue such a claim because he did not separately plead it in his

Complaint, and further argues that any failure to accommodate claim is untimely because

Plaintiff did not file an EEOC charge of failure to accommodate within 300 days of "the alleged

unlawful employment practice."  *See* Def.'s Reply at 9-10.  Defendant's first argument fails

because Plaintiff's January 4, 2006 EEOC charge alleges that he "was unjustifiably denied a

reasonable accommodation (i.e., the opportunity to use [his] lunch break for [his] 'Friday Muslim

Prayer' session from 1:10 p.m. to 2:10 p.m.) with respect to [his] religion on numerous

occasions."  *See* Def.'s Ex. 35 (1/4/06 EEOC Charge).  The Court therefore concludes that

Plaintiff's failure to accommodate claim is not barred, even though not separately pled in his

Complaint, because it "could have reasonably been expected to grow out of [his] earlier

complaint," and is "like or related" to the claims of discrimination raised in his EEOC charge.

*See Wiley v. Glassman*, 511 F.3d 151, 160 (D.C. Cir. 2007) (quoting *Weber v. Battista*, 494 F.3d

179, 184 (D.C. Cir. 2007)).[22]

---

remedies with respect to that claim.  "Title VII requires that a person complaining of a violation
file an administrative charge with the EEOC and allow the agency time to act on the charge."
*Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (citing 42 U.S.C. § 2000e-5(f)(1).
Further, a "Title VII lawsuit following the EEOC charge is limited in scope to claims that are
'like or reasonably related to the allegations of the charge and growing out of such allegations.'"
*Id.* (quoting *Cheek v. W. and S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)).  Plaintiff's
EEOC charge is entirely devoid of references to or even hints at a claim of retaliation.

[22] Similarly, although Defendant correctly notes that Plaintiff did not plead a claim for
discrimination on the basis of national origin in his Complaint, *see* Def.'s Reply at 2 n.3, Plaintiff
did claim national origin discrimination in his EEOC charge, *see* Def.'s Ex. 35 (1/4/06 EEOC
Charge).  The Court therefore considers Plaintiff's claim of discrimination on the basis of
national origin below, pursuant to the same standards as his claim of religious discrimination.

It is less clear whether Plaintiff's failure to accommodate claim is, as Defendant argues, time barred because Plaintiff did not file an EEOC charge until January 4, 2006. Defendant appears to be correct that a rejection of a request for an accommodation is a "discrete act of discrimination" that triggers Title VII's statutory charge-filing requirement, and not a "continuing violation." *See Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 368-69 (D.C. Cir. 2007) (because failure to accommodate disability is a discrete act, plaintiff's complaint was timely only as to acts that occurred within 180 days of her EEOC charge); *see also Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 134-35 (2d Cir. 2003) ("an employer's rejection of an employee's proposed accommodation for religious practices does not give rise to a continuing violation"). Nevertheless, Plaintiff's EEOC charge suggests that his request for a religious accommodation was denied as late as August 2005. Def.'s Ex. 35 (1/4/06 EEOC Charge) (stating that Plaintiff's request to attend Friday prayer sessions was denied "[f]rom approximately 2/00 to 8/05."). As such, Plaintiff may have raised his failure to accommodate claim within 180 days, and well within 300 days, of the alleged unlawful employment practice.[23]

The Court need not determine whether Plaintiff's failure to accommodate claim is time barred, however, because Plaintiff cannot state a *prima facie* accommodation claim and therefore

---

*See* Def.'s Reply at 2 n.3 (citing *Matta v. Snow*, No. Civ. A. 02-862 (CKK), 2005 WL 3454334, at *17-18 (D.D.C. Dec. 16, 2005)).

[23] While Defendant assumes that Plaintiff was required to file an EEOC charge of discrimination within 300 days of the alleged unlawful employment practice, Def.'s Reply at 10, Title VII generally requires a complainant to file a discrimination claim with the EEOC within 180 days. 42 U.S.C. § 2000e-5(e)(1). EEOC regulations extend the deadline for filing to 300 days where the complainant first files a discrimination charge with a state or local agency with authority to grant or seek relief from the alleged discriminatory practice. *Id.*; *Mayers*, 478 F.3d at 368. However, there is no evidence in the record that Plaintiff first filed his charge of discrimination with the District of Columbia Office of Human Rights.

cannot pursue an independent claim on that basis.  To state a *prima facie* claim, Plaintiff must

show that "(1) [he] held a bona fide religious belief conflicting with an employment requirement;

(2) [he] informed [his] employers of [his] belief; and (3) [he was] disciplined for failure to

comply with the conflicting employment requirement."  *Lemmons v. Georgetown Univ. Hosp.*,

431 F. Supp. 2d 76, 95 (D.D.C. 2006) (citing cases from other circuits); *see also Taub v. FDIC*,

No. 96-5139, 1997 WL 195521, at *1 (D.C. Cir. Mar. 31, 1997).  If the plaintiff successfully

establishes a *prima facie* case, "the burden shifts to the employer to show that it was unable

reasonably to accommodate the plaintiff's religious needs without undue hardship."  *Lemmons*,

431 F. Supp. 2d at 95.

     Here, there is no dispute that Plaintiff meets the first and second prongs.  As to the third,

however, Plaintiff does not allege that he chose to attend Friday prayers in lieu of driving an

assigned route, and therefore cannot–and does not–show that he was either disciplined or

threatened with discipline as a result of the conflict between his religious belief and his

employment requirements.[24]  Instead, Plaintiff asserts that Defendant "did not accommodate my

religious observance request to pray during lunches; or they made it so hard that I was not able to

do it."  Pl.'s Opp'n at 5.  As the United States District Court for the Eastern District of Michigan

---

[24] In his Opposition, Plaintiff suggests that he need only show that he was "threatened"
with adverse treatment.  Pl.'s Opp'n at 10.  Plaintiff does not cite any precedent suggesting that
this is a correct statement of the law in this Circuit (and certainly does not cite any cases to
substantiate his assertion that he is not required to show that he was "disciplined, discharged, or
threatened with such actions").  *Id.* at 10; *contra Lemmons*, 431 F. Supp. 2d at 95; *Taub*, 1997
WL 195521.  In any event, because Plaintiff does not allege that he ever refused to drive a
scheduled route in order to attend Friday prayer services, he cannot show that he was disciplined
or threatened with discipline as a result.  Although Mr. Edwards alleges that Mr. Wyatt
"threatened Mr. Isse when he wanted time off to pray" during Ramadan, *see* Pl.'s Opp'n Ex. 3
(Edwards Aff.) ¶ 3, Plaintiff himself does not even allege as much, and Mr. Edwards' affidavit is
devoid of detail as to any alleged threat.

aptly explained in a case where the plaintiff alleged that her employer failed to accommodate her Sabbath observance, "[b]y agreeing to work on her Sabbath, whether willingly or reluctantly, Plaintiff avoided suffering any adverse *employment* consequences as a result of her religious beliefs; rather her personal religious observance suffered on account of her adherence to her work schedule.  Yet Title VII protects only the former, employment-related interests from abridgement."  *Stone v. West*, 133 F. Supp. 2d 972, 985 (E.D. Mich. 2001) (emphasis in original) (citation omitted); *see also Thompson v. Kaufman's Bakery, Inc.*, No. 03-CV-340S, 2005 WL 643433, at *2 (W.D.N.Y. Mar. 16, 2005) (same).

Plaintiff's failure to establish the third prong of his *prima facie* case is fatal to an independent claim that Defendant failed to accommodate Plaintiff's request to schedule his lunch breaks around Friday prayer sessions.[25]  Nevertheless, the Court notes that Plaintiff's allegations of failure to accommodate may be probative of a discriminatory animus with respect to his wrongful termination claim.  As such, the Court considers those allegations, as appropriate, in determining whether Plaintiff's wrongful termination claim survives Defendant's motion for summary judgment.

B.    *Plaintiff's Wrongful Termination Claim*

1.    *Proper Standards*

Pursuant to Title VII, it is unlawful for an employer "to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To prove a violation of Title VII, Plaintiff must demonstrate by a preponderance of the

---

[25] Because Plaintiff cannot establish a *prima facie* accommodation claim, the Court does not address his assertion that Defendant has not "shown that [accommodating his request] would be a hardship on their business."  Pl.'s Opp'n at 5.

evidence that the actions taken by the employer were "more likely than not based on the consideration of impermissible factors" such as race, ethnicity, or national origin. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (internal quotation marks and citation omitted). In so doing, "the plaintiff may prove his claim with direct evidence, and absent direct evidence, he may indirectly prove discrimination" under the burden-shifting analysis created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Brady v. Livingood*, 456 F. Supp. 2d 1, 6 (D.D.C. 2006). "While courts have not precisely defined what constitutes 'direct evidence,' it is clear that 'at a minimum, direct evidence does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decisionmakers unrelated to the decisional process itself.'" *Brady*, 456 F. Supp. 2d at 6 (citing *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 96 (1st Cir. 1996) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251-52 (1989) (plurality op.), *superseded in part by* The Civil Rights Act of 1991; *Price Waterhouse*, 490 U.S. at 277-78 (O'Connor, J., concurring))). Although they may be probative of discrimination, "stray remarks do not satisfy a plaintiff's burden of proving discrimination by direct evidence." *Brady*, 456 F. Supp. 2d at 6 (citing *Ayala-Gerena*, 95 F.3d at 96 (citing *Price Waterhouse*, 490 U.S. at 277-78 (O'Connor, J., concurring))).

In the instant case, *pro se* Plaintiff alleges that Mr. Wyatt made various purportedly anti-Muslim and anti-Somalian comments, but does not clarify whether he believes these alleged comments constitute direct evidence of discrimination. The Court therefore clarifies that they do not. Although, as discussed below, Mr. Wyatt was intimately involved in the decisions to discipline and terminate Plaintiff, Plaintiff proffers no evidence whatsoever that any of Mr. Wyatt's alleged comments were in any way related to those decisions. Mr. Wyatt's alleged

comments therefore appear to be "stray remarks," which might be probative of discrimination, but are not sufficient as direct evidence of discrimination. *See Price Waterhouse*, 490 U.S. at 277-78, 109 S. Ct. 1775 (O'Connor, J., concurring).

In the absence of direct evidence, it is necessary to apply the *McDonnell Douglas* tripartite burden-shifting framework to Plaintiff's discrimination claim. *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802). It is the district court's responsibility to closely adhere to this analysis and go no further, as it does not sit as a "super-personnel department that reexamines an entity's business decisions." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If he succeeds, the burden shifts to Defendant to articulate some legitimate, non-discriminatory reason for Plaintiff's termination, and to produce credible evidence supporting its claim. *Id.* Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."). As such, while "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Morgan v. Fed. Home Loan Mortgage Corp.*,

33

328 F.3d 647, 651 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 881 (2003); *see also Burdine*, 450 U.S. at 253.

If Defendant is successful, "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations and quotation marks omitted). At that point, Plaintiff has the burden of persuasion to show that Defendant's proffered reason was not the true reason for the employment decision. *Burdine*, 450 U.S. at 256. Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256; *see also Reeves*, 530 U.S. at 143. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147 (citing *St. Mary's Honor Ctr.*, 590 U.S. at 517) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc) ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").

Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148. The Court of Appeals for the District of Columbia Circuit has distilled this analysis, noting that the fact-finder can infer discrimination from the combination of:

34

(1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong record in equal opportunity employment).

*Aka*, 156 F.3d at 1289.  However, evidence in each of the three categories is not required.  *Id.*

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997).  "[T]he court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable [fact-finder] could conclude that he has suffered discrimination." *Aka*, 156 F.3d at 1290.

2.     *Application of the* McDonnell Douglas *Analysis*

a.     *Plaintiff's Prima Facie Case*

At the outset, the Court notes that Defendant has already articulated a legitimate non-discriminatory reason for Plaintiff's termination, in both Mr. Wyatt's September 16, 2005 memorandum notifying Plaintiff of his termination, *see* Def.'s Ex. 17 (9/16/05 Mem. from K.Wyatt to M. Isse), and the Hearing Panel's November 28, 2005 memorandum affirming Plaintiff's termination, *see* Def.'s Ex. 32 (11/28/05 Mem. from M. Mikkelsen to I. Broder).  As the D.C. Circuit recently reiterated in *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007), "once a defendant has proffered such a nondiscriminatory explanation, it has 'done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case.'" *Id.* (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).  Thus, whether

35

Plaintiff actually made out a *prima facie* case "'is no longer relevant,' and the only question is

'whether the defendant intentionally discriminated against the plaintiff.'" *Id.*  Nevertheless, the

Court evaluates Plaintiff's *prima facie* case because, as noted above, it "'is part of the evidence

[the Court] must consider in addressing the question' of whether [Plaintiff] has created a genuine

issue of [religious or national origin] discrimination." *Id.* (quoting *George v. Leavitt*, 407 F.3d

405, 413 (D.C. Cir. 2005)).

    Here, Plaintiff claims disparate treatment discrimination, and thus makes out a *prima*

*facie* case "'by establishing that: (1) [he] is a member of a protected class; (2) [he] suffered an

adverse employment action; and (3) the unfavorable action gives rise to an inference of

discrimination.'"  *Id.* (quoting *George*, 407 F.3d at 412); *see also Stella v. Mineta*, 284 F.3d 135,

145 (D.C. Cir. 2002).  Defendant does not challenge Plaintiff's ability to establish his *prima facie*

case, and the Court agrees that Plaintiff easily establishes each prong, with respect to both

religious and national origin discrimination.  As to the first two, it is undisputed that Plaintiff is a

Muslim and a native of Somalia, and that his employment with the University was terminated.  In

establishing the third prong, Plaintiff may either "demonstrat[e] that [he] was treated differently

from similarly situated employees who are not part of the protected class," *Czekalski*, 475 F.3d at

365, or may show that "the discharge was not attributable to the two [most] common legitimate

reasons for discharge: performance below the employer's legitimate expectations or the

elimination of the plaintiff's position altogether," *George*, 407 F.3d at 412.

    Plaintiff claims that "Defendant failed to enforce the same standards to the other

employees who were not Muslim and/or foreign born."  Pl.'s Opp'n at 5.  This assertion appears

to be based upon Plaintiff's allegations that other shuttle drivers were not disciplined for running

36

stop signs or terminated for using Grant Road rather than Albemarle Street. *See* Compl. ¶ 12;

Def.'s Ex. 21 (Appeal of Term.); Def.'s Ex. 26 (Isse Dep.) at 242:17-254:20; 255:7-258:5. To

show that another individual is similarly situated, however, Plaintiff must "demonstrate that all

of the relevant aspects of their employment situation are nearly identical." *Childs-Pierce v. Util.*

*Workers Union of Am.*, 383 F. Supp. 2d 60, 73 (D.D.C. 2005) (citing *Phillips v. Holladay Prop.*

*Servs.*, 937 F. Supp. 32, 37 (D.D.C. 1996), *aff'd Phillips v. Holladay Corp.*, No. 96-7202, 1997

WL 411695 (D.C. Cir. Jun. 19, 1997); *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d

1507, 1513-14 (D.C. Cir. 1995)), *aff'd* No. 05-7121, 2006 WL 1878891 (D.C. Cir. Jun. 27,

2006)). Thus, "the co-workers must have dealt with the same supervisor, have been subject to

the same standards and have engaged in the same conduct . . . ." *Id.* Plaintiff is unable to make

such a showing.

 First, to the extent that Plaintiff alleges that other drivers told him that they took left turns

from Grant Road but were not disciplined, *see* Def.'s Ex. 26 (Isse Dep.) at 248:4-17, 255:7-20,

those allegations constitute inadmissible hearsay. Further, although Plaintiff alleges that he

observed other drivers using Grant Road and/or running stop signs, *see id.* at 243:6-252:22, he

proffers no evidence that either Mr. Newman or Mr. Wyatt was aware of many of those alleged

infractions, *id.* at 255:7-258:5. Of course, Plaintiff cannot claim that management disparately

disciplined other drivers unless he shows that management was aware of those drivers' alleged

infractions. Finally, while Plaintiff alleges that he personally reported two other drivers' alleged

infractions to Mr. Wyatt, *id.* at 244:1-252:19, he also admits that his assumption that they were

not disciplined is based only on what he heard around the Transportation Services Department,

*see id.* at 247:9-249:11; 253:20-258:3, and that he has no knowledge of other drivers'

disciplinary histories, *id.*[26]  This final admission prevents Plaintiff from showing that he is

similarly situated to other drivers, because "Plaintiff's [own] disciplinary history with defendant

[may be] a relevant factor that distinguishes [him]."  *Childs-Pierce*, 383 F. Supp. 2d at 75.[27]

    Although the record is devoid of evidence that Plaintiff's position has been eliminated,

Plaintiff can nevertheless meet the third element of his *prima facie* case by demonstrating that he

did not perform below Defendant's legitimate expectations.  *See George*, 407 F.3d at 412.  On

this count, Plaintiff has raised a clear factual dispute because he denies that he was involved in

the incidents that gave rise to his April 8, 2005 and July 26, 2005 disciplinary warnings, and

denies being aware that taking the left turn from Grant Road rather than Albemarle Street

constituted a deviation from a normal route.  Plaintiff thus succeeds in making out a *prima facie*

---

[26] As discussed above, Defendant proffers a list of other University shuttle drivers who have been terminated for safety violations, and Mr. Newman avers that other drivers have been given Level II disciplinary warnings for safety infractions.  *See* Def.'s Stmt. ¶ 17; Def.'s Ex. 1 (Newman Decl.) ¶ 17; Def.'s Ex. 39 (list of terminated shuttle drivers).  Defendant argues that this evidence "precludes a disparate treatment claim as a matter of law."  Def.'s Mem. at 18 (citing *Freedman v. MCI Telecomm'cns Corp.*, 255 F.3d 840 (D.C. Cir. 2001)).  Plaintiff correctly points out, however, that the safety infractions for which shuttle drivers were terminated appear more significant that those with which Plaintiff was charged.  *See* Pl.'s Opp'n at 13 n.7; Def.'s Ex. 39 (listing safety violations including failing to secure a bus that crashed into a parked car; driving recklessly and under suspicion of diving under the influence; and leaving a running bus unattended).  As such, Defendant's list does not show that Plaintiff was treated the same as similarly situated drivers–i.e., those who engaged in the same conduct as Plaintiff–outside his protected classes.  Similarly, as to the Level II warnings given to other drivers, in the absence of complete information as to those drivers' violations and disciplinary histories, the Court cannot determine whether they are similarly situated to Plaintiff as a matter of law.

[27] Based on Plaintiff's Opposition, it is not clear whether Plaintiff proffers his allegations of  disparate discipline as indirect evidence of discrimination for purposes of his wrongful termination claim, or as support for an independent claim of disparate treatment discrimination. *See* Pl.'s Opp'n at 5-6.  The Court therefore clarifies that Plaintiff's inability to demonstrate that he is similarly situated to other drivers would be equally fatal to an independent claim of disparate treatment discrimination.

case of disparate treatment discrimination.  As the D.C. Circuit has instructed, the Court makes

"these points on the prima facie case not to evade the ultimate question of discrimination *vel non*,

but rather because [Plaintiff's] prima facie case is part of the evidence [the Court] must consider

in addressing that question."  *Czekalski*, 475 F.3d at 366 (quoting *George*, 407 F.3d at 413).

### b.     *Defendant's Legitimate, Non-Discriminatory Reason*

In response to Plaintiff's claim that his termination represented disparate treatment on the

basis of religion and national origin, Defendant points to the legitimate, non-discriminatory

reasons for Plaintiff's termination that are encapsulated in Mr. Wyatt's September 16, 2005

memorandum.  Those reasons include Plaintiff's April 8, 2005 and July 26, 2005 disciplinary

warnings and the safety violations underlying those warnings, Plaintiff's alleged disobeyance of

Mr. Wyatt and Mr. Newman's direct instructions not to deviate from the Albemarle Street route

without prior authorization, and Plaintiff's alleged misrepresentation in denying to Mr. Wyatt

that he had deviated from the normal route.  *See* Def.'s Ex. 17 (9/16/05 Mem. from K. Wyatt to

M. Isse).  Defendant thus succeeds in meeting its burden of production under the *McDonnell*

*Douglas* test by offering a legitimate, non-discriminatory reason for Plaintiff's termination.

### c.     *Evidence of Pretext or Discrimination* Vel Non

Given these credible, legitimate non-discriminatory factors identified by Defendant,

Plaintiff now must seize the "opportunity to discredit the employer's explanation," *Aka*, 156 F.3d

at 1288, by demonstrating that the proffered reasons are a mere pretext for discrimination, *see*

*Paquin*, 119 F.3d at 26-27.   As always, Plaintiff retains the "ultimate burden of persuading the

court that [he] has been the victim of intentional discrimination."  *Burdine*, 450 U.S. at 256.

However, "one way for a plaintiff to show that an adverse employment decision was made for a

discriminatory reason is to show that the nondiscriminatory explanation the defendant proffered for its decision was false." *Czekalski*, 475 F. 3d at 366 (citations omitted). Defendant argues that Plaintiff cannot do so because, according to Defendant, "no reasonable juror could conclude that Mr. Isse did not commit the infractions for which he was disciplined," and "the evidence shows that Mr. Isse's supervisors reasonably and in good faith <u>believed</u> that discipline was warranted." Def.'s Mem. at 13 (emphasis in original). The Court addresses each argument in turn.

With respect to Defendant's first assertion–that no reasonable juror could conclude that Plaintiff did not commit the infractions for which he was disciplined–the Court disagrees. As discussed above, Plaintiff maintains that he has never dropped passengers off unauthorized stops as Ms. Jagoe accused him of doing on April 4, 2005, *see* Pl.'s Reply Stmt. ¶ 5, and specifically testified during his deposition that he was driving a law school route bus–rather than the Metro 1 bus–on that date, *see* Def.'s Ex. 26 (Isse Dep.) at 121:8-122:2. Defendant is correct that Plaintiff has not proffered "supporting evidence" for these assertions, and that Plaintiff's April 8, 2005 disciplinary memorandum was based on a combination of Ms. Jagoe's identification of Plaintiff and Mr. Wyatt's alleged confirmation that Plaintiff was the scheduled relief driver for the Metro 1 bus. *See* Def.'s Ex. 8 (4/8/05 Mem. from K. Wyatt to M. Isse). However, Defendant likewise does not proffer "supporting evidence" for Mr. Wyatt's assertion that Plaintiff was the scheduled relief driver. *See* Def.'s Ex. 3 (Wyatt Decl.) ¶ 12. In sum, a clear factual dispute exists as to whether Plaintiff was, in fact, driving the Metro 1 bus in question, which cannot be resolved on the record before the Court or in the absence of the type of credibility assessments that are prohibited on a motion for summary judgment.

Similarly, Plaintiff maintains that he was not driving the #160 bus when Mr. Suter observed it running a stop sign and failing to use a turn signal on the morning of July 11, 2005. *See* Pl.'s Reply Stmt. ¶ 9; Def.'s Ex. 14 (8/9/05 Mem. from M. Isse to A. Newman); Def.'s Ex. 26 (Isse Dep.) at 126:2-128:1. As to that incident, the gas receipt indicating that Plaintiff purchased gas for the #160 bus at some point on July 11, 2005, *see* Def.'s Mem. at 15, does not foreclose the clear factual dispute between Mr. Wyatt's assertion that his records showed Plaintiff as the driver assigned to the #160 bus, *see* Def.'s Ex. 3 (Wyatt Decl.) ¶ 14, and Plaintiff's assertion that he was not driving the bus when Mr. Suter observed it. Finally, as to the September 15, 2005 incident, Plaintiff denies being informed that the normal Metro shuttle route used Albemarle Street and not Grant Road, and thus denies deviating from an approved route. *See* Pl.'s Reply Stmt. ¶ 14. As such, a factual question clearly exists as to whether Plaintiff was aware, as of September 2005, that the only approved Metro shuttle route ran via Albemarle Street rather than Grant Road. Another clear factual question exists as to whether Plaintiff spoke with Mr. Wyatt on September 15, 2005 and denied using Grant Road.

While the Court cannot, and does not, conclude from these factual disputes that Defendant's proffered justification for Plaintiff's termination is false, they nevertheless require the trier of fact to make the determination. The Court therefore turns to Defendant's next argument: that these factual disputes are immaterial because the evidence establishes that Plaintiff's supervisors reasonably and in good faith believed that Plaintiff had committed the infractions for which he was disciplined. Defendant is correct that courts are without authority to "'second guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Fischbach*, 86 F.3d at 1183 (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

As a result, "[o]nce the employer has articulated a non-discriminatory explanation for its action . . . the issue is not 'the correctness or desirability of the reasons offered . . . but whether the employer honestly believes in the reasons it offers.'" *Id.* (quoting *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir. 1992)).

Defendant's argument is persuasive with respect to Mr. Newman. For both the April 8, 2005 and July 26, 2005 disciplinary memoranda, Mr. Newman based his decisions to discipline Plaintiff on an initiating complaint from a University Director outside of the Transportation Services Department, as well as corroborating information from Mr. Wyatt. *See* Def.'s Ex. 1 (Newman Decl.) ¶¶ 8, 10, 13. Mr. Newman also reviewed each decision to discipline Plaintiff with the University's Human Resources department in advance doing so. *Id.* Similarly, Mr. Newman based his decision to terminate Plaintiff following the September 15, 2005 incident on a report from an outside Director, Mr. Wyatt's report that Plaintiff denied taking Grant Road, and the corroboration Mr. Newman received from Ms. Karmiol that Plaintiff had taken a left turn from Grant Road. *Id.* ¶¶ 14-16. Again, Mr. Newman reviewed his decision with the Human Resources department before actually terminating Plaintiff's employment. *Id.* ¶ 16. There is simply no evidence in the record to suggest that Mr. Newman did not reasonably and in good faith believe that Plaintiff had committed the various infractions of which he was accused, and that discipline–including termination–was warranted based on the University's progressive discipline policy. In addition, the reasonableness and good faith nature of Mr. Newman's decision to terminate Plaintiff is confirmed by the fact that it was affirmed by the Review Board after its hearing and then by the University's Acting Provost. Moreover, as Defendant notes, Plaintiff does not allege any religious or national origin-based animus on the part of Mr.

42

Newman, the Human Resources department, the Review Board, or the Acting Provost.  Def.'s

Mem. at 17.

The Court nevertheless concludes that Mr. Newman's reasonable and good faith belief

does not preclude Plaintiff from establishing that Defendant's proffered reason for terminating

Plaintiff is pretextual, because of the crucial role that Mr. Wyatt played in the decisions to

discipline, and ultimately terminate, Plaintiff.  Much of Plaintiff's case is premised on his

allegations of religious and national origin-based animus on the part of Mr. Wyatt, and the D.C.

Circuit has held "that evidence of a subordinates's bias is relevant where . . . the ultimate

decisionmaker is not insulated from the subordinate's influence."  *Griffin v. Washington*

*Convention Ctr.*, 142 F.3d 1308, 1310 (D.C. Cir. 1998); *cf. Holbrook v. Reno*, 196 F.3d 255,

160-61 (D.C. Cir. 1999) (evidence of supervisor's discriminatory remarks not evidence of

discrimination where record did not indicate that supervisor had input in disciplinary decision);

*Hall v. Giant Food*, 174 F.3d 1074, 1079-80 (D.C. Cir. 1999) (evidence of supervisor's

discriminatory remarks not probative of discrimination where the decisionmaker "made an

independent assessment" of the plaintiff's conduct).  Further, the D.C. Circuit has noted that

where a non-decisionmaker is alleged to harbor discriminatory animus and to have "participated

in and influenced [the decisionmaker's] decision, [the non-decisionmaker's] good-faith belief in

the proffered reasons also becomes relevant." *George*, 407 F.3d at 416.

Based on the record, the Court cannot conclude that Mr. Newman was "insulated" from

Mr. Wyatt's influence.  To the contrary, Mr. Newman's Declaration reveals that Mr. Wyatt

provided key corroboration for each incident; Mr. Wyatt reported to Mr. Newman that Plaintiff

was the scheduled driver for the buses in question on April 4, 2005 and July 11, 2005, and also

reported that Plaintiff denied using Grant Road on September 15, 2005. *See* Def.'s Ex. 1 (Newman Decl.) ¶¶ 8, 10, 15; Ex. 3 (Wyatt Decl.) ¶ 16. Mr. Newman's Declaration makes clear that he relied upon Mr. Wyatt's corroboration in each instance, and that Mr. Wyatt was also involved in each decision to discipline Plaintiff. *Id.* In particular, Mr. Newman avers that "[b]ased on Ms. Jagoe's report and Mr. Isse's prior disciplinary record, Kevin Wyatt and I agreed that Mr. Isse's employment should be terminated." *Id.* ¶ 15.

Mr. Wyatt's intimate involvement in Mr. Newman's decisions to discipline and terminate Plaintiff is, of course, material in light of Plaintiff's allegations that Mr. Wyatt refused to accommodate Plaintiff's request to schedule his lunch breaks around Friday prayer sessions, and Plaintiff's allegations of anti-Muslim and anti-Somalian comments by Mr. Wyatt. The Court therefore turns to Defendant's arguments that these allegations are not sufficient to demonstrate pretext.[28] First, Defendant asserts that "Mr. Wyatt denies these alleged events occurred" and that "no reasonable factfinder could conclude otherwise" because Plaintiff did not include the allegations in his various written complaints to the Human Resources department over the years. Def.'s Mem. at 22. While it is true that Plaintiff's written complaints do not specifically reference Friday prayer sessions or Mr. Wyatt's alleged anti-Muslim and anti-Somalian comments, as noted above, at least two of Plaintiff's complaints generally referenced feeling

---

[28] Ordinarily, "[o]ne way in which a plaintiff can attempt to demonstrate that an employer's proffered non-discriminatory justification is a pretext for discrimination is to present evidence that a similarly situated individual [outside of the protected class] was treated more favorably." *Childs-Pierce*, 383 F. Supp. 2d at 73. Here, however, Plaintiff cannot establish pretext by reference to similarly situated individuals because, as discussed above, he admits that he has no knowledge of any other shuttle driver's disciplinary history, does not actually know whether certain drivers were disciplined for their alleged infractions, and does not proffer evidence that management was aware of other drivers' alleged safety infractions but failed to discipline them.

44

discriminated against on the basis of his religion, national origin, and race.  *See* Def.'s Ex. 22

(1/30/02 Letter from M. Isse to B. Harner) and Ex. 23 (3/27/03 Letter from M. Isse to M. Muha).

Plaintiff also testified during his deposition that he verbally reported his complaints regarding

Mr. Wyatt's comments and Friday prayer sessions to members of the University's Human

Resources department.  *See* Def.'s Ex. 26 (Isse Dep.) at 75:18-78:4; 111:18-112:112:12; 197:15-

201:15.  Moreover, it is clear that Plaintiff now alleges that Mr. Wyatt denied his request for a

religious accommodation and made various anti-Muslim and anti-Somalian comments.

Plaintiff's failure to explicitly include those allegations in his written complaints to Human

Resources does not preclude him from raising them now.

Defendant next argues, citing a case from the Eastern District of New York, that Mr.

Wyatt's alleged refusal to allow Plaintiff to attend Friday prayer sessions is not evidence of

religious animus because Plaintiff admits that he was allowed to attend at least some prayer

sessions.  Def.'s Mem. at 23 (citing *Ahmad v. Nassau Health Care Corp.*, 234 F. Supp. 2d 185,

193 (E.D.N.Y. 2003), *aff'd* 71 Fed. Appx. 98 (2d Cir. 2003)).  Of course, *Ahmad* is not binding

on this Court.  In any event, the Court finds that it is distinguishable from the instant case in that

it appears to involve only one request for three days off to observe a Muslim holiday, which was

partially denied due to "legitimate scheduling concerns."  *Id.*  Here, Plaintiff alleges that he

encountered difficulty attending Friday prayer sessions on a recurring basis from early 2000

through August 2005.  *See* Def.'s Ex. 26 (Isse Dep.) at 241:10-242:14; Def.'s Ex. 35 (1/6/04

EEOC Charge).  Further, the record before the Court in this case contains numerous factual

disputes as to how frequently Plaintiff was allowed to attend Friday prayer sessions, how

willingly Mr. Wyatt permitted him to do so, and how much difficulty was involved in scheduling

Plaintiff's Friday lunch breaks around prayer sessions. The Court therefore cannot conclude that no genuine issue of material fact exists as to whether Mr. Wyatt's alleged failure to accommodate Plaintiff's religious observance was excused by "legitimate scheduling concerns."

Finally, Defendant argues that Plaintiff's allegations of discriminatory animus are too far removed temporally and too sporadic to prove pretext. Def.'s Mem. at 23-26. The Court is well aware that in the context of retaliation claims, the "cases that accept mere temporal proximity between an employer's knowledge of a protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). However, the cases that Defendant cites do not establish a similar requirement where a plaintiff seeks to demonstrate pretext through evidence of an alleged discriminatory animus. Rather, those cases reiterate the principle discussed above that stray remarks by a decisionmaker do not constitute direct evidence of discrimination. *See* Def.'s Mem. at 24. Moreover, in the instant case, it is not even clear that a large time lapse exists because Plaintiff was terminated in September 2005 and alleges that Mr. Wyatt denied Plaintiff's request for a religious accommodation repeatedly between early 2000 and August 2005. Def.'s Ex. 26 (Isse Dep.) at 241:10-242:14; Def.'s Ex. 35 (1/6/04 EEOC Charge). Plaintiff similarly alleges that over a course of years, beginning after September 11, 2001, Mr. Wyatt made various comments that Plaintiff perceived as anti-Muslim and anti-Somalian. *See* Def.'s Ex. 26 (Isse Dep.) at 79:8-85:6. As such, the Court cannot conclude that Mr. Wyatt's alleged anti-Muslim and anti-Somalian comments and alleged refusal of Plaintiff's request for a religious accommodation are, as a

46

matter of law, not probative of discriminatory animus on his part.[29]

In sum, genuine issues of material fact abound with respect to Plaintiff's allegations of anti-Muslim and anti-Somalian comments by Mr. Wyatt, as well as Plaintiff's claim that Mr. Wyatt refused Plaintiff's request for a religious accommodation. Further, in light of Mr. Wyatt's undisputed intimate involvement in the decisions to discipline and terminate Plaintiff and Mr. Newman's specific reliance in each instance upon corroborating evidence reported by Mr. Wyatt, the Court cannot conclude that Mr. Newman's decisions were insulated from Mr. Wyatt's influence. S*ee Cones*, 199 F.3d at 519 (rejecting argument that non-decisionmaker's alleged discriminatory intent was irrelevant where the record was "replete with evidence of the [non-decisionmaker's] involvement in the hiring decision."); *George*, 407 F.3d at 416. The Court also cannot overlook the genuine issues of material fact as to whether Plaintiff committed the safety violations for which he was disciplined on April 8, 2005 and July 26, 2005, and whether Plaintiff was aware that turning left on Grant Road constituted a deviation from an approved route. Rather, the Court must conclude that genuine issues of material fact exist as to whether Defendant's proffered reasons for disciplining and terminating Plaintiff were pretext for religious and national origin-based animus. As such, the Court must deny Defendant's motion for summary judgment with respect to Plaintiff's wrongful termination claim.

---

[29] Defendant also argues that, in light of the evidence that Mr. Wyatt gave Plaintiff satisfactory employment evaluations in 2004 and 2005, no reasonable juror could conclude that Mr. Wyatt "set [Plaintiff] up" in September 2005 because of his religion. *See* Def.'s Mem. at 25 (referring to the "same actor inference"). As the D.C. Circuit has pointed out, however, the same actor inference is just that, an inference, which "cannot immunize [defendant] from liability for subsequent discrimination, [and is not] alone sufficient to keep [a] case from the jury." *Czekalski*, 475 F.3d at 368-69. While Mr. Wyatt's satisfactory evaluations of Plaintiff are therefore a piece of evidence to be considered on the ultimate question of discrimination *vel non*, the Court does not find them dispositive of that question.

**IV: CONCLUSION**

For the reasons set forth above, the Court shall GRANT-IN-PART and DENY-IN-PART Defendant's Motion for Summary Judgment in its entirety.  Specifically, the Court shall dismiss Plaintiff's retaliation claim, which he has abandoned, and shall dismiss Mr. Wyatt as an individual party defendant in this action.  The Court concludes, however, that genuine issues of material fact preclude summary judgment on Plaintiff's wrongful termination claim.  An appropriate Order accompanies this Memorandum Opinion.

Date:   February 25, 2008

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

48